**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. JKB-13-3778 |
| $122,640 in U.S. Currency, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MOTION TO DISMISS

Claimant Samantha Banks, by and through counsel, C. Justin Brown, pursuant to the duty of candor and Maryland Rules of Professional Conduct 3.3 and 3.4, hereby moves this Honorable Court to dismiss this case with prejudice. This motion is based upon the Government's production, during discovery, of a document that it knew to be fabricated. The document, a back-dated certification of a narcotics K-9 team, was generated by members of the Maryland Transportation Authority Police after the original document was lost. Two federal prosecutors became aware of how the document was produced, yet they passed it on to opposing counsel in a manner that obscured the truth. The certificate is material evidence to this case, and therefore dismissal is warranted.

### I. FACTUAL BACKGROUND

On September 12, 2013, Jerry Lee Banks was flying out of Baltimore-Washington International airport on his way to Atlanta. He checked his bag and boarded the plane. Prior to take-off, however, he was pulled off the plane and informed that there was an issue with his luggage. (Declaration of Kevin Davis, Attachment 1 to Complaint, CM/ECF No. 1, hereinafter "Davis Declaration," at ¶¶ a–d).

A screener employed by the Transportation Security Administration ("TSA") had noticed something unusual about the bag and pulled it off the line for inspection. He opened the bag and found a large amount of U.S. currency, later determined to be $122,640. Some of it was packaged in heat-sealed plastic, some was bundled in stacks. The TSA officer then turned the matter over to the Maryland Transportation Authority Police ("MTAP"). An officer from MTAP took the currency to the BWI police station for further investigation. (Davis Declaration at ¶¶ a–c, i). The currency was eventually seized by the Drug Enforcement Agency ("DEA").

The authorities interviewed Jerry Lee Banks. He stated that the money belonged to his business partner (and wife) Samantha Banks (hereinafter "Banks"), and that it was in his possession in relation to a potential real estate transaction. He denied any connection to illegal drug activity, left the airport, and returned to his wife in Indiana. Samantha Banks later claimed the currency as her property. (Davis Declaration at ¶¶ b, d–e, h; Verified Claim, CM/ECF No. 4; Answer to Complaint, CM/ECF No. 5).

After Jerry Lee Banks left the BWI police station, an MTAP K-9 team was called to the police station to conduct a scan of the currency. The team consisted of a handler, Corporal Joseph Lambert, and a dog, Falco.[1] The K-9 team performed a scan of the currency, and, according to Lambert, the dog alerted. (Davis Declaration at ¶ f).

The Government proceeded with forfeiture of the currency, alleging that the currency was "involved in an [*sic*] a transaction or attempted transaction involving the proceeds of a specified unlawful activity, to wit: drug trafficking, in which the person

---

[1] In DEA task force officer Kevin Davis' declaration regarding this event, the dog was initially described as "Keegan." This appears to have been a mistake and all parties now agree that the dog was "Falco."

conducting or attempting to conduct the transaction knew that the property was derived from some form of unlawful activity, and knew that the transaction was intended to promote said specified unlawful activity." The forfeiture proceeding was turned over to the United States Attorney's Office, which filed a Complaint pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A). (CM/ECF No. 1).

Notably, there were no drugs found in Jerry Lee Banks' luggage and no accompanying criminal charges were filed. Neither Jerry Lee Banks nor Samantha Banks has a prior drug conviction.[2] (Davis Declaration at ¶¶ j–k). The Government's allegation that the currency was somehow connected to narcotics activity seems to consist of three general pieces of evidence: (1) the K-9 alert to the currency; (2) the manner in which the currency was packaged in the suitcase, which the Government alleges is consistent with how drug traffickers package currency; and (3) the mere fact that Jerry Lee Banks possessed and traveled with a large amount of currency.

Samantha Banks filed a timely Verified Claim of the currency, in which she stated that she owned the funds; she had obtained the funds legally through her various property management activities; and the funds were not in any way related to illegal narcotics activity. (CM/ECF No. 4).

The seizure of Banks' life savings has caused her extreme hardship. Her automobile, which she used for work, was repossessed. She was forced to shut down much of her real estate business. She was forced to move because she could no longer afford her rent. Finally, she was unable to pay college tuition for her son, who graduated from high school with honors in May 2013. *See* Ex. 1.

---

[2] Agent Davis, however, noted in his Declaration, which was attached to the Complaint, that Jerry Lee Jones was arrested in 2006 for attempted possession of cannabis.

## II. DISCOVERY AND THE K-9 ALERT

The case proceeded to discovery. The Government filed its First Set of Special Interrogatories pursuant to Supplemental Rule G(6)(a), and Banks answered. Banks then propounded Interrogatories and a Request for Production of Documents.

### A.      Requests for K-9 documents

Of particular relevance here are Banks' multiple requests for information related to the K-9 scan of the defendant currency and the handler who conducted the scan, Cpl. Lambert.

The Government responded to Claimant's discovery requests in numerous installments. Most importantly, on April 15, 2014, in the initial disclosure, AUSA Stefan Cassella signed a cover letter that accompanied 34 pages of documents. The letter included the following sentence: "Please note the Narcotic Certification (bates number 0033) is a reproduction of the original certificate." Ex. 2, 4/15/14 Letter. The narcotics certificate, dated August 16, 2013, was a critical piece of evidence: it was the certificate that would have been operative for the dog and the handler at the time of the narcotics scan of the defendant currency. *See* Ex. 3, Certificate. The certificate was produced as a color copy; it was the only document undersigned counsel is aware of that was produced in this form. Missing from the disclosure, however, was any supporting documentation showing the basis for the certificate.

Undersigned counsel sent a follow-up letter to Cassella on May 8, 2014, seeking a more complete disclosure, particularly related to the K-9 documents. The letter stated, "[a]s you will see below, we are <u>most</u> concerned that you have not turned over any of the

training records pertaining to Cpl. Lambert and his K-9, Falco, other than a one-page

certificate." Ex. 4, 5/8/14 Letter.

The letter went on to request the following: "any information you are aware of

related to a lack of competency, integrity or reliability on the part of Cpl. Lambert, as

well as a full explanation of what, if any, actions have been taken by his superiors to

address this." *Id*.

After the May 8 letter from undersigned counsel, the Government responded on

May 21, 2014, with a supplemental disclosure. The cover letter, signed by Cassella,

stated "Please be advised that at this point, we have provided you with all pertinent

documents in our possession." Ex. 5, 5/21/14 Letter.

However, Claimant was still not satisfied that the Government had turned over all

its documents, and counsel sent a second follow-up letter, dated May 30, 2014, noting in

detail which requests had gone unfulfilled. Ex. 6, 5/30/14 Letter.

On June 12, 2014, Claimant filed a third letter, this time raising two new

concerns: (1) it had come to undersigned counsel's attention that the Government had

subpoenaed and obtained various records related to Banks' finances, but those records

had not been turned over to Claimant in discovery (despite an explicit request to do so);

(2) the Government had listed additional witnesses, including Ted Cox and John

McCarty, both of whom were MTAP K-9 trainers during the relevant periods, but had not

provided contact information for either of them.[3] Ex. 7, 6/12/14 Letter.

The Government made additional disclosures in a June 16, 2014 letter. Ex. 8,

6/16/14 Letter. Most relevantly, the Government provided more information about the

---

[3] Both of these issues were eventually addressed by the Government and resolved.

August 16, 2013, narcotics certificate described above. *See id.* The letter stated that "After a reasonable search of the files in the possession of MTAP's training personnel, the certification score sheets and photographs for the August 16, 2013 Certification cannot be located." *Id.* Nothing in the letter addressed the certificate itself. The letter also went on to state that "this office is unaware of any information relating to any lack of competency, integrity or reliability on the part of Cpl. Lambert." *Id.*

**B.     Deposition of Michael McNerney**

After the above-described discovery exchanges, undersigned counsel made arrangements for a July 9, 2014, deposition of the Government's disclosed expert witness, Sr. Officer Michael McNerney, who was the head trainer of the MTAP K-9 team at the time when the dog scan took place.

The day before the deposition, and just after the Government had conducted a prep session with McNerney, AUSA Shea called undersigned counsel and stated that, for reasons he could not disclose, McNerney would no longer be the Government's expert witness. Undersigned counsel said he still wanted to depose McNerney as a fact witness. AUSA Shea responded that he would not allow the deposition on the grounds that McNerney was a non-testifying expert witness. *See* Fed. R. Civ. Proc. 26(b)(4)(D). Counsel persisted and requested that the deposition go forward. Later that day, Shea called back and stated that, after consulting Cassella, the Government would agree to the deposition.

The following exchange occurred at the deposition of McNerney:

> MR. BROWN:  Okay.  Let me turn your attention to
> another document which I'm going to ask to have marked
> as Claimant's Exhibit No. 3.

(Narcotic Certificate Dated August 16, 2013 was marked as
Claimant's Exhibit No. 3.)

BY MR. BROWN:

Q.  Do you recognize that document?

A.  Yes.

Q.  What is it?

A.  It's a certification document for the narcotics
certification for Corporal Lambert.

Q.  Do you know how this document was generated?

A.  Yes, I do.

Q.  Can you tell me how it was generated?

A.  Through phone conversations with Officer McCarty
and Joe Lambert.

Q.  Okay.  Is this an actual authentic certification?

A.  No.

Q.  Is this a fraudulent certification?

A.  I believe so.  I'm not sure whatever happened after the -

MR. SHEA:  Could we be clear what we mean by
fraudulent?

BY MR. BROWN:

Q.  What do you mean you think it was fraudulent? You
tell me.

A.  The date in question, August 16th, I don't know if that's
the actual date that they did the certification based off
conversation with Officer McCarty.

Q.  Okay.  Can you tell me in detail how this document
came to be produced?

A.  For this case Officer -- I mean, Corporal Lambert came
to me and asked me if I knew where the certification was
for his dog around that -- well, not even that date, for his
dog from -- in August.  And I said I don't know.  You have
to ask Officer McCarty. So he said he tried calling him.  He
didn't answer.  So I went into our trainer's office, and I
looked around.  I couldn't find anything.  So I called
Officer McCarty, and he said he thought he had turned it in
to the sergeant, but he couldn't tell me what day it was or
what they trained on. So then Corporal Lambert contacted
Senior Officer McCarty, and they -- that's the date they said
they came up with for the training.  I guess based off of
records.  I don't know.

Q.  Okay.  So --

A.  Like I said, I can't say if the certification happened
because I wasn't there, but based off the conversation I
don't know.

Q.  Do you know who made this document?

A.   Corporal Lambert.  Or actually Officer McCarty made it and then e-mailed it to Corporal Lambert.

Q.   And do you know how -- did he -- do you know whether McCarty used a computer to make this?

A.   I believe he did.

Q.   And was he at home at the time when he made it?

A.   Yes.

Q.   So are you telling me he made this document from his home computer?

A.   Yes.

Q.   And that he made this document in preparation for this litigation?

A.   Yes.

Q.   And that Corporal Lambert was also involved in that?

A.   Yes.

Q.   And you believe this to be a falsified document?

MR. CASSELLA:  Objection.  To what -- again, what's falsified mean?  Are we asking whether or not this is a recreation of an original document that was lost?  Are we asking whether the document was never certified? I mean, it's a loaded question.  You have to be more clear on that.

BY MR. BROWN:

Q.   Do you think that this is an authentic document, yes or no?

MR. SHEA:  Same objection.  What do we mean?

BY MR. BROWN:

Q.   You can still answer the question.  They have a right to object, but you can answer this.  Do you think this is an authentic document?

A.   The document itself?

Q.   Yes.

A.   No.

Q.   Okay.

A.   But I can't testify to the training, if it actually happened or not.

Q.   I'm asking you specifically about this document.  So you do not believe this to be an authentic document?

A.   No.

Q.   And do you know anything about who signed this document?

A.   No.

Q.   Whose signature does that appear to be on this document?

A.   Officer McCarty.

Q.   Okay.  Did you -- were you concerned about the production of this document?

A.   Yes.

Q.   And did you inform anyone about this document?

A.   Yes.

Q.   Did you inform the US Attorney's Office of this document?

A.   Yes.

Q.   And you told them that you believe this to be an inauthentic document?

A.   Yes.

Q.   Who specifically did you tell that to?

A.   I sat in the office with --

Q.   You told Evan Shea that this was --

A.   That I felt it was a fraudulent document.

Q.   And what was his response to you about that?

A.   That it was a duplicate document.  The training -- that the training had occurred.

Q.   Well, did you understand a duplicate of what?

A.   Right.  I -- according to Officer McCarty he said he made one.  So I don't know if it's a duplicate of the one he made.  But like I said, when I asked they couldn't tell me the specific date or where they trained at.

Q.   Okay.  Did you tell anyone else in addition to Mr. Shea about this?

A.   Yes.  When the document was made I told the sergeant.

Q.   What's the name of the sergeant who you told?

A.   Sergeant Hoyer.

Q.   Okay.  And what did Sergeant Hoyer say about it?

A.   He didn't say anything to me about it.  He went to Corporal Lambert, and I guess they went up the chain of command.

Q.   Okay.  Who else knew about this document?

A.   The lieutenant, Lieutenant Frank.  The captain, Captain Alton, A-L-T-O-N, and our Attorney General.

Q.   And what --

A.   Sharon Benzel.

Q.   Sharon?

A.   Benzel, B-E-N-Z-E-L.

Q.   Okay.  And did any of them address this document with you?

A.   It was all the same.  It's a duplicate document.

Q.   They thought it was a duplicate document?

A.   (Nods head up and down.)

Q.   Okay.  Why did you know that it was not a duplicate document?

MR. CASSELLA:  Objection.  He didn't say he knew it wasn't a duplicate document.

BY MR. BROWN:
Q.  Did you agree that it was a duplicate document?
A.  No.
Q.  Why did you not agree that it was a duplicate document?
A.  Because there was no documentation with it to prove that it was a valid document.
Q.  And were you concerned about the fact that it was generated in preparation -- well, let me ask you this. Is it fair to say this document was generated in preparation for litigation, for this lawsuit?
A.  This document, yes.
Q.  Yes, this document?
A.  Yes.
Q.  That it was made after the fact, and it was not -- well, that it was made -- do you know when it was made approximately?
A.  I can't remember the date, no.
MR. SHEA:  Can we take a break real quick, just for -- to clarify something with counsel?
MR. BROWN:  Okay.
MR. SHEA:  Just off the record.
 (Discussion held off the record.)

Ex. 9, Excerpt of Lambert's Deposition Transcript, at 26–33.

While speaking off the record, but in the presence of the court reporter, counsel questioned the two prosecutors about how they could use such a document in litigation. Shea initially claimed that he had verbally told undersigned counsel about the true nature of the document. When undersigned counsel told him this was not correct, he then changed his position and stated that the nature of the document had been disclosed in a letter from Cassella. Cassella agreed with this.

Shea and Cassella then pointed to the April 15, 2014, letter that referred to the certificate as a "reproduction of the original certificate" and took the position that, by calling the document a "reproduction," they had adequately disclosed the truth about the document. Ex. 2. Further, they took the position that Cpl. Lambert, Officer McCarty and

others at the MTAP had done nothing wrong in this episode – despite Officer

McNerney's assertion that his colleagues had committed fraud. Shea and Cassella further

stated that they had made no follow up inquiry and had not contacted either Lambert or

McCarty about the document.

### C.    McCarty's Account

After the deposition of McNerney, undersigned counsel contacted Officer John

McCarty. McCarty provided an account entirely consistent with McNerney's account,

and he signed an affidavit summarizing the same. *See* Ex. 10, McCarty Affidavit.

McCarty's explanation included some new information. He explained that because

Lambert was his superior officer, he felt that he was compelled by a direct order to

produce the certificate. *See id.* He also stated that he knew the certificate to be of "no

value" because there was no underlying documentation, and he had no way of knowing

whether August 16, 2013, was the correct date of the certification. *Id.* When he faxed the

document to Lambert, he did not know that the document he produced would be passed

off in litigation as a "reproduction." *Id.* Finally, he stated he was on strong pain

medication at the time this occurred and he was not thinking clearly. *See id.*

### D.    The Aftermath

In the week following the McNerney deposition, the U.S. Attorney's Office

proceeded as if nothing remarkable had happened. Cassella filed a Motion to Extend

Discovery based on unrelated personal matters, and it was granted. (CM/ECF Nos. 11,

12). Cassella's paralegal, Jennifer Stubbs, emailed undersigned counsel requesting dates

to depose Samantha Banks, Jerry Lee Banks, and Claimant's K-9 expert, Ted Cox.

## III. LEGAL ARGUMENT

This episode amounts to a violation of the Government's duty of candor and merits dismissal of the case. It is not disputed that the K-9 Falco and the handler Lambert were actually certified at the time in question. But to focus on that fact misses the point. What matters is the lengths to which members of MTAP and the U.S. Attorney's Office went to mislead the Claimant and gain an advantage in litigation. What matters is the institutional harm caused when officers of the court commit this type of conduct.

It is inescapable that the April 15, 2014, letter was designed to prevent the Claimant from learning the truth about how the document was created. In addition, it appears that the letter was at least partially intended to provide cover in the off chance that somebody discovered the truth.

### A.      Violation of the Duty of Candor.

Courts of all jurisdictions rely on the duty of candor.[4] Without it our system cannot function. While the duty of candor is imposed generally, it is also embodied in the Maryland Rules of Professional Conduct. Rule 3.3 requires candor toward the tribunal, and Rule 3.4 requires fairness to opposing party and counsel.

A district court, based on its inherent power, may dismiss a complaint for breach of the duty of candor. *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457 (4th Cir. 1993) (recognizing that a court has the power to dismiss a case, but first must weigh several factors). The Supreme Court has held that the use of a fraudulent document at

---

[4] This issue is framed as a violation of the duty of candor, but it also could be considered spoliation of evidence, which applies a similar analysis. Spoliation is "the destruction *or material alteration* of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (internal citations omitted).

trial is grounds to set aside the judgment. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251 (1944), *overruled on other grounds by Standard Oil Co. of California v. United States*, 429 U.S. 17 (2004). Further, this Court has previously dismissed a criminal indictment based on prosecutorial misconduct that included, *inter alia*, the act of falsifying documents. *See United States v. Omni Int'l Corp.*, 634 F. Supp. 1414 (1986).

The case that best illustrates the gravity attached to the duty of candor is *United States v. Shaffer Equip. Co.*, 11 F.3d 450, in which the Fourth Circuit affirmed the district court's findings that a Government employee acted fraudulently, and the Government attorneys violated the duty of candor by concealing the fraud from the court and opposing counsel. There, an EPA employee central to the Government's lawsuit falsified his academic credentials to get his job. During the course of the case, the Government's attorneys became aware of this, and the Inspector General initiated a criminal investigation. The Government concealed this knowledge from defense counsel. *See id.* at 453–56. The defendants eventually became aware of the fraud, and the court concluded that the Government's attorneys violated their general duty of candor, as well as West Virginia Rule of Professional Conduct 3.3 and Federal Rule of Civil Procedure 26(e)(2) (requiring counsel to supplement discovery requests).[5] *See id.* at 456.

---

[5] Specifically, the district court found, and the Fourth Circuit affirmed, that the EPA's associate-level counsel committed the following violations: (1) he knew that the EPA employee's, Caron's, credentials were falsified and instructed Caron not to answer questions about his academic credentials during a deposition, (2) he failed to withdraw his objections to interrogatories that he previously submitted, (3) he failed to modify the positions taken during the deposition, and (4) he failed to notify opposing counsel that "Caron's credibility in the case was relevant" after he concluded, through his own independent research, that Caron falsified the credentials. *See id.* at 456. Further, the court characterized the lead attorney's actions as "egregious . . . more severe

In reaching its holding, the Fourth Circuit explained the duty of candor as a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation." *Id.* at 458 (emphasis omitted) (quoting *Tiverton Board of License Commissioners v. Pastore*, 469 U.S. 238, 240 (1985)). The duty of candor protects against "clever devices to divert the search, mislead opposing counsel or the courts, or cover up that which is necessary for justice in the end." *Shaffer*, 11 F. 3d at 457–58.

In discussing the duty of candor, the Fourth Circuit relied on *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251 (1944), in which the Supreme Court set aside a judgment because counsel introduced a fraudulent document at trial, and explained the following:

> *It is a wrong against the institutions* set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that *preservation of the integrity of the judicial process* must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Shaffer*, 11 F. 3d at 458–59 (emphasis in original) (quoting *Hazel-Atlas*, 322 U.S. at 246).

In this case, the Government and State violated the general duty of candor, as well as Maryland Rules of Professional Conduct 3.3 and 3.4. Officer McCarty, by his own admission, created the fake certification on his home computer and faxed it to Cpl. Lambert. *See* Ex. 10. Somehow, the certification was transformed from a black-and-white

---

violations[,]" which consisted of (1) improperly continuing the litigation, (2) failing to disclose to the court the existence of the ongoing investigations, (3) preventing the associate from disclosing the facts in a letter to opposing counsel when the associate suggested to do so, and (4) concealing his knowledge that Caron had testified falsely in other cases and in affidavits sent to the EPA. *Id.*

fax into a color document with a gold seal.[6] It was back-dated with a date that may or may not have been correct. *See* Ex. 9 at 27; *see also* Ex. 10. Lambert's superior officers were informed of this. *See* Ex. 9 at 30–32. The fake narcotics certificate was then handed over to the United States Attorney's Office, and, at some unknown time, two federal prosecutors became aware of the process by which the document had been generated. *See* Ex. 2; *see also* Ex. 9 at 30–31. The Government's own expert witness, Sr. Officer McNerney, told AUSA Shea that the document was "fraudulent." Ex. 9 at 30. Cassella also knew how the document had been generated. *See* Ex. 2. Yet, when asked about Lambert's character, Cassella had written "this office is unaware of any information relating to any lack of competency, integrity or reliability on the part of Cpl. Lambert." Ex. 8.

It appears neither prosecutor took any action other than to minimize the significance of what had happened. Not only did they apparently not investigate further, but when McNerney told Shea the document was "fraudulent," Shea responded that it was a "duplicate document." Ex. 9 at 30. *Cf. Omni*, 634 F. Supp. at 1426 (noting that if "defense counsel in a criminal case received a subpoena and made 'minor' modifications to the documents sought, allegedly to clarify errors in style and grammar, the Court is certain that the process by which such changes were made would be cause of major concern to the Government, and would probably lead to the threat of criminal prosecution.").

---

[6] According to McCarty, he faxed the document to Lambert. The version counsel received was a color copy. One can easily surmise that color was added to the document at some stage to make it seem more authentic.

When turning the document over to the Claimant, moreover, instead of telling the true story, Cassella wrote that it was a "reproduction." Ex. 2. It is inescapable that this choice of words was intended not to reveal the truth, but to conceal the truth.

Finally, when confronted at the McNerney deposition with the fraudulent nature of the document, the Government attorneys repeatedly attempted to impede the questioning. For example, when counsel asked the witness whether he believed the document was falsified, Cassella objected in a suggestive manner. *See* Local Rules, Appendix A, Guideline 6(b) ("Objections should be stated as simply, concisely and non-argumentatively as possible to avoid coaching or making suggestions to the deponent…")

> Q.   And you believe this to be a falsified document?
> MR. CASSELLA:  Objection.  To what -- again, what's falsified mean?  Are we asking whether or not this is a recreation of an original document that was lost?  Are we asking whether the document was never certified? I mean, it's a loaded question.  You have to be more clear on that.

Ex. 9 at 28–29.

Not only was the document fraudulent, but it was material. It was the single operative document showing that Cpl. Lambert and Falco were certified as a narcotics K-9 team at the time of the currency seizure. The materiality of the document, moreover, speaks for itself: if it were not material, people would not have gone to such lengths to hide the truth. The officers at MTAP, and ostensibly the federal prosecutors, knew how bad it would look at trial if Lambert could not produce his certification.

It is irrelevant that Falco and Lambert were probably actually certified around the time in question. The Supreme Court has rejected this very type of argument. In *Hazel-Atlas*, a party's attorney co-authored an article with a non-party collaborator that was introduced into evidence, claiming the collaborator was the sole author. After that party

won the case, it was audited, and proof of the fraudulent claim regarding authorship surfaced. *See* 322 U.S. at 240–49. In deciding to set aside the judgment, the Court explained that a party cannot "escape the consequences" of the deception on the ground that the contents of the falsified document were true: "Truth needs no disguise. The article, even if true, should have stood or fallen on the only title it could honestly have been given—that of a brief in behalf of Hartford, prepared by Hartford's agents, attorneys, and collaborators." *Id.* at 249; *see also Omni*, 634 F. Supp. at 1440 ("[T]here is no justification for creating documents during this time period [litigation], without indicating so, no matter what the motive.").

Here, it almost goes without saying that, if Falco and Lambert really were certified at the time of the K-9 alert, then the Government should have simply stated this and explained that the certificate could not be found.

**B.     Remedy: This Court Should Dismiss the Complaint With Prejudice and Award Attorney's Fees, Or, In the Alternative, Impose Other Sanctions.**

This Court has the inherent power to impose sanctions for a "*full range of litigation abuses.*" *Shaffer*, 11 F. 3d at 457 (emphasis in original) (quoting *Chambers v. NASCO Inc.*, 501 U.S. 32, 46 (1991)); *see also id.* ("This power is organic, without the need of a statute or rule for its definition"); *Silvestri*, 271 F. 3d at 590 (explaining that a court has the power to impose sanctions for spoliation due to its "inherent power to control the judicial process and litigation."). The Court has wide discretion to choose what sanction is proper for the specific violation. The Court has an inherent power to dismiss an action where a party "deceives a court or abuses the process at a level that is

utterly inconsistent with the orderly administration of justice or undermines the integrity

of the process." *Shaffer*, 11 F. 3d at 462.

If the Court does not dismiss this case, it may impose other sanctions. *Id.* ("Under

the inherent power, a court may issue orders, punish for contempt, vacate judgments

obtained by fraud, conduct investigations as necessary to exercise the power, bar persons

from the courtroom, assess attorney's fees, and dismiss actions.").

When determining whether dismissal is the proper sanction to impose, the district

court must consider the following six factors:

(1)      the degree of the wrongdoer's culpability;
(2)      the extent of the client's blameworthiness if the conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients;
(3)      the prejudice to the judicial process and the administration of justice;
(4)      the prejudice to the victim;
(5)      the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and
(6)      the public interest.

*Id.* at 462–63.

In *Shaffer*, the Fourth Circuit held that dismissal was improper largely based on

equitable grounds. The defendant, a corporation, had created a hazardous waste site in

West Virginia that posed a health risk to people in the area. The EPA asked the

corporation and land owner to pay for the clean-up, but both refused. As a result, the EPA

spent over $5 million to extract the hazardous chemicals – and they were forced to bring

suit to try and recover their expenditures. *See id.* at 453. If the lawsuit was dismissed, the

EPA (funded by taxpayers) would be out $5 million, the offending corporation would

have a huge windfall, and the goal of deterrence would be undermined.

Here—in stark contrast to *Shaffer*—the factors weigh heavily in favor of dismissing this case with prejudice. The action here is the seizure of money from an individual who has no criminal record or any other connection to drug trafficking. The authorities did not press criminal charges with the seizure – because no criminal act was committed. At best, the Government's case amounts to suspicion.

The Claimant, meanwhile, has been subject to great hardship. Since the seizure, her car has been repossessed, she has been forced to move, and she has not been able to pay for college for her son. The return of her money does not represent a windfall; it represents the fair outcome of this case.

## IV. CONCLUSION

For the reasons described above, Claimant respectfully asks this Court to dismiss this proceeding with prejudice, or to impose any other sanction the Court deems appropriate, on the grounds that the Government violated its duty of candor. Claimant seeks attorney's fees, costs and any other appropriate remedy.

## V. REQUEST FOR A HEARING

Claimant seeks a hearing on this Motion.

Respectfully submitted,

_____/s/_____

C. Justin Brown
THE LAW OFFICE OF C. JUSTIN BROWN
231 E. Baltimore St., Suite 1102
Baltimore, MD 21202
Tel: 410-244-5444

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of July, 2014, a copy of the foregoing

Motion was sent to each of the parties via CM/ECF.


_____/s/_____
C. Justin Brown