# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| Plaintiff, | * |
| v. | *   Civil No. JKB-13-3778 |
| $122,640 in U.S. Currency, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \*

## CLAIMANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO CLAIMANT'S MOTION TO QUASH SUBPOENA

Claimant Samantha Banks, by and through counsel, C. Justin Brown, pursuant to Federal Rule of Civil Procedure 45, hereby submits her Reply to the Government's Opposition to her Motion to Quash the subpoena issued to Ted Cox.

The Government stakes out two positions to support its argument that it may depose Cox, the canine expert noted by Claimant. First, the Government asserts that it needs to interview fact witnesses, such as Cox, because it wants to "search for the truth" of the allegations of Government misconduct raised in Claimant's Motion to Dismiss. Government's Opposition ("Opp.") at 15. Second, the Government argues that it will introduce canine testimony as substantive evidence at trial, even though it does not have an expert witness, and therefore Cox has relevance as an opposing expert witness. Both positions are meritless.

## ARGUMENT

I. **IT WOULD BE IMPROPER, AND A CONFLICT OF INTEREST, FOR THE GOVERNMENT TO USE ITS INVESTIGATIVE POWERS TO HELP DEFEND AGAINST CLAIMANT'S MOTION TO DISMISS.**

The Government claims that it may depose or interview Ted Cox because he is a fact witness to the allegations raised in the Motion to Dismiss, and it wants to "search for the truth" of how the false document was created. There are three problems with this proposition. First, the Government should not be able to investigate its own misconduct at the expense of the Claimant. Second, the Government should not be allowed to interview Cox while it is blocking undersigned counsel from interviewing the Government's witnesses. And third, the investigation proposed by the Government is improper because it would place the Government—or at least, the US Attorney's Office for this District—in the untenable position of simultaneously defending the interests of its own attorneys, while trying to question witnesses about potentially criminal conduct.

    a.    **Background.**

The Claimant in this case has set forth serious and legitimate concerns that are supported by well-documented evidence. First, Claimant alleges that Maryland Transportation Authority Police ("MTAP") officers created a fake narcotics certificate to make it appear that the canine team involved in the currency forfeiture was certified. At this time it is unknown whether the team was actually certified, although the Government has taken the position that it was.[1]

Second, Claimant alleges that two assistant United States attorneys were fully aware of how the certificate was created, yet they presented it to undersigned counsel in a misleading

---

[1] The Government claims the team was actually certified, but the certification documents were lost. Claimant believes that this is not necessarily the case. Among other reasons, MTAP records provided by the Government indicate that the K-9 team had not trained an adequate number of hours to have been certified on August 16, 2013, as the Government claims.

2

manner to gain an advantage in litigation. In public statements to the press, MTAP seems to have acknowledged, at least internally, that it did something wrong, whereas the U.S. Attorney's Office maintains that "there was no intent to deceive anyone." Van Smith, *Frisky Business*, BALTIMORE CITY PAPER (July 30, 2014) (Online version attached as Ex.1) (quoting USAO spokesperson Marcia Murphy); *see also* Ian Duncan, *MdTA police launch probe of K-9 unit*, THE BALTIMORE SUN (April 10, 2014) (Ex. 2).

These concerns come before the Court by way of Claimant's Motion to Dismiss, which alleges that the misconduct – by both MTAP and the U.S. Attorney's Office – should be remedied by dismissal of the case. An unusual twist is that the issues raised in the Motion to Dismiss cannot possibly arise at trial because, at this point in the proceedings, it would be impossible for the Government in good faith to introduce canine evidence at trial. First, the Government knows that any canine evidence is hopelessly unreliable. Second, the Government cannot introduce the evidence without an expert witness. *See infra*. Thus, the allegations raised in the Motion to Dismiss are ancillary to the case-in-chief.

Despite this backdrop, the Government insists that it can use the discovery process, and its investigatory resources, to defend itself in the Motion to Dismiss. Furthermore, the Government claims that Ted Cox is a "material witness" for purposes of litigating the Motion to Dismiss. *See* Opp. at 6. Thus, the Government wants to depose Cox.

    **b.**    **An investigation into the Government's breach of duty of candor should not come at the expense of Claimant.**

The Government has proposed deposing Ted Cox in South Dakota, where he lives. This deposition would take place at a USAO location that is approximately a five-hour drive from Cox's home. The deposition would likely require significant preparation time and the presence of undersigned counsel. It would be very expensive for Claimant.

3

Undersigned counsel agrees with the Government that Cox has some relevant factual information that may be useful to the Court in considering the Motion to Dismiss. Cox has spoken with individuals involved in the creation of the fake certificate. He has also spoken directly to Jennifer Stubbs, a paralegal in the U.S. Attorney's Office, and he has told her explicitly about the fraudulent creation of the narcotics certificate. This information is certainly relevant to the Motion to Dismiss, and the Government should have access to it.

However, the information that Cox possesses is relevant only to the Motion to Dismiss; it is not relevant to the substantive case. *See infra*. The question then becomes whether the Government may use the Court's discovery process, including issuing subpoenas bearing the caption of this case, to obtain evidence solely for the purpose defending itself against the allegations in the Motion to Dismiss. While undersigned counsel is not generally opposed to this, it becomes problematic when this process is expensive and must be partially paid for by the Claimant. For this reason, if the Government wants to conduct discovery solely to defend the Motion to Dismiss, it should have to pay for all expenses, and attorney's fees, for any deposition of Ted Cox.

    **c.**    **The Government cannot have its cake and eat it too.**

The Government, in its Opposition to the Motion to Quash, insists that Ted Cox is a "material witness." It accuses the Claimant, moreover, of trying to "conceal" something about Cox by moving to quash the subpoena. Opp. at 15.

On August 27, 2014, however, Claimant asked the Government if undersigned counsel could depose the Government's witnesses in relation to the Motion to Dismiss: AUSA Stefan Cassella, AUSA Evan Shea, and paralegal Jennifer Stubbs. The Government refused. This is

fundamentally unfair and undermines the Government's position that it should be able to access all witnesses who are material to the Motion to Dismiss.

If Cox is a "material witness," as the Government claims, it is impossible to escape the conclusion that multiple employees of the U.S. Attorney's Office are also witnesses for purposes of the Motion to Dismiss. Members of that office certainly have first-hand information about the most important questions raised in the Motion to Dismiss: when the U.S. Attorney's Office knew about the fake certificate, who knew about it, how much they knew, and whether describing the certificate as a "reproduction" was intended as a good-faith effort to fully explain the situation to opposing counsel.

Cassella, for example, signed the April 15, 2014, letter that referred to the certificate as a "reproduction." He went on to say, after the July 9, 2014, deposition of Sr. Officer Michael McNerney, that he knew all the facts about the creation of the document, there was nothing wrong with how it was created, and he had adequately disclosed everything to undersigned counsel. Stubbs became aware of the fraudulent nature of the document no later than May 7, 2014, when she was warned about it by Cox, and it is reasonable to infer that she passed this information on to her superiors. AUSA Evan Shea, meanwhile, was told about the certificate by McNerney, and possibly others, some time prior to McNerney's deposition on July 9, 2014. This information possessed by three Government witnesses is undoubtedly more material to the Motion to Dismiss than any information possessed by Ted Cox.

If the Government takes the position that Claimant cannot depose the Government's witnesses under oath, it is hypocritical for the Government to insist on taking Cox's deposition.

### d. The Government's conflict of interest.

There are legitimate questions at this stage of the proceeding as to whether the U.S. Attorney's Office for this District is even capable of conducting an unbiased fact-finding inquiry related to the narcotics certificate. This is because the U.S. Attorney's Office has two potentially divergent interests. On one hand, the Office has an interest in investigating conduct that is potentially criminal – *i.e.* the creation of a falsified government document that was used in litigation to deceive the Claimant. On the other hand, the Office has an interest in defending its attorneys, and is likely to do so by opposing the Motion to Dismiss. This amounts to a basic and irresoluble conflict of interest: the Office cannot represent the interests of the United States of America, and its individual prosecutors, at the same time.

On an even more immediate level, it would be improper for one witness, such as AUSA Cassella, to directly question another witness. This applies not only to Cox, but it applies to any other witness the Government might attempt to interview or depose in relation to the Motion to Dismiss – and perhaps even the case-in-chief. For example, if Cassella were to use the power of his office to interview MTAP officials, a flagrant conflict of interest would arise – particularly if those MTAP officials had Fifth Amendment rights, were not represented by individual counsel, and were compelled to attend the interview by internal MTAP regulations.[2]

One can only imagine the potential conflicts this would cause. What if the MTAP officer gave a statement that revealed criminal conduct – but that statement was harmful to the AUSA's interest in defending against the Motion to Dismiss? Should the AUSA disregard the statement or initiate a criminal inquiry? What if the AUSA interviewed a witness who had criminal exposure, but whose statement was helpful to defend against the Motion to Dismiss? Might the

---

[2] Adding more complexity to the matter, any such interviews would arguably raise issues under *Garrity v. New Jersey*, 385 U.S. 493 (1967).

AUSA be tempted to get that witness to talk by assuring him he would not be charged with criminal conduct? The potential for conflict is limitless. Even the appearance of such a conflict should give the U.S. Attorney's Office pause. In the interest of justice, these scenarios should be avoided.

In sum, it is questionable whether the U.S. Attorney's Office should be investigating the fraudulent documents in the first place. At the very least, attorneys who are witnesses should not be involved in any part of the investigation. Ideally, any such investigation would be conducted by an independent fact finder, or someone who was entirely removed from the interests of the prosecutors involved in the disclosure of the fake certificate. And that fact finder should have access to all relevant witnesses.

**II.    There Is No Valid Reason For The Government To Depose Ted Cox Regarding His Expert Opinion Or The Canine Evidence Generally.**

The Government takes the position that it may introduce substantive canine narcotics evidence at trial without the use of an expert witness and without meeting the *Daubert* standard. This runs contrary to common sense, and to basic principles of our legal system.

**a.    *Daubert* applies in this case, and it requires expert testimony regarding the canine evidence.**

*Daubert v. Dow Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, including *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), reflect foundational and well-established principles regarding expert evidence.

Those principles apply here because, as explained in detail below, substantive testimony about a canine alert necessarily involves expert testimony—it requires scientific, technical, or other specialized knowledge. Here, the Government affirmatively chose not to designate an expert. Without an expert, there is no other way it can introduce the canine evidence at trial.

Because the evidence cannot be introduced at trial, it is *de facto* excluded, and the Government has no valid reason to depose Claimant's expert regarding this inadmissible evidence.

The Federal Rules of Evidence provide that a non-expert witness may testify as to an opinion only if it is "not based on scientific technical or other specialized knowledge." Fed. R. Evid. 701. The only witnesses who may offer such an opinion must do so pursuant to Federal Rule of Evidence 702, which requires that the person be "qualified" as an expert witness. *See* Fed. R. Evid. 702 (stating that "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" and then listing factors).

The Supreme Court interpreted Rule 702 in *Daubert* and *Kumho Tire*. In *Daubert*, the Court held that the trial judge has an important gatekeeping function: for scientific expert testimony to be admissible, the court must first find that the testimony is both reliable and relevant. *See Daubert*, 209 U.S. at 597 (stating that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

In *Kumho Tire*, the Court held that the judge's gatekeeping function under *Daubert* also extends to non-scientific expert testimony. *See Kumho*, 526 U.S. at 141 ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Court reasoned that "[e]xperts of all kinds tie observations to conclusions through the use of general truths derived from specialized experience." *Id.* at 148 (internal citations and quotations omitted). It explained that expert testimony includes "specialized observations, the specialized translation of those observations

8

into theory, a specialized theory itself, or the application of such a theory in a particular case."
*Id.* at 149. A key aspect that differentiates expert testimony from lay testimony is whether the testimony rests "upon an experience confessedly foreign in kind to [the jury's] own." *Id.*

In this case, any relevant testimony about the canine evidence must be sponsored by expert testimony within the meaning of Rule 702, *Daubert*, and *Kumho*. While the canine handler, Lambert, could testify as to the facts as a non-expert witness, he could not testify as to his interpretation of the facts without first qualifying as an expert witness. This is because his explanation of the facts would be a "specialized observation[,]" *id.* at 149, and would rely on his "specialized experience" as a canine handler. *Id.* at 148.

For example, in the Narcotic Detection K-9 Report, Lambert provided, in pertinent part, the following:

> During the scan, K9 Falco stopped his forward motion at a small black bag, he became excited (tail wagging, aggressive pull, heavy breathing). He then gave a final response by sitting. This bag did contain the recovered currency.
> Narcotic detection dog "Falco" is trained to alert to the odor of controlled substances . . . Upon location of one of these five substances, the dogs [*sic*] behavior will change. K9 Falco is trained to come to a final response of sitting at the source of the odor. This is called a "passive" final response. This response may also indicate items recently contaminated with or associated with . . . the controlled substances.
> K9 Falco and I have received over 120 hours in narcotics odor recognition and we participate in weekly maintenance training.[3] We also take part in a [*sic*] in-house certification conducted by the K9 Training Staff.

Ex. 3.

The above-referenced excerpt contains facts, specialized observations, and opinions. If Lambert is not qualified as an expert under Rule 702, he may testify as to the facts, but not regarding his specialized observations or opinions. And, if the key part of that excerpt were

---

[3] According to Lambert's training records provided by the Government, Lambert and Falco had only trained about 20 hours prior to the Banks currency seizure**.**

reduced to only the facts, it would, in sum, convey that the following occurred: K9 Falco was walking forward. He stopped by a small black bag. He wagged his tail and breathed heavily. He sat. The bag that he sat near contained the defendant currency.

As this example shows, without Lambert's expert testimony, the factual evidence regarding the canine is entirely irrelevant. The Government needs expert testimony to explain, for example, that when Falco sits, this likely means that he is alerting to the odor of illegal narcotics or traceable narcotic residue. *See Kumho*, 526 U.S. at 148 ("Experts . . . tie observations to conclusions through the use of general truths derived from specialized experience."); *see also United States v. Graham*, 2011 WL 1457131 at *7 (W.D.N.Y. Apr. 8, 2011) (unpublished), *report and recommendation adopted*, 2011 WL 1885343 (W.D.N.Y. May 18, 2011), *aff'd* 504 F. App'x 63 (2d Cir. 2012) (the Government's expert opining that "a dog is unable to convey his or her detection without a handler's interpretation."). Otherwise, the only thing conveyed is the fact that a dog sat near a bag with money in it. Jurors, judges, or anyone who does not have "scientific[,] technical[,] or other specialized" knowledge would not infer that this factual scenario has any meaning. And the only way to give the trier of fact the benefit of an expert's specialized knowledge, opinions, and conclusions is to first designate him as an expert witness and pass muster under the court's gatekeeping function, pursuant to *Daubert*, to allow him to be qualified as an expert. *See* Fed. R. Evid. 701, 702. Accordingly, here, because the Government did not designate an expert relating to the canine evidence, the Government cannot introduce this type of evidence at trial. *See* Fed. R. Evid. 401 ("Irrelevant evidence is not admissible."), 701, 702.

> **b.      None of the cases that the Government cites refutes *Daubert*'s application here.**

The Government misunderstands Claimant's argument regarding *Daubert*'s application to this case. Instead of citing to case law that refutes the fact that *Daubert* applies here, and that, accordingly, it needs an expert, the Government presents a smoke-and-mirrors argument that distracts from the relevant inquiry.

In its Opposition, the Government cites four cases and claims that they "expressly rejected" *Daubert*'s application. Opp. at 12. The Government's reliance on each of those cases is squarely misplaced, as they are readily materially distinguishable from the instant case.

In three of those cases, the Government wanted to introduce the canine sniff as a basis for the law enforcement officer's probable cause to search the area to which the canine indicated, where illegal items were found. *See United States v. Outlaw*, 134 F. Supp. 2d 807 (W.D. Tex. 2005) (finding that *Daubert* did not apply where the canine alerted to a suitcase, the alert gave agents probable cause to search the suitcase, and agents found drugs in the suitcase); *United States v. Berrelleza*, 90 F. App'x 361, 365 (10th Cir. 2004) (finding that *Daubert* did not apply where the canine alerted to a vehicle, the alert gave the officer probable cause to search the vehicle, and agents found drugs in the vehicle); *United States v. Fisher*, 2002 WL 563581 at *1, n.2 (E.D. Pa. April 15, 2002) (finding that *Daubert* did not apply where the canine alerted to a vacant room, the alert gave the agents probable cause to search the room, and agents found drugs in the room).

In those probable cause cases, the Government was not using the canine alert to prove that the chemicals in the suitcase were illegal narcotics or other contraband. It did not need to use the alert to prove this because the agents actually found the drugs. Rather, the Government used the alert to establish that there was probable cause to search the suitcase to find the drugs.

11

Therefore, *Daubert* did not apply because the existence of probable cause is a legal issue, not a fact issue. *See Outlaw*, 134 F. Supp. 2d at 810.

In stark contrast to those cases, here, the Government wants to introduce the dog sniff as substantive evidence to prove that the currency, in fact, contained detectable amounts of illegal narcotics. The court in *Outlaw* recognized the distinction between substantive evidence and probable cause evidence when it explained that "the purpose of a *Daubert* hearing is to determine whether expert testimony meets the threshold of reliability so that the trier of fact may rely on such testimony to determine a fact issue." *Id.* It provided one example of a fact issue: whether or not a chemical caused cancer. Similarly, here, there are multiple fact issues[4] that require expert testimony.

In the fourth case relied upon by the Government, *United States v. $369,980 in U.S. Currency*, 214 F. App'x 432, 435 (5th Cir. 2007), the claimant argued that the district court erred in denying a *Daubert* hearing. The Fifth Circuit noted that there, unlike here, the claimant filed a motion to exclude evidence, did not request a hearing, and did not mention any *Daubert* concerns in his motion. *See id.* The court summarily analyzed the issue in one paragraph, stating that "while district courts have a general gate-keeping duty under *Daubert*, the obligation does not require the court to hold a separate hearing." *Id.* Thus, the court did not disavow *Daubert*'s applicability to the claimant's reliability challenge; it simply determined that a hearing was not required. In support of this ruling, the court cited to *Outlaw*, which, as noted above, concerned the use of the canine sniff to show probable cause to search.

---

[4] For example, in its Opposition, the Government recognized that the issue of the reliability of canine evidence constitutes a fact issue. *See* Opp. at 9 ("[T]he only remaining issues are issues of fact: was the particular dog trained and has the dog proven to be reliable.").

The Government also correctly states that "if there is a debate as to how a dog *should be trained*, or *what constitutes evidence of that training*, the court may[5] consider expert testimony on those points." Opp. at 9 (citing *United States v. $1,032,980 in U.S. Currency*, 855 F. Supp. 2d 697–705 (N.D. Ohio 2012)). However, it then goes on to opine that, "in a case like this one, where the general reliability of a dog alert is not an issue, and there is general agreement as to what constitutes proof of adequate training, the only remaining issues are issues of fact." Opp. at 9. In a footnote following this claim, the Government claims that "Claimant has not signaled any intent to challenge the reliability of dog alerts generally or to raise the contamination theory through expert witnesses or otherwise." *Id.*

The Government's claim that Claimant did not put it on notice that she intends to challenge "how a dog should be trained" or "what constitutes evidence of that training"—amongst other aspects of this case—is completely unfounded. For example, in a letter dated July 7, 2014, Claimant disclosed Ted Cox as her expert witness and attached a summary of some of his opinions. *See* Ex. 4. In the summary, Cox stated he would testify that the alert was not reliable because (1) the canine and/or the handler was not properly trained; (2) the canine was never trained on uncirculated currency; (3) the canine was never trained on secondary odors, such as plastic gloves, packaging, cutting agents and other scents that could have caused a false alert; (4) the canine and/or the handler did not train for an adequate number of hours prior to certification; and (5) the location where the canine sniff occurred may have been contaminated.

---

[5] Though Claimant agrees with the Government that expert testimony is the correct vehicle to establish these points, Claimant disagrees that this is merely an option and not a requirement in this case. Unlike here, the case that the Government cites for its point, *$1,032,980*, 855 F. Supp. 2d 678, concerned the Government's use of the canine sniff evidence as support for probable cause to search, not as substantive evidence to search, and, thus, did not require a *Daubert* analysis. *See id.* at 704 (concluding that the canine alert "constituted a *bona fide* positive alert for contraband and, thereby, provided probable cause for the search" of the claimant's truck).

While this is not an exhaustive list, it is clear that Claimant's expert would testify as to "what constitutes proof of adequate training."

The Government further contends that, if there are issues of fact as to whether the particular dog was trained and certified and whether it has been proven to be reliable, then expert testimony is not required. *See* Opp. at 9–10. Instead, it believes it can introduce canine evidence at trial by introducing the canine records or other evidence at trial without an expert. Strangely, the Government offers no explanation as to how it would do this, and the cases it cites are inapplicable and do not counter *Daubert*'s application here. In support, it cites three cases from district courts in this circuit. *See* Opp. at 10–11.

First, the Government cites *United States v. $433,980 in U.S. Currency*, 473 F. Supp. 2d 672 (E.D.N.C. 2006), in its Opposition (reprinted below for ease of reference):

> In *United States v. $433,980 in U.S. Currency*, 473 F. Supp. 2d 672 (E.D.N.C. 2006), the Government sought the forfeiture of a large sum of currency seized from the claimant during a traffic stop. The court noted that much of the briefing in the case concerned the general reliability of dog alerts and the scientific evidence, based on expert testimony, refuting the theory that all circulating currency is tainted by narcotic odor. 473 F. Supp. 2d at 691. But the court found it unnecessary to enter into that debate or to rely on expert testimony to determine that the dog alert had probative value. It was sufficient, the court said, that Government [*sic*] had presented factual evidence that *the particular dog* involved in the case was properly trained, certified and reliable. *Id.* ("Because there is separate evidence of the K-9's reliability in this particular case, the Court need not and does not take a position on either the currency contamination theory or the general probative value of K-9 drug sniffs.")

Opp. at 10 (emphasis in original). That case does not have a page 691, and it does not support any of the Government's assertions in paragraph 10.[6]

---

[6] To the extent that *$433,980*, 473 F. Supp. 2d 672, could be construed as remotely relevant to canine reliability, there is a single paragraph where the court rejected the claimant's request to take judicial notice of contamination theory. The court recognized that "the extent to which circulating currency is tainted by narcotics is the subject of considerable debate, and thus cannot

14

Through Claimant's research, Claimant believes that the Government meant to cite to *United States v. $433,980 in U.S. Currency*, 473 F. Supp. 2d 685 (E.D.N.C. 2007), and the Government misconstrues that opinion in its summary. There, the court did not mention that "much of the briefing concerned the general reliability of dog alerts and the scientific evidence[,]" as the Government claims. Opp. at 10; *see $433,980*, 473 F. Supp. 2d at 691 (stating that the briefing concerned the significance of—not the science or reliability of—the two canine alert). Instead, the only reference in the entire case regarding expert testimony on this issue was to the Government's citation to "cases which endorse expert testimony" regarding canine alerts and contamination theory in its motion for summary judgment, and the court did not address this. *Id.*; *see also id.* at 691, n.6 (noting that the claimant "presented no evidence to suggest that the K-9 sniffs in this case, or K-9 sniffs more generally, were inaccurate.").

While the Government is correct that *$433,980* and the two other cases it cites do not specifically mention expert testimony, these cases all involved motions for summary judgment, and it is not known whether the litigants had experts. *See id.* at 692 (granting the Government's motion for summary judgment based on claimant's "failure to offer evidence"); *see also United States v. $78,850 in U.S. Currency*, 517 F. Supp. 2d 792 (D.S.C. 2007) (denying the claimant's motion for summary judgment); and *United States v. $864,000 in U.S. Currency*, 2009 WL 2171249 (M.D.N.C. July 20, 2009) (granting the Government's motion for summary judgment). Far from refuting Claimant's argument, these cases simply omit any relevant discussion about the subject upon which her Motion to Quash is about: *Daubert* and expert testimony.

---

fairly be characterized as generally known within the jurisdiction or readily verifiable in the way which judicial notice typically requires." *Id.* at 678.

Further, the fact that two of those cases involved dispositive motions for summary judgment in favor of the Government is relevant because a court may grant a motion for summary judgment only if it finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The judge is not "to weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Here, regarding the canine evidence, there are definitely genuine issues as to material facts[7] – precisely why an expert is required. And, if there were two opposing qualified experts, then the court would have to weigh their opinions. *See id.*

The other cases relied on by the Government are similarly inapposite, as they do not address expert opinions at all.[8]

### c.    Case law that supports *Daubert*'s application here.

Despite the Government's failure to cite relevant case law, there are cases that offer strong support for Claimant's position.[9] *See Graham*, 2011 WL 1457131 at *11 (stating that in order to evaluate the reliability of expert testimony regarding canines, the court must conduct a

---

[7] The Government states that "the only remaining issues are issues of fact: was the particular dog trained and certified and has the dog proven to be reliable." *See* Opp. at 9–10. While those are certainly issues, Claimant disagrees that they are the *only* issues. Other canine-related issues include, but are not limited to: what the proper standards, methods, and procedures are for canine and handler training, certification, and recertification; whether such standards and procedures were followed here; whether the particular canine sniff was properly conducted; and whether there should have been independent scientific corroboration of the canine sniff.

[8] *See United States v. $132,245 in U.S. Currency*, 2014 WL 4099740 (9th Cir. Aug. 21, 2014) (not once mentioning experts); *United States v. $21,175 in U.S. Currency*, 521 F. App'x 734 (11th Cir. 2013) (same); *United States v. $220,000 in U.S. Currency*, 2013 WL 1694814 at *6 (S.D. Ohio Apr. 18, 2013) (same); *United States v. $22,000 in U.S. Currency*, 2010 WL 5426836 at *4 (D. Ned. Nov. 16, 2010) (same).

[9] In her Motion to Quash, Claimant cited all of the cases discussed here, other than *$49,790*. *See* Mot. to Quash at 4–5. The Government did not even mention—much less address, distinguish, or refute—a single one of these cases in its Opposition.

two-stage *Daubert* analysis); *see also United States v. Myers*, 2010 WL 2723196 at *3 (S.D.W. Va. July 8, 2010) (excluding expert testimony from canine handler because the Government failed to provide sufficient "evidence regarding the general acceptance, standard, or testing of canine searches" and forensic testing "did not support the findings of the canine search"); *United States v. Hebshie*, 754 F. Supp. 2d 89, 116–19, 127 (D. Mass. 2010) (finding counsel ineffective for not requesting a *Daubert* hearing regarding evidence about accelerant-sniffing canine); *United States v. $49,790 in U.S. Currency*, 763 F. Supp. 2d 1160 (N.D. Cal. 2010) (conducting *Daubert* analysis for the Government's two experts, the canine handler/trainer and a scientist).

For example, in *Graham*, 2011 WL 1457131, the defendant sought to preclude the testimony of the canine handlers, and the court conducted a *Daubert* hearing regarding the admissibility of their testimony because it "encompasses both scientific and specialized knowledge[,]". *Id.* at *11. It reasoned that *Daubert* applied because "the reliability of canine detection depends upon two components: the canines' olfactory senses and the humans' ability to use those senses for their purposes." *Id.*  The second component involves whether the particular canine was "properly and effectively trained [to detect scents] . . . and to communicate their detection to their handlers." *Id.*

During the hearing, the *Graham* court considered the testimony of the Government's scientific expert, Dr. Kenneth Furton, as well as the testimony of the canine's present and past handlers.[10] Of particular relevance here, Furton explained that the fact that canines as a species are reliable does not mean that the particular canine at issue is reliable: "the ability of a particular

---

[10] In finding that the canine evidence was reliable, the Court relied in part on the handlers' testimony about their extensive training with the canine, including, but not limited to a six-month training academy, monthly maintenance trainings, certifications, recertifications (including on the date at issue), and the fact that the canine never had a false alert while they worked with it. *Id.* at *15.

dog to do so [detect and alert to scents] reliably is widely variable and depends upon its training, certification, maintenance, and recertification[,]" subjects about which the handlers testified. *Id.* at *7 (internal quotations and citations omitted). This is because "a dog is unable to convey his or her detection without a handler's interpretation." *Id.* at *8. Furton also opined that "a dog's alert should nonetheless be corroborated[11] through other investigative techniques." *Id.*

Another example is *$49,790*, 763 F. Supp. 2d 1160, a currency seizure narcotics detection canine alert case that involved a bench trial.[12] There, like in *Graham*, the Government had experts: Furton, to opine about narcotics detection canines, and the canine's trainer and handler

---

[11] Here, Falco's alert to the currency is the only evidence of the presence of detectable narcotics—there is no independent corroboration of this assertion. According to the Government's Answer to Claimant's Interrogatory No. 10, the currency is currently in a bank account comingled with other currency "in accordance with Department of Justice policy regarding the handling of sums of currency in excess of $5,000." In support, the Government cited the DOJ's *Asset Forfeiture Policy Manual* (2013), Chapter 1, § VI (relevant pages attached as Ex. 5), which states the following general policy: "Seized cash, *except where it is to be used in evidence*, is to be deposited promptly in the . . . [account] pending forfeiture." Ex. 5 at 41 (emphasis added). If the currency is to be used in evidence, then the USAO handling the case may request an exemption. *See id.* If granted, the exemption permits the agency to retain the currency and use it in evidence, instead of comingling it. *See id.* Here, a request for exemption would have been granted because the Government contends that the currency contained traceable narcotics and was packaged in an incriminating fashion. *See* Opp. at 3; Ex. 5 at 42 (expressly permitting retention if it serves a "significant independent, tangible, evidentiary purpose due to . . . packaging in an incriminating fashion, or the existence of a traceable amount of narcotic residue on the bills"). By retaining the currency, the Government would not have to rely on the canine alert; instead, it could have proven the presence of narcotics through other evidence, such as scientific testing—which would have provided results far more accurate and reliable than an alleged canine alert. The Government apparently believes that it is okay both to not have an expert regarding the canine "alert" and also to not corroborate its allegations through utilizing this simple alternative to comingling the funds. Such a position is untenable and unfair to Claimant.

[12] Procedurally, *$49,790* began due to submission of cross-motions for summary judgment. The court held a hearing on the motions, and the parties agreed to convert their motions into submissions for final adjudication, "a bench trail on the papers." *See id.* at 1162. The court noted that, unlike a motion for summary judgment, it made credibility determinations and weighed the evidence, as if it was a bench trial with live witnesses. *See id.*

at the time of the canine sniff, to opine about the canine's reliability. The Claimant also had an expert on narcotics detection canines.

In *$49,790*, the court conducted a *Daubert* analysis regarding all of the aforementioned proposed experts. *See id.* at 1163 ("An adequate Daubert analysis of every challenged expert opinion seems prudent in fulfilling the court's obligation to ensure actual conformance with FRE 702 as interpreted by the Supreme Court [in *Daubert* and *Kumho Tire*.]"). It construed the handler/trainer's testimony as expert testimony (as opposed to mere fact-witness testimony) because "[r]elevant expert testimony is not limited to science; it can be based on experience." *See id.* at 1165. After finding the agent qualified as an expert based on his experience and training, the agent opined that the canine was sophisticated. The court found that his opinion was reliable based on his testimony about "his extensive observation and evaluation" of the canine; his involvement in numerous searches; his role in obtaining the canine's initial certifications and recertifications; and the canine's awards for outstanding performance. *Id.* at 1165–66.

As the above-referenced cases demonstrate, if the Government is using the canine alert as substantive evidence, then it must introduce such evidence with an expert witness, who is subject to the requirements of Federal Rule of Evidence 702, *Daubert*, and *Kumho*.

Here, the Government is unable to provide expert testimony because it does not have an expert. It chose to withdraw its designation of Sr. Officer Michael McNerney, Falco's trainer, as its expert witness. It then chose to let the deadline pass without designating someone else.

Under these circumstances, it is legally impossible for the Government to introduce canine evidence at trial. And—not only is it impossible—it would not be right: the Government knowingly made the decisions that put it in its current quagmire regarding this evidence. For

these reasons, there is absolutely no valid reason to depose Ted Cox about his expert opinion or about facts relating to the canine alert.

## CONCLUSION

For the reasons described above, Claimant Samantha Banks respectfully requests that this Court quash the Government's subpoena to depose Ted Cox. Claimant also requests attorneys' fees and any other appropriate remedy.

Respectfully submitted,

_____/s/_____

C. Justin Brown
THE LAW OFFICE OF C. JUSTIN BROWN
231 E. Baltimore St., Suite 1102
Baltimore, MD 21202
Tel: 410-244-5444

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of September, 2014, a copy of the foregoing Motion was sent to each of the parties via CM/ECF.

_____/s/_____
C. Justin Brown