## DECLARATION OF AUSA EVAN T. SHEA

1. I am an Assistant United States Attorney in the Asset Forfeiture and Money Laundering Section of the Criminal Division of the United States Attorney's Office for the District of Maryland. I have held that position since June of 2012. I received my J.D. from the University of Virginia School of Law in 2007, and was admitted to the Maryland state bar in December of 2007. Before coming to the United States Attorney's Office, I served as a law clerk to then Chief Judge Legg and as a litigation associate at a Washington law firm.

2. Sometime in the Spring of 2014, I am not sure when, Jennifer Stubbs, a contract paralegal in the Asset Forfeiture and Money Laundering Section, the section in which I work, came to my office to discuss the present case, with which she was assisting Stefan Cassella, my supervisor and the Chief of the Asset Forfeiture and Money Laundering Section of the United States Attorney's Office for the District of Maryland.

3. Cassella was handling the case alone. I was not the "second chair" or otherwise officially involved in the case, but Stubbs often times came to me for advice regarding civil discovery issues.

4. Stubbs told me that the case was a civil forfeiture case involving the seizure of a large amount of cash at BWI airport. Stubbs explained that the claimant's counsel, Justin Brown, had made a number of discovery requests. Cassella had asked Stubbs to collect documents and information from the law enforcement agencies involved in the seizure and to draft responses to the discovery requests.

5. Several of the requests related to an "alert" by a narcotics detection K-9 during the K-9's scan of the currency. Stubbs explained to me that she had run into difficulty obtaining documents from the Maryland Transportation Authority Police related to the K-9 that had done

1

the scan of the currency involved in the case, and furthermore had had difficulty getting ahold of anyone at the Maryland Transportation Authority Police who could answer her questions both about the documents and the interrogatories Brown had sent.

6. Stubbs further explained that she had finally gotten ahold of a former Maryland Transportation Authority employee. My understanding was that Stubbs was directed to the former employee by a current employee when she was having trouble reaching someone who could answer her discovery-related questions. The former employee had told Stubbs that the current officers in the K-9 unit at the Maryland Transportation Authority Police were likely avoiding her, because (1) they had lost a certification document which was issued with respect to the training of the K-9 that occurred immediately before the seizure in our case, and the group had recreated that certificate in response to the requests that Stubbs had made, and (2) the K-9s in that group were likely not receiving the requisite amount of training that they needed to meet industry standards.

7. I told Stubbs that she should make sure that Cassella was fully informed of these issues.

8. I immediately went to meet with Cassella about what Stubbs had told me. I relayed to Cassella the information Stubbs had gathered regarding the document that was recreated and the sufficiency of the training.

9. I remember Cassella stating that the issue of the sufficiency of the K-9's training and whether it was reliable would be revealed in discovery. We both agreed that we should provide Brown with all the information we received regarding the K-9's training.

10. At some point in the late Spring of 2014, Cassella went on extended family medical leave to deal with an illness in his family.

2

11.   At that point, I had not seen the April 15, 2014, letter from Cassella to Brown, or any other correspondence sent in the case. As stated below, I did not read the April 15, 2014 letter, until it was produced in the middle of Brown's deposition of Michael McNerney on July 9, 2014.

12.   On June 10, 2014, in Cassella's absence, Stubbs asked for my assistance in gathering documents from the Maryland Transportation Authority Police to respond to supplemental discovery requests in this case with which she was assisting Cassella. Specifically, she was attempting to collect documents and information to respond to a letter sent from Justin Brown to Cassella on May 30, 2014.

13.   On June 13, 2014, Stubbs and I convened a meeting at the United States Attorney's Office with Sergeant Joseph Hoyer and Officer Mike McNerney, both of the Maryland Transportation Authority Police, to discuss the collection of documents and information to respond to the discovery requests. Until that meeting, I had not spoken or met with Hoyer, McNerney, or anyone else, current or former, at the Maryland Transportation Authority Police about the case.

14.   At the meeting, Hoyer described documents he had collected in response to Stubbs' requests. Those documents included several "special reports," which he had written in response to Stubbs's requests. One special report explained the efforts to locate additional documents related to the August 2013 certification process that the K-9 involved in the case underwent – each time a K-9 goes through the certification process the trainers create a "score sheet" indicating whether the K-9 correctly alerted to locations where narcotics were hidden, and take pictures of the room where the certification training took place. The special report

explained that Hoyer had looked through all of the group's file cabinets and could not locate those supporting documents.

15. Another special report summarized the performance record of the K-9 involved in the case both in training and in the field. The record appeared to me to indicate that the K-9 performed well.

16. Finally, Hoyer provided a "log" which K-9 handlers use to sign out and sign back in training aids (containing narcotics) which were stored in a locked cabinet. Brown had specifically requested this document. Maryland Transportation Authority Police regulations require the training aids – because they contain narcotics – be held in a locked container, and that any officer sign a log if they take possession of the aid, and sign the log again when they return the aid to the locked container.

17. At the end of the meeting, because of the issues the Maryland Transportation Authority Police had had collecting documents, I asked Hoyer and McNerney whether there was anything about the case that they were worried would reflect badly on their agency. McNerney responded that he believed that a document that purported to certify the necessary training of the K-9 involved in case in August 2013 (the original of which could not be located) should not have been recreated. McNerney believed that officers responsible for it should have simply told us, the United States Attorney's office, that the certification document had been lost.

18. I confirmed with Stubbs that we had explained to Brown that the document had been lost and was recreated after the fact, and she said that it had. I was not aware, however, exactly how that disclosure had been made, nor had I reviewed or read any document, including the April 15, 2014, letter, making that disclosure.

4

19. After the meeting, I directed Stubbs to consult with Cassella regarding the best way to respond to the May 30, 2014 (referred to paragraph 4, from Brown to Cassella) given the information that Hoyer and McNerney had provided.

20. On June 19, 2014, Cassella forwarded me a voicemail he had received from Brown. In the voicemail, Brown sounded irritated. Brown stated in the message that he was trying to be cooperative and reasonable during the course of discovery in the case, but that the government did not appear to be taking the same approach. He noted one particular grievance – the government had provided phone numbers for Ted Cox, and John McCarty that didn't work. At the time, I didn't know who either of those individuals was.

21. On June 20, 2014, I met with Stubbs (Cassella still being out extended leave), who explained that McCarty and Cox were former trainers of the K-9 involved in the case. Stubbs told me that the numbers provided to Brown were valid, and that she had used them that day.

22. On June 23, 2014, I called Brown regarding Cox and McCarty's phone numbers. I told Brown that it was my understanding that the numbers we provided worked and that we didn't have any other numbers. Brown explained to me that we had provided the Maryland Transportation Authority Police's main phone number as the phone number at which to reach Cox, a former trainer of the dog involved in the case who had left the agency and moved to South Dakota and McCarty, a trainer of the K-9 involved in the case who was out on medical leave. Brown stated that the Maryland Transportation Authority Police would not provide personal numbers for Cox or McCarty such that he could actually reach them.

23. Over the next week, I contacted Cox and McCarty on their personal cell phones, and received their permission to provide Brown those numbers. I felt such permission was

necessary due to the Privacy Act, which puts restrictions on the disclosure of personal information of government employees. I provided both McCarty and Cox's personal cell phone numbers to Brown.

24. On July 8, 2014, Cassella (who was back for one week only from his extended leave) and I met with McNerney to prepare for the deposition. We began with McNerney's opinion of the K-9 involved in the case. McNerney stated that he believed that the K-9 was *not* properly trained and was *not* reliable.

25. McNerney went on to explain why the training was inadequate. He explained that the "elimination training" – eliminating the possibility that the dog will alert to a "false positive" – was not done with sufficient regularity and thus did not meet industry standards. Thus, McNerney explained, although the initial training was adequate, such that if narcotics were present, the K-9 would alert, a number of other scents could cause the K-9 to falsely alert when no narcotics were present.

26. I recall that, at some point either before or during the deposition preparation meeting, the issue of the certificate regarding the August 2013 training came up. McNerney reiterated that he believed that the individuals involved at the Maryland Transportation Authority Police should not have re-created the document. They should have simply told us that the document was lost. At no time did he characterize the document as "fraudulent."

27. Cassella and I excused ourselves from the meeting. I told Cassella that, given McNerney's opinion regarding the reliability of the dog, McNerney could not be our expert. Cassella agreed.

28. Cassella asked me to call Brown and tell him that McNerney would not be our expert.

29.     I called Brown and told him that McNerney would not be the government's expert. Brown asked me why we had decided that. I told him that I wasn't in a position to tell him that. I told him that it was Cassella's case, and Cassella would decide down the line whether the government would still seek to introduce evidence of the K-9 alert at trial. I further stated something to the effect of "you can guess why we're not calling McNerney as an expert" or "read between the lines."

30.     I asked Brown whether he still wanted to depose McNerney. We both agreed to call each other back with our respective positions on the deposition later that day.

31.     Brown called me back at the end of the business day, several hours later, and told me that he wanted to proceed with the deposition. I told Brown that we would have the witness at his office at the appointed time.

32.     I went to see Barbara Sale, the chief of the criminal division. I told Sale about McNerney's opinion, and my concern about relying on the evidence of the dog alert in light of that opinion. I did not mention the issue with the certificate regarding the August 2013 training.

33.     Brown's deposition of McNerney was held in a conference room in Brown's office at his office at 10 a.m. on July 9, 2014.

34.     When Brown got to the subject of the certification document regarding the August 2013, training, McNerney stated that the certificate was not authentic. I asked for a break, to which Brown consented. Off the record, I sought to confirm with Brown that we, the government, had disclosed to him the nature of the certification document regarding the August 2013 training, *i.e.*, that it is that it had been re-created. Again, though, I had not read Cassella's April 15, 2014, letter. Brown acted shocked that I was asserting that the government had already disclosed the nature of the training certification.

35. I sought confirmation from Cassella that the nature of the certification document had been disclosed to Brown. Cassella was unsure of the details, and Cassella suggested we call Stubbs. Cassella reached Stubbs, and Stubbs told him that the certification document was explained in an April 15, 2014, letter to Brown. Cassella asked Stubbs to fax it to him at Brown's office.

36. Brown reviewed the letter there in his office. Upon reading it, Brown claimed that the letter was "misleading." I reviewed the letter for the first time at that point as well, and, reacting on instinct, defended it as adequately disclosing the nature of the document.

37. I have had no role in the case since the July 9, 2014, deposition. Cassella returned from his leave and has been handling the case since that time.

38. At no time did I believe or have reason to believe that the Training Certificate produced to Brown in discovery on April 15, 2014 was anything other than a straightforward re-creation of a valid lost or missing certification.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO TITLE 28 U.S.C.§ 1746 THAT THE FACTS SET FORTH HEREIN ARE ACCURATE, TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Evan T. Shea
Assistant United States Attorney