UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
Northern Division

UNITED STATES OF AMERICA,

Plaintiff,

- against –

$122,640.00 in U.S. Currency,

Defendant.

Civil No. 13-cv-03778-JKB

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MOTION FOR SUMMARY JUDGMENT AS TO CLAIMANT'S STANDING

The United States of America, by its counsel, moves pursuant to Rule G(8)(c) of the

Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and

Asset Forfeiture Actions, for summary judgment on the ground that the Claimant, Samantha

Bell-Banks, lacks standing to contest this civil forfeiture action.

In support of its motion, the Government says the following.

## INTRODUCTION

### The Nature of the Action

This is a civil forfeiture action in which the Government seeks the forfeiture of $122,640 in

U.S. Currency that was seized from Jerry Lee Banks at BWI Airport on September 12, 2013.   The

plaintiff is the United States, the defendant *in rem* is the seized currency, and the party seeking to

intervene as a claimant to the property is Samantha Bell-Banks.   *See United States v. One-Sixth*

*Share*, 326 F.3d 36, 40 (1st Cir. 2003) ("Because civil forfeiture is an *in rem* proceeding, the

property subject to forfeiture is the defendant. Thus, defenses against the forfeiture can be brought

only by third parties, who must intervene."); *United States v. All Funds in Account Nos.*

1

*747.034/278 (Banco Espanol de Credito)*, 295 F.3d 23, 25 (D.C. Cir. 2002) ("Civil forfeiture actions are brought against property, not people. The owner of the property may intervene to protect his interest."); *United States v. $25,790 in U.S. Currency*, 2010 WL 2671754, *2 (D. Md. July 2, 2010) ("the party claiming the property ... is merely an intervener").

### Statutory and Article III Standing

To intervene in a civil forfeiture proceeding, the claimant must establish that she has standing to do so. *See United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 57 (1st Cir. 2013) (in a civil forfeiture case, the defendant is the property, and persons raising defenses to the forfeiture must establish standing to intervene). For that reason, the claimant's standing is a threshold issue in every civil forfeiture case. *See United States v. 14,800.00 in U.S. Currency*, 2012 WL 4521371, *3 (D. Md. Sept. 28, 2012) ("standing is a threshold issue that must be resolved before addressing an asset forfeiture claim").

Standing to contest a civil forfeiture action involves two distinct concepts: statutory standing and Article III standing. *See United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1273 n.3 (10th Cir. 2008) (noting that Article III standing and statutory standing are separate matters). "The term 'statutory standing' relates to a claimant's ability to show that he has satisfied whatever statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court, while 'Article III standing' relates to the claimant's ability to show that he has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III of the Constitution." *United States v. 8 Gilcrease Lane*, 641 F. Supp.2d 1, 5-6 (D.D.C 2009). "In order to stand before a court and contest a forfeiture, a claimant must meet both Article III and statutory standing requirements." *United States v. $487,825.00*, 484 F.3d 662, 664 (3d Cir. 2007).

2

A claimant may satisfy the statutory standing requirements merely by showing that she has complied in all respects with the pleading requirements in Supplemental Rule G(5).  *See United States v. $25,790 in U.S. Currency,* 2010 WL 2671754, *2 (D. Md. July 2, 2010) (collecting cases).  To satisfy the Article III or case-or-controversy standing requirement, however, she must show that she has a legitimate ownership or possessory interest in the property and that she exercised dominion and control over it.   Otherwise, the court lacks jurisdiction to adjudicate her claim.  *See United States v. $38,000 in U.S. Currency,* 816 F.2d 1538, 1543 (11th Cir. 1987) (without a sufficient interest in the property, a claimant has no "case or controversy" capable of adjudication); *United States v. Real Property Located at 5201 Woodlake Dr.,* 895 F. Supp. 791, 793 (M.D.N.C. 1995) ("in order to contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III standing; otherwise there is no 'case or controversy,' in the constitutional sense, capable of adjudication in the federal courts"); *United States v. $119,030 in U.S. Currency,* 955 F. Supp.2d 569, 577 (W.D. Va. 2013) (collecting Fourth Circuit cases holding that claimant must have had dominion and control over the defendant property to establish Article III standing).

At this time, the Government challenges only the claimant's Article III standing.

**The Burden of Proof**

The burden of proof lies on the claimant to establish her standing.  *See United States v. $133,420.00 in U.S. Currency,* 672 F.3d 629, 644 (9th Cir. 2012) ("Although the burden of proving that the property is subject to forfeiture is on the Government, the burden of establishing standing is on the claimant," citing Rule G(8)(c)(ii)(B)); *United States v. $500,000.00 in U.S. Currency,* 591 F.3d 402, 405 n.2 (5th Cir. 2009) ("the claimant opposing forfeiture bears the burden of establishing standing"); *$119,030,* 955 F. Supp.2d at 576 (same).

3

As a district court in Florida recently observed, "standing serves to ensure that the Government is put to its burden of proof only where someone with a legitimate interest contests the forfeiture. . . . Where a claimant is unable or unwilling to establish standing, the Government is relieved of its duty to provide proof of forfeitability." *United States v. $100,000 in U.S. Currency*, 2014 WL 1330845, *6 (S.D. Fla. Mar. 28, 2014) (collecting cases).   Thus, if the court grants summary judgment for the Government because the claimant lacks standing, the case is comes to an end, and litigation over the forfeitability of the property is avoided.   *Id.   See United States v. $321,470.00 in U.S. Currency*, 874 F.2d 298, 303 (5th Cir. 1989) ("property may be forfeited without any showing by the government that it is subject to forfeiture if the only claimant is unable or unwilling to provide evidence supporting his assertion of an interest in the property").   This is entirely proper, for as the Second Circuit observed this summer, until the claimant establishes standing, "he is simply a stranger to the litigation."   *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2nd Cir. 2014).

## SUMMARY OF THE ARGUMENT

Rule G(8)(c)(ii) sets forth three alternative ways in which the Government may challenge the claimant's standing to intervene in a civil forfeiture action: by filing a motion for judgment on the pleadings; by requesting an evidentiary hearing at which the claimant must establish her standing by a preponderance of the admissible evidence; or by filing a motion for summary judgment.   Here, the Government has elected the third alternative; it seeks summary judgment on the ground that the Claimant has failed to adduce sufficient evidence to allow the court to find, by a preponderance of the evidence, that she has a lawful ownership or possessory interest in the defendant property.   Indeed, aside from her own self-serving and uncorroborated testimony,

much of which is demonstrably false, Claimant has failed to show that she has ever had any interest in the defendant property at all.

Claimant asserts that the defendant property constitutes her life savings which she accumulated from legitimate business transactions and kept concealed under the floor boards of her son's bedroom until giving it to her husband to invest in real estate venture in Baltimore. The evidence developed in the course of discovery, however, belies that assertion. Her personal tax returns for the nine years preceding the seizure demonstrate that Claimant lacked a legitimate source of income to explain her possession of $122,640, and her own actions during that period, including her numerous applications for public assistance in which she stated, under oath, that she had no assets, and her defaults on numerous loans and other obligations, are inconsistent with her assertion that she had more than $100,000 in cash at her disposal.

Moreover, Claimant's explanations for the source of the currency, the places where it was kept, and its intended use have been contradictory and in some cases demonstrably false. For example, Claimant stated on more than one occasion that part of the defendant currency was derived from a real estate transaction whereby she sold a parcel of property in Gary, Indiana to one Cecilia Gonzalez for $100,000 and received $75,000 in cash as a down payment. In support of this assertion, Claimant provided two hand-written receipts plus a Bill of Sale and an Agreement to Sell Real Estate bearing the signature of Cecilia Gonzalez. In fact, no such sale ever occurred. The relevant land records show that Claimant never owned the parcel of real property in question, and Cecilia Gonzalez has provided a sworn declaration stating that she never gave Claimant $75,000, and that the signatures on the Bill of Sale and Agreement to Sell Real Estate are forgeries.

Likewise, Claimant's explanation for her husband's travel to Baltimore with the $122,640 concealed in his luggage is highly implausible, entirely uncorroborated, and inconsistent with the

5

documentary evidence.   She asserts that her husband was to fly to Baltimore to meet a real estate

agent named "Roger Hayward" who had some townhouses to sell.[1]   Claimant, however, has been

unable to provide any contact information for Mr. Hayward or any proof whatsoever that he exists.

Moreover, it is oddly coincidental that "Roger Hayward" happens to be the name of the person

who was the true owner of the parcel of real property in Gary, Indiana that Claimant purported to

sell to Cecilia Gonzalez.   The two "Roger Haywards," Claimant testified in her deposition, are

two different individuals who happen to have the same name.

In addition, the details of Jerry Lee Banks' travel itinerary belie his wife's claim that he

was in Baltimore for a legitimate business purpose.   Claimant and her husband both aver that Mr.

Banks attempted to telephone "Roger Hayward" when he arrived at his Baltimore hotel and

abandoned the real estate transaction only after his repeated attempts to reach Mr. Hayward by

telephone were unsuccessful.   They contend that at that point, Mr. Banks decided to purchase a

ticket to San Francisco for a few days' vacation.   It was when he boarded the flight to San

Francisco that the defendant currency was found in Mr. Banks' luggage.

Records obtained in the course of discovery, however, show that Mr. Banks did not arrive

at his hotel in Baltimore until 12:08 a.m. on September 12, 2013, and that he purchased the ticket

to San Francisco at 2:35 a.m. the same morning.   Thus, for the court to accept Claimant's

explanation for the presence of the defendant currency in Baltimore, it would have to believe that

---

[1] The name "Roger Hayward" appears through the record in this case.   It is sometimes spelled "Roger Hayword."   For convenience, a single, uniform spelling is used in this motion.   According to Claimant and her husband, there were two persons named "Roger Hayward": one who is a property owner in Gary, Indiana whom Claimant has known for a long time, and who owned at least one of the properties that Claimant purported to sell; and another person of coincidentally of the same name who offered Claimant property for sale in Baltimore, but who neither Claimant nor her husband ever met, and whose contact information they do not have.   For clarity, the name Roger Hayward appears without quotations when referring to the person who is known to exist in Gary, Indiana, and appears in quotations when referring to the possibly fictitious "Roger Hayward" in Baltimore.

Mr. Banks flew to Baltimore intending to contact a realtor whom he had never met, called him repeatedly between 12:08 a.m. and 2:35 a.m., and then abandoned the venture in favor of a vacation trip to San Francisco when his calls went unanswered.

A far more plausible explanation is that the $122,640 was never in Mrs. Banks possession at all, and that Jerry Lee Banks arrived in Baltimore after midnight, met someone at his hotel who gave him the $122,640, and then booked a one-way ticket to San Francisco.   Indeed, travel records show that Mr. Banks made numerous trips to San Francisco in the year prior to the seizure, all on one-way tickets purchased on the day of travel, including one trip that was concluded only *four days* before his trip to Baltimore.   This is precisely the profile of a courier carrying money for a drug organization.

The bottom line is that Claimant has offered absolutely no credible evidence that *any* of the defendant currency was ever in her possession at all.   To support her claim, she has offered inconsistent and demonstrably false statements supported by forged documents and perjured testimony, and has provided an entirely uncorroborated and highly implausible explanation for the presence of the seized money in Baltimore.   Because no reasonable finder of fact could conclude, in light of this evidence, that Claimant has met her burden of proving that she has standing to contest this forfeiture action, the court should enter summary judgment for the Government.

# THE PROCEDURE FOR CHALLENGING STANDING

## Overview of Rule G(8)(c)(ii)

What the claimant must show to establish standing depends on the stage of the proceedings.   *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation"); *United States v. $133,420.00 in U.S. Currency,* 672 F.3d 629, 635 (9th Cir. 2012)

7

(explaining the three ways the Government can challenge standing under Rule G(8)(c), and the different standards that apply in each situation).

As a district court in Chicago recently observed, at the pleading stage "the bar for establishing Article III standing is low;" an assertion by the claimant, made under oath, that she was in possession of the property at the time it was seized and is its owner would be sufficient. *United States v. Funds in the Amount of $239,400*, ___ F. Supp.3d ___, 2014 WL 5023453, *3 (N.D. Ill. Oct. 7, 2014).  *See United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 651, 653 (7th Cir. 2013) (claim asserting ownership, under oath, is sufficient to establish standing at the pleading stage).   If the Government produces evidence calling the claim of ownership into question, however, it may use Rule G(8)(c) to put the claimant to her proof, either by requesting an evidentiary hearing or by filing a motion for summary judgment.   *$574,840*, 719 F.3d at 653; *$119,030*, 955 F. Supp.2d at 575 (quoting 2006 Advisory Committee Note to Supplemental Rule G(8)(c)(ii)(B)).

If a motion for summary judgment is denied and an evidentiary hearing is required, whether the claimant has met her burden of establishing standing is an issue for the court, not a jury.  *See United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002) ("standing is, moreover, a legal question to be determined by the court, not a jury"); *United States v. $133,420.00 in U.S. Currency*, 2010 WL 2594304, *7 (D. Ariz. June 23, 2010) (if an evidentiary hearing is needed to resolve a Rule G(8)(c) challenge to Article III standing, the hearing will be to the court without a jury), aff'd 672 F.3d 629 (9th Cir. 2012).

In this case the Government has assembled evidence strongly suggesting that the claimant, Samantha Bell-Banks, does not have a legitimate ownership or possessory interest in the defendant currency, and has accordingly filed a motion for summary judgment under Rule G(8)(c).   Thus,

the burden is now on the claimant to prove by a preponderance of the admissible evidence that she has an ownership or possessory interest in the defendant currency sufficient to establish Article III standing. *See Funds in the Amount of $239,400,* ___ F. Supp.3d ___, 2014 WL 5023453, *3 (if the Government files a motion for summary judgment and supports it with evidence suggesting claimant does not have standing, claimant cannot merely rely on his claim but must offer facts sufficient to establish that he has a legitimate interest in the property). And if the court, as the finder of fact, could not find on the evidence in the record, that Claimant could meet that burden, it should enter summary judgment for the Government.

**The Summary Judgment Standard**

The legal standard for granting a motion for summary judgment under Rule G(8)(c) is the same as it is under Rule 56(c) in an ordinary civil case. See *United States v. 133 U.S. Postal Service Money Orders,* 780 F. Supp. 2d 1084, 1090 (D. Haw. 2011) (when the Government moves for summary judgment under Rule G(8)(c), the standards in Rule 56 apply).

Under Federal Rule of Civil Procedure 56(c), a court must enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has made clear that, "[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

A genuine issue of triable fact exists only if "the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the nonmoving party." *United States v.*

*$447,815.00 in U.S. Currency,* 2011 WL 4083640, *2 (M.D.N.C. July 26, 2011) (Report and

Recommendation), adopted by the district court, 2011 WL 4078922 (M.D.N.C. Sep. 2, 2011),

aff'd *sub nom. United States v. Carroll,* 470 Fed. Appx. 192 (4th Cir. 2012).  *See Anderson v.*

*Liberty Lobby,* 477 U.S. at 248; *Matushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

587 (1986).  Accordingly, where the non-moving party bears the burden of proof, entry of

summary judgment is appropriate if that party fails to adduce evidence sufficient to carry her

burden.  *See Celotex Corp. v. Catrett* , 477 U.S. 317, 322 (1986).  In a civil forfeiture case, that

means that the Government's Rule G(8)(c) motion for summary judgment for lack of standing

should be granted if claimant has not adduced sufficient evidence to allow the finder of fact to find

that claimant has met his burden of establishing standing by a preponderance of the evidence.

*United States v. All Assets Held at Bank Julius Baer & Co.,* 664 F. Supp. 2d 97, 103 (D.D.C. 2009).

To create a triable issue of fact, the claimant must do more than rely on her own

self-serving claims and assertions.   In particular, a claimant who was not present when the

defendant property was seized cannot rely on her own sworn statement that she is the owner of the

property to show that the property was ever in her possession and that she has a lawful interest in it.

*See 447,815.00,* 2011 WL 4078922, *3; *$119,030,* 955 F. Supp.2d at 576.  As one district court

observed earlier this year, "if mere allegations were enough at the summary judgment and trial

stages, it would be impossible, as a practical matter, for the Government to challenge illegitimate

claims of ownership."  *United States v. $19,000 in U.S. Currency,* 2014 WL 582080, *4 (D.P.R.

Feb. 14, 2014).

Accordingly, to withstand a motion for summary judgment, the claimant must come

forward with corroborating evidence of her lawful interest, but if the documentation the claimant

provides in response to special interrogatories and in support of her ownership claim is shown to

be false, she is left with nothing more than her own self-serving assertion of ownership, and summary judgment must follow. *See United States v. Approximately $658,830 in U.S. Currency*, 2012 WL 3233642, *8 (E.D. Cal. Aug. 6, 2012) (bare assertion of ownership is insufficient to withstand motion for summary judgment for lack of standing where claimant's corroborating evidence proved to be false); adopted by the district court, 2012 WL 4461018 (E.D. Cal. Sept. 25, 2012), aff'd 563 Fed. Appx. 579 (9th Cir. 2014).

### Cases Applying the Summary Judgment Standard

Numerous recent cases illustrate the application of the above summary judgment principles to the claimant's burden to establish standing under Rule G(8)(c).   Above all, the courts have emphasized that once the Government offers evidence controverting the claimant's claim of standing – by showing, for example, that she lacks sufficient legitimate income to explain her possession of the defendant property, that she has made inconsistent and false statements in support of her claim, or that there is evidence that the money is fact derived from a drug trafficking offense -- she cannot rely on her own bald assertion of ownership to withstand a motion for summary judgment, but must come forward with admissible, corroborating evidence to do so.

### Lack of Corroborating Evidence

For example, in *United States v. $138,381.00,* 240 F. Supp.2d 220 (E.D.N.Y. 2003), a case with facts not unlike those in the instant case, the claimant's husband was boarding a flight from New York City when the Government seized over $138,000 in currency from his checked luggage. After analyzing the claimant's tax returns and her living expenses, the court concluded that she lacked sufficient legitimate income to explain her and her husband's possession of the defendant currency.   When the Government comes forward with substantial evidence demonstrating that the claimant lacked the financial means to accumulate the seized currency, the court said, the claimant

11

must produce affidavits or other evidence to support her bald assertion of ownership of the

defendant property.   Because the claimant did not do so, the court concluded, no reasonable

fact-finder could find that the claimant and her husband jointly owned the defendant property.

240 F. Supp.2d at 231-33.   Thus, the Government was entitled to summary judgment based on the

claimant's lack of Article III standing.

Likewise, in *United States v. $447,815.00 in U.S. Currency*, 2011 WL 4083640 (M.D.N.C.

July 26, 2011), the Government seized 23 bundles of currency wrapped in rubber bands and clear

plastic wrap from the concealed compartment in a vehicle.   The claimant, who was not present

when the money was seized, sought to establish her standing to contest the forfeiture through her

deposition testimony and answers to interrogatories.   But the court held that "such testimony

standing alone, credible or not, is not sufficient to confer standing," and that without some other

evidence of ownership, the Government was entitled to summary judgment.   2011 WL 4083640,

*3-4, aff'd *sub nom. United States v. Carroll,* 470 Fed. Appx. 192 (4th Cir. 2012).[2]

---

[2] *See also United States v. $225,894 in U.S. Currency,* 852 F. Supp.2d 578, 581 (D.N.J. 2012)
(where claimant asserted an interest in money seized from his brother's bank account, alleging that it
belonged to him and that he had given it to his brother for safe keeping, claimant's responses to
interrogatories and his deposition testimony were insufficient, without corroboration, to establish he had
ever had possession of the defendant money; summary judgment for the Government); *United States v. All
Assets Held at Bank Julius Baer & Co.,* 664 F. Supp. 2d at 104-05 (granting summary judgment where
claimants, aside from their own assertions, could not produce an documentary evidence that they had any
legal interest in the defendant funds); *United States v. $100,000 in U.S. Currency,* 2014 WL 1330845, *3-5
(S.D. Fla. Mar. 28, 2014) (granting summary judgment where claimant failed to produce evidence that she
had exercised dominion or control over money held in a bank account in her name); *United States v.
$19,000.00 in U.S. Currency,* 2014 WL 582080, *4 (D.P.R. Feb. 14, 2014) (granting summary judgment
where claimant failed to offer any evidence of ownership of currency other than a conclusory assertion that
the money came from "legitimate income and savings"); *United States v. 2007 Custom Motorcycle,* 2011
WL 232331, *2 (D. Ariz. Jan. 24, 2011) (granting summary judgment where there was no indication that
claimant could meet the burden of proof as to standing with admissible evidence).

## Contradictory and False Explanations

The Government may also controvert the claimant's claim of standing by showing that she has put forward contradictory or demonstrably false explanations in support of her claim.

In *United States v. $31,000 in U.S. Currency,* 2012 WL 5343350 (E.D. Mich. Oct. 29, 2012), another case with facts that echo those in the instant matter, the Government seized $31,000 in currency, bundled in rubber bands and placed in a plastic bag, from a vehicle in which the claimant and a companion were riding.   The companion said that the claimant derived the money from rental properties in Indiana where he served as a property manager, but the claimant offered a contradictory explanation, stating that the money was derived from an insurance settlement.   The latter explanation was shown to be false, however, when bank records showed that the insurance check was not cashed until *after* the defendant currency was seized.   In light of the contradictory and false explanations, the court held that the claimant could not establish a lawful interest in the property and granted the Government's motion challenging standing.   2012 WL 5343350 at *5.

Similarly, in *United States v. Approximately $658,830.00 in U.S. Currency,* 2012 WL 3233642 (E.D. Cal. Aug. 6, 2012), the Government seized the defendant currency, which was packed in vacuum-sealed bags, from a package intercepted at a UPS shipping facility.   The claimant, who was neither the sender nor the recipient of the package, filed a claim asserting that he was the true owner of the money, and that it was the proceeds of his father's estate.   Further investigation by the Government revealed, however, that the claimant's father had died without any assets.   Moreover, the Government was unable to locate any of the witnesses who, according to the claimant's responses to special interrogatories, had knowledge of the source of the money and would support the claimant's explanation.   Accordingly, because the claimant was left only

with his unsupported claim of ownership, the court held that he had failed to demonstrate any interest in the money and thus could not establish his standing.   2012 WL 3233642 at *7-8.

### Evidence the Claimant was a Drug Courier

Finally, claimants have the greatest difficulty establishing standing when, in addition to the claimant's lack of legitimate income and her contradictory and false statements, there is strong circumstantial evidence that the defendant property was involved in a drug trafficking offense, for the stronger the evidence that the claimant was acting as a courier for a drug organization, the less likely it is that she had a legitimate interest of her own in the property.

In *United States v. $119,030.00 in U.S. Currency,* 955 F. Supp.2d 569 (W.D. Va. July 2, 2013), the Government seized the defendant currency, which was bundled in rubber bands and wrapped in three grocery bags, during a traffic stop on I-81 near Harrisonburg, Virginia.   The driver explained that he was driving cross-country to Texas and denied any knowledge of the money, but nevertheless filed a claim.

Granting the Government's motion for summary judgment for lack of standing, the court held that despite the claimant's possession of the money at the time it was seized, his contradictory statements, including his initial denial of the money, belied his claim of ownership, and that the "suspicious circumstances surrounding [the claimant's] travel to Texas, including the bundling of the cash and the claimant's prior involvement with marijuana dealing, suggest that the money was actually involved in illegal drug trafficking."   955 F. Supp.2d at 581.

Most recently, in *United States v. Funds in the Amount of $239,400,* ___ F. Supp.3d ___, 2014 WL 5023453 (N.D. Ill. Oct. 7, 2014), the claimant purchased a one-way ticket for cross-country travel from Boston to Los Angeles for a high price shortly before the time of departure.   A search of his luggage revealed four packages of currency wrapped first in Saran

Wrap, then in tin foil, and then bundled in rubber bands.   A drug dog alerted to the currency.
2014 WL 5023453 at *1-2.

The claimant explained that he was traveling to California to purchase computer parts, but
could not produce tax filings, business records, or any other documents to corroborate that claim.
*Id.* at *2.

To oppose the Government's motion for summary judgment for lack of standing, the
claimant attempted to rely on his claim, made under penalty of perjury, that he was the owner of
the seized currency, but the court held that that was not enough.   When a claimant "is confronted
with a valid challenge to his standing," the court said, "it is no longer sufficient to simply rest on
the facial validity of his standing claim."   *Id.* at 4.

The court then listed the factors that called the claimant's standing into question and put the
burden on him to come forward with sufficient evidence to establish is standing.   In particular, the
court pointed to the claimant's travel itinerary (cross-country travel on a one-way ticket purchased
on the day of travel for a high price); the packaging of the money in plastic wrap, tin foil and
rubber bands; the dog alert; the claimant's "incredible" explanation or his possession of the cash,
unsupported by any documents; and the "non-responsive nature" of the claimant's responses to the
Government's special interrogatories, which gave rise to "an adverse inference with respect to the
validity of the claimant's claim to standing."   *Id.* at 5-6.

"Against this strong circumstantial evidence presented by the Government," the court
concluded, "Claimant offers nothing but his verified claim to ownership." *Id.* at *6.   Accordingly,
the court held that the claimant could not carry the burden of establishing standing by a

15

preponderance of the evidence and granted the Government's motion for summary judgment. *Id.*[3]

As will be explained below, all of the factors that played a significant role in the outcome of these cases --- a lack of legitimate income, demonstrably false statements made in support of Claimant's claim of ownership and the complete absence of any reliable documentary evidence sufficient to corroborate that claim, and strong circumstantial evidence that the defendant currency was derived from or was intended to be used to commit a drug offense --- are present in this case.

## FACTS AND CLAIMANT'S EXPLANATIONS

### The Seizure of $122,640 at BWI

Claimant's husband, Jerry Lee Banks, arrived at BWI Airport on Southwest flight 612 from Chicago at 11:20 p.m. on the evening of September 11, 2013, and checked into the Aloft Hotel, a property located adjacent to the airport in Linthicum, MD.  (Southwest Airlines records, Exhibit 1; Aloft Hotel records, Exhibit 2).  The hotel records show that the check-in time was 12:08 a.m. on September 12, 2013.  (Declaration of Woody Montgomery, Exhibit 3).

The next morning at approximately 10:51 a.m., Banks checked his luggage at the airport and boarded Delta flight 2025 which was due to depart to Atlanta at 11:15 a.m.  (Declaration of Kevin Davis, Exhibit 4; Declaration of Pamela Fears, Exhibit 5 ).  His itinerary included a change of planes in Atlanta to Delta flight 2349 to San Francisco.  (Fears Declaration; Delta Airlines records, Exhibit 6).

---

3 *See also United States v. v. $11,320.00 in U.S. Currency,* 880 F. Supp.2d 1310, 1315, 1322-23 (N.D. Ga. 2012) (claimant's bare assertion of ownership insufficient to withstand motion for summary judgment as to Art. III standing where the money was in twelve bundles, wrapped in rubber bands, the driver made inconsistent statements, and there were other indicia of a nexus to drug trafficking).

Before the flight departed, a TSA screener detected "an anomaly" in Banks' suitcase as it went through the scanning device. (Davis Declaration at para. b).  Upon opening the suitcase, the screener found a clear plastic vacuum-sealed bag containing a large amount of U.S. Currency wrapped in rubber bands in plain view on top of some clothing.  *Id.*  Further inspection revealed a second clear plastic vacuum-sealed bag containing currency wrapped in rubber bands concealed inside a pair of sweatpants, as well as multiple bundles of currency wrapped in rubber bands and placed underneath additional articles of clothing.  *Id.*

The TSA screener alerted the Maryland Transportation Authority Police (MTAP), and an officer went to Gate D24 to meet Banks, who by this time had been removed from the plane. When asked to explain his possession of the currency, Banks stated that he was in the real estate business and that some transactions are done in cash.  *Id.* at para. d.

The officers explained that Banks was free to go but that the currency would be seized. He was offered a receipt and the return of the clothing in the suitcase, but he declined to accept either.  Banks then exited the airport, stating that his "business partner" Samantha Banks would be back to retrieve the currency.  *Id.* at para. e.

After Banks departed, a drug dog alerted to the presence of a controlled substance on the currency. *Id.* at para. f.   The currency was counted and determined to be $122,640. *Id.* at para. i.

On September 15, 2013, DEA Task Force Officer Kevin Davis placed a call to the claimant, Samantha Banks, who had called earlier to inquire about the seized currency.   Claimant explained that she was in the real estate business and that the seized currency was for the purchase of real estate.   She could not, however, provide a name or address for the person from whom she intended to purchase the real estate.  *Id.* at para. h.   She said only that her husband had had problems meeting with an unidentified person and had decided to fly home.  *Id.*   Finally, when

17

asked why the currency was placed in vacuum-sealed plastic bags, Claimant could not provide an answer. *Id.*

### Claimant's Claim and Response to Discovery

On January 16, 2014, Claimant filed a claim to the defendant currency, asserting that the money was derived from purchasing, rehabbing and selling homes, and from the ownership of rental properties. (ECF 4). On February 4, 2014, the Government served Claimant with special interrogatories pursuant to Rule G(6), inquiring into her standing to contest the forfeiture, and on or about June 18, 2014, served her with General Interrogatories and a Request for Production of Documents. The special interrogatories and Claimant's responses are set forth in Exhibit 7; the General Interrogatories and Claimant's responses are set forth in Exhibit 8; and the documents Claimant provided in response to the Government's Request for Production of Documents, including her tax returns for 2005 through 2013, are set forth in Exhibits 9 and 10A through 10I.

On July 24, August 18, and August 21, 2014, the Government sent Claimant a series of letters pressing for more responsive answers to several of the interrogatories. The Government's letters are attached as Exhibit 11, and Claimant's responses dated August 5, 2014 and September 5, 2014 are attached as Exhibits 12 and 13, respectively.

On September 18, 2014, the Government took the depositions of Samantha Bell-Banks and Jerry Lee Banks at the Office of the United States Attorney in Chicago. The depositions were attended by Claimant's counsel and were video-recorded. The video recordings with side-by-side transcriptions are Exhibits 14A and B (Claimant) and 15A and B (Jerry Lee Banks or "JLB"), respectively. References in the form "T. __" are to the page numbers in the respective transcripts.

**Source of the defendant currency**

Claimant asserts that the seized currency "constitutes her life savings [which] was accumulated over a period of nine (9) years through Claimant's personal savings of her annual income." (Response to Special Interrogatory 4B.)   Of the total amount, Claimant said she had accumulated $70,000 by the first day of January, 2013, and acquired the balance in the first eight months of that year.  (Claimant's Deposition at T.76-77;   Response to General Interrogatory 5.)

In support of those assertions, Claimant provided a list of seven transactions that occurred in 2013 and twelve that occurred in 2007, and a list of five properties for which she collected rent in either 2010 or 2012, along with supporting documents.  (Response to Special Interrogatories 4A and 4C);   Exhibits A through F to Response to Special Interrogatory 4; Response to Request for Production 6.)   The 2007 transactions and the rent payments, however, involved small amounts of money totaling $6,203 and $8,050, respectively.  (Response to General Interrogatories 7 and 8.)   Neither contributed significantly to the $70,000 that she had allegedly saved by the beginning of 2013.   Claimant did not list any transaction for any other year between 2005 and 2012.

The 2013 transactions involved more significant sums of money, the largest of which was the sale of a dwelling at 2688 Harrison Street, Gary, Indiana, to one Cecilia Gonzalez on September 9, 2013 for $100,000 – three days before the seizure of the defendant currency. (Response to Special Interrogatory 4A.)   Claimant said that the transaction "was conducted personally, through the landowner and buyer, and the land was conveyed by quitclaim deed." (Letter dated August 5, 2014, response to Quest. 6.)   In support of her claim to have sold this property, Claimant provided a Bill of Sale dated September 9, 2013, an Agreement to Sell Real Estate dated July 13, 2013, and two receipts for down payments, totaling $75,000, dated July 13

19

and August 13, 2013, respectively, but she could not produce the deed or any other documents normally associated with a real estate closing.  (Response to Special Interrogatory 6, including Exhibits E and F; Letter dated August 5, 2014, response to Quest. 6; Response to Request for Production No. 3.)

Claimant later clarified that she retained a total of $65,500 from the 2013 transactions for herself, including $25,000 from the sale of the Harrison Street property, but admitted that she did not include the $65,500 in income on her 2013 tax return.  She explained that her tax preparer at H&R Block, Victoria Bush, "advised her not to include as income parts of the money seized by the federal Government – as it was already in the possession of the federal Government – and that she could amend her return within three years . . . depending out the outcome of this forfeiture case." (Letters dated August 5 and September 5, 2014; 2013 Tax Return, Exhibit 10I.)

Claimant was questioned closely about the sale of the Harrison Street property at her deposition.   She testified that although she listed herself as the owner on the Bill of Sale, the property actually belonged to Jerry Lee Banks, whose name appeared on the title.   (Claimant's Deposition at T.122.)    The following exchange appears at page 123 of the transcript:

Q. On the bill of sale you list yourself as the owner; is that right?

A. That's correct.

Q. All right.   Were you the owner?

A. I was to have the authority to sell it.

Q. Okay.   But you were not the owner?

A. I had the authority to sell it.

Q. If you just answer the questions.

A. I am answering the question.   I had the authority to sell it.

Q. From whom?   Who gave you that authority?

A. From the owners.

Q. Who was who?

A. Jerry Banks.

Claimant then testified that Jerry Lee Banks had paid $18,000 for the house and that she received "over $100,000" in cash for the property from Cecilia Gonzalez "in like three or four installments." (Claimant's Deposition at T. 124, 126.)   When asked if that meant that her husband had made a substantial profit from the sale of the house, Claimant said, ". . . actually, yeah, he made a – he made a nice investment off of that property right there.   Yes, he did." (*Id.* at T. 125.)

### Storage and packaging of the defendant currency

In response to special interrogatories regarding the manner in which the defendant currency was packaged, Claimant said, "Jerry Lee Banks packaged the defendant currency," and that it was packaged in vacuum-sealed plastic "so that the defendant currency would not be detected during travel." (Response to Special Interrogatory 11.)   Claimant repeated this explanation in response to the general interrogatories as well: "The currency was packaged to avoid detection from anyone who was able to steal the currency or to otherwise negatively affect Claimant's title to and/or concomitant rights in the currency and/or Jerry Lee Banks' lawful possession of and/or use of the currency." (Response to General Interrogatory 3.)

In her deposition, however, Claimant gave a different explanation.   She said that she kept the money in a crawl space under her house for a period of eight years and that she kept it in a plastic bag because the crawl space floods and she was concerned that the money would get wet. (Claimant's Deposition at T. 55-56, 84-85.)   Moreover, Claimant said that she was the person

who put the money in the plastic bag and in the crawl space and that Jerry Lee Banks' only role was to count the money and put it back in the plastic bag before he left for Baltimore.  (*Id.* at T.55.)

### Applications for public assistance

In the course of discovery, the Government asked Claimant to list every occasion when she had applied for any form of Government assistance, rent subsidy, or other benefit intended for persons of low income.    She first responded that she had applied for and obtained unemployment benefits "at some point in 2012" and added, "Claimant does not presently recall any occasions not listed herein that are responsive to this interrogatory."  (Response to General Interrogatory 9.) Later, Claimant added that she did apply for "some Government benefits in the months following the seizure of her money because the seizure caused her financial hardship."  (Letter Dated August 5, 2014, response to Quest. 4.)  She continued, "Specifically, Claimant recalls that she applied for food stamps and health insurance with the applicable Government agencies in Indiana, and she was denied for both."   She added that she could not recall any additional applications for Government assistance.  *Id.*   Finally, in the Letter dated September 5, 2014, Claimant reiterated that she applied for food stamp benefits "in 2013 after the seizure."

### "Roger Hayward" and Jerry Lee Banks' travel to Baltimore

When asked why the defendant property was in Baltimore, Claimant asserted that "Jerry Lee Banks was traveling to Baltimore, Maryland to look at distressed properties for sale [and] intended to use the defendant currency to purchase such properties if the opportunity arose." (Response to Special Interrogatory 11.)    She explained   that she learned of the distressed properties in June 2013 from a Craigslist posting by a "Roger Hayward" who claimed to be a real estate agent advertising townhouses for sale in bulk.   She said that she spoke with "Roger

22

Hayward" by telephone five or six times over a period of several months, obtained a list of the properties for sale, and arranged for her husband to travel to Baltimore to meet "Hayward" and see the properties. (Response to General Interrogatory 1; Claimant's Deposition at T.31-37.)   She conceded, however, that neither she nor Jerry Lee Banks ever met "Hayward" (Claimant's Deposition at T.33, 42), and that she was unable to locate a phone number for "Roger Hayward," did not have his email address, and did not have a copy of the posting that he had allegedly placed on Craigslist. (Letter Dated August 5, 2014, response to Quest. 2.)   Claimant also acknowledged that her husband would have been making the down payments without having had the properties inspected and without the benefit of title searches. (Claimant's Deposition at T.53.)   Finally, Claimant acknowledged that she had not mentioned "Roger Hayward" or the other details of the proposed real estate transaction to the agents who interviewed her on September 15, 2013, three days after the seizure. (*Id.* at T.75.)

Regarding the trip itself, Claimant said that the plan was for Jerry Lee Banks to call "Hayward" the morning after he arrived in Baltimore – "because he got in kind of late" – so that "Hayward" could pick him up at his hotel and show him the properties over the next "couple of days." (Claimant's Deposition at T.37-38, 45.)   Then, assuming all went according to plan, Jerry Lee Banks would use the $122,640 that he was carrying to make down payments on the properties. (*Id.* at T.50-51.)   But things did not go according to plan.

"When Jerry Lee Banks arrived in Baltimore," Claimant said, "he called Hayward, and the call went to Hayward's voicemail.   The next morning, he called Hayward again, and the message he received indicated that Hayward's telephone line was disconnected." (Response to General Interrogatory 1; Claimant's Deposition at T.57-60.)   At that point, Claimant said, Banks decided to abandon the real estate venture and travel on to San Francisco "for a few days vacation" without

23

making any effort to find "Roger Hayward" other than to re-check Craigslist to see if his posting was still there.   According to Claimant, she was unable to retrieve it.   (Response to General Interrogatory 1; Claimant's Deposition at T.60-65.)

Finally, when asked about her husband's decision to fly to San Francisco instead of returning to Chicago, Claimant testified – and her counsel confirmed – that Jerry Lee Banks told her that he did not buy the San Francisco ticket until he was unable to reach "Roger Hayward." (*Id.* at T.68.)   Claimant added that she had no idea how often her husband traveled to San Francisco – suggesting that he had done so perhaps twice in two or three years.   (*Id.* at T.70.) When asked specifically if he had been to San Francisco previously in 2013, she said, "I don't know.   I don't even know.   I'm not sure.   I don't think he did.   I don't know."   (*Id.* at T.70-71.)

### Deposition of Jerry Lee Banks

Jerry Lee Banks was deposed immediately following the conclusion of Claimant's deposition.   He was not present during Claimant's deposition. (JLB Deposition at T.5.)

Regarding the trip to Baltimore, Banks stated that his wife told him about the posting by "Roger Hayward" on Craigslist but acknowledged that he never saw the posting himself and never talked to "Hayward" before he traveled on September 11, 2013.   (T.17-20.)   His wife, he said, made all the arrangements, and he was thus uncertain exactly who "Hayward" was supposed to be or what the understanding was between "Hayward" and his wife.   (T.19, 23, 33-34.)   He was certain, however, that the "Roger Hayward" he was to meet in Baltimore and the Roger Hayward who owned the property at 2688 Harrison Street in Gary, Indiana, and with whom he and his wife had been dealing for many years, were two different people.   (T.20, 63.)   That the two gentlemen had the same name, he said, was a "Total coincidence."   (T.64.)

The bulk of Banks' testimony concerned the itinerary of his travel to Baltimore, what he planned to do regarding the investment properties he hoped to buy once he arrived, and what efforts he made to contact "Roger Hayward" before deciding to travel instead to San Francisco.

Banks stated that he bought his ticket from Chicago to BWI "the night before I left," or possibly "that morning," paying full fare for a one-way ticket.  (T. 21-23.)   His plan was to call "Hayward" after he arrived and to arrange to have "Hayward" show him the properties that were for sale over the next day or two.   (T.23-24, 32.)

Banks insisted that he made multiple attempts to reach "Hayward" after he checked into the hotel and before he went to bed, but was unable to reach him.   The phone "kept ringing," he said.   "No answering machine."   (T.29-30, 41.)   He said he "called him several more times that night, and then I woke up than morning early, and then I called him [again]."   (T.31-32.)   The following exchange appears at T.41 of the deposition:

Q.  So give me an idea of what time of day it was when you called him the first time.

A. It was at night. I told you it was kind of late, so –

Q. Whatever time [it was, it was after] you checked in the hotel?

A. Yeah, I'm not real sure.   But after I checked in, I got settled in.   I got settled in, got – probably kicked my feet up for a second and called.

Q. And how many – you said you called him several more times?

A. Ah-huh.

Q. And over what period of time?

A. Over that night, and then I told you, off into the next morning I called him when I woke up

Q. So you went to bed?

A. Ah-huh.

25

Q. And give me an idea of what time it was you got up in the morning and called him again?

A. I believe it was – I'm not really sure, but I believe it was around 6:00 a.m. early.   I woke up pretty early.

Government counsel then asked if Banks was certain that he tried to call "Hayward" in the morning, and if it was after that last attempt that he purchased his ticket to San Francisco.   The following exchange appears at T-50-51:

Q. So whenever it was, then you tried to call him several more times?

A. In that morning when the sun came up.   I woke up, was going down to get my breakfast sandwich, and then I called – you know, called him again.

Q. And it was after that that you made the reservation – you bought the ticket to San Francisco?

A. I wasn't until – until I went to – yeah, afterwards, after I couldn't contact him . . . and then I went and made the reservation.

Banks explained that he made the reservation online using his laptop, and repeated that he did this in the morning of September 12 after he got out of bed and was unable to reach "Hayward."   Government counsel then pointed out that the records obtained from the Aloft Hotel showed that Banks did not check into his room until after midnight and that records obtained from Delta Airlines showed that he made the reservation to fly to San Francisco at 2:35 a.m..   This suggested that the only time Banks tried to call "Hayward" was between midnight and 2:35 a.m. The following exchange appears at T.52-54 of the deposition transcript:

Q. So how did you make your reservation with Delta?

A. Laptop

Q. You got on your laptop?

A. Online, yes.

26

* * *

**Q.** And this is sometime in the morning after you got up?

**A.** Yes.   This is after I – yeah, after I got up.

**Q.** Would it surprise you if the Delta record showed that you made the reservation at 2:35 in the morning?

**A.** I don't know.   I don't think so.

**Q.** Could you have made the reservation at 2:35 in the morning?

**A.** Possibly.   I'm not sure.   I'm really not sure.   I don't think so, though, at all.

**Q.** If the records show that you made the reservation at 2:35 in the morning, that would mean that you made the reservation only two and half hours after you checked into the hotel at midnight, wouldn't it?

**A.** You mean for the –

**Q.** For San Francisco

**A.** San Francisco?

**Q.** Yeah

**A.** I don't think I made it that early at all.   I don't think so.   If I did, then I was up, and I must have called him at that time then if I did.   So whatever time it was, because I am really --- I don't know the times.   Like I can tell you, I don't know the times.   I can't tell you specific times, but I do know how the events went.

**Q.** 2:35 in the morning would be an odd time to try to call a real estate contact you had never met before, wouldn't it?

**A.** It could.   It could be.   It would be, and I don't think – that's why I don't think I did that.

**Q.** But your recollection is that you went to bed and got up in the morning before you tried to call him again.

**A.** That's correct.

**Q.** And you made the reservation on the airplane after that?

27

A. I believe so.

Q. But you could have made it as early as 2:35 in the morning?

A. I might have.  I'm not sure.  I don't think so, though.

Banks was then asked why he chose to go to San Francisco when his phone calls to "Hayward" went unanswered.   He testified that he had planned all along to go to San Francisco after leaving Baltimore to attend a prize fight, that his wife knew this, and that when he called her she told him to "just go ahead on."(T.42-45.) Nevertheless, although the trip was planned in advance, Banks acknowledged that he purchased a one-way ticket to San Francisco on the day of travel for full fare. (T.46-47.) He added that he did not consider it unsafe to leave the $122,640 in currency in his checked luggage while traveling. (T.45-46.)

Government counsel then asked Banks how often he made the trip to San Francisco, and he replied that he was there "three or four times" in the past year to visit friends and go "club hopping." (T.47-48.) He said that he always traveled on a one-way ticket for which he paid full price on the day of travel. (T.48.)

Banks was pressed to explain what efforts, if any, he made to locate "Roger Hayward" after he could not reach him by phone.   He said that other than calling his wife, he made no such efforts: he did not look in a phone book for another number, did not check to see if "Hayward" had a business location that he might visit, and did not go to the addresses of the properties he had come to purchase to see if someone might direct him to "Hayward" from there. (T.43-44.)

Banks was also asked to explain what he had intended to do regarding the properties that were for sale in Baltimore if he had been able to contact "Hayward."   He testified that he would have asked "Hayward" to show him the properties, negotiated a price and "put the money down and get some people started on it, and get me a person to watch it from the neighborhood so they

wouldn't break it in." (T.36.)  When asked who the "people from the neighborhood" who were going to look after the property might be, he responded, "I don't know.  Probably the crook on the corner, you know what I mean, the wine head down the block.  That's the guy that I hire in the neighborhood to watch my property." (T.36)

Banks was also asked if he did not plan to check the validity of the titles on the properties before investing his wife's life savings in them.  He responded that his wife would handle that, and that she was willing to accept the word of "Roger Hayward" that there were no liens on the property, even though neither he nor his wife had ever met "Hayward." (T.38.)

Finally, Government counsel asked Banks about the defendant currency.  He first said that the money had been in a safe in the crawl space under his house and that he put it in the plastic, vacuumed-sealed bag himself shortly before leaving for Baltimore.  (T.25-26.)  Later, he said the money had been in the plastic bag all along because the crawl space floods when it rains.  (T.26-27.)

Banks testified that he and his wife had had the money for a long time but did not know how much they had saved by the beginning of 2013 and how much they obtained that year.  (T.54-55, 59.)  He maintained that the $122,640 was their entire savings and that he left nothing behind for household expenses when he took the money to Baltimore to invest.  (T.57.)

Regarding the alleged sale of the Harrison Street property to Cecilia Gonzalez, Banks stated that it was Roger Hayward who owned the property, and he denied that he owned the property himself. (T.10.)  The following exchange appears at (T.60-62)

**Q.** Who owned the property?

**A.** I believe – and once again, I'm not sure, but I think Roger Hayward owned it, . . . . We dealt with Roger most of the time, so –

29

**Q.** And you didn't own the property?

**A.** No.

**Q.** And your wife didn't own the property?

**A.** No.

* * *

**Q.** [I]f you had been one of the owners of the property, then you would have had to be involved [in the sale], is that right?

**A.** Yeah, but I'm not one of the owners of it.

**Q.** You weren't?   Okay.   So . . . do you know who she sold it to or who Roger sold it to?

**A.** I don't know.   I believe it might have been some Mexicans.   I don't know the exact names.

## ARGUMENT

### Overview

The documentary evidence and sworn statements that the Government has assembled in the course of discovery belie virtually all of the contentions Claimant made in her claim, discovery responses, and deposition.   Thus, Samantha Bell-Banks cannot possibly meet her burden of establishing standing to contest the forfeiture of the defendant currency.   Indeed, there is no evidence, other than her and her husband's uncorroborated statements, that the $122,640 was ever in her possession.

Claimant has produced no support for her contention that she had $70,000 in cash hidden in her residence as of January 1, 2013.   In fact, all evidence – including her tax returns, car loan application, credit reports and applications for food stamps – is to the contrary.

She fares no better in supporting her claim that she earned the balance of the defendant currency in 2013.   She failed to report any such income on her 2013 tax return, falsely claimed

30

that her tax preparer advised her to omit that income, failed to file any reports with the IRS on the alleged $10,000 currency transactions that she claims to have conducted, and attempted to support a large portion of the claimed income with false documents bearing the forged signature of an innocent third party.

Claimant's claim also suffers from a myriad of inconsistencies and other false statements. She and her husband have given conflicting testimony as to the intended purpose of the $122,640, why it was kept in plastic bags, who packed the money in the bags and when they did so, and who owned the property at 2688 Harrison Street that Claimant allegedly sold to Cecilia Gonzalez. And Claimant's testimony was plainly false when she stated, under oath, that she had never applied for food stamps, did not default on her car loan until after the defendant currency was seized, never incurred expenses for personal travel out of town, and did not know how often her husband traveled to San Francisco.

Finally, Claimant has put forward an incredible, unsupported and entirely false story regarding her husband's purpose in being in Baltimore with the defendant currency in his possession. She alleges that a realtor in Baltimore, whose very existence she cannot establish but who happens to have the same name as an Indiana realtor with whom she is well-acquainted, offered property for sale in Baltimore over the internet, and that she decided to invest her life savings in the Baltimore properties without even checking to see if the seller had valid title.

Indeed, the story she and her husband have told is demonstrably false. Jerry Lee Banks did not arrive in Baltimore until the early morning hours of September 12, 2013, and less than two and a half hours later had already booked a flight to San Francisco with $122,640 concealed in his checked luggage. The repeated statements by Claimant and her husband that Jerry Lee Banks made numerous attempts to reach "Roger Hayward" in the morning of September 12 before he

31

decided to fly to San Francisco were simply untrue.   In fact, none of the phone records for Claimant's and her husband's cell phones show any calls whatsoever to any person in Baltimore connected with the real estate business in the weeks, days and hours leading up to the seizure of the defendant currency.

Finally, the facts suggest a different explanation for the presence of the defendant currency in Baltimore.   Banks was a frequent traveler to San Francisco: he had been there at least six times in the past year, including a trip that was concluded only four days before the seizure of the defendant currency.   His travel on one-way tickets purchased on the day of travel for the full fare, his carrying bundles of currency in vacuum-sealed bags in his checked luggage, and his travel itinerary are consistent with the activities of a drug courier who travels frequently from the East Coast and Midwest to California with currency needed to consummate a drug transaction.   It is likely that Banks was engaged in such a transaction when the TSA screener spotted the bundles concealed in his luggage, and the more likely it is that he was engaged in such a transaction, the less likely it is that the defendant currency was actually Claimant's property derived from her life savings – the assertion she must prove to establish standing.

For all of these reasons, no court could find that Claimant has established that she is the owner of the defendant currency.   Accordingly, the Government is entitled to summary judgment pursuant to Rule G(8)(c).

**No corroboration for the $70,000**

Claimant alleges that she saved the bulk of the defendant currency from the income from her property management business over a period of nine years.   (Response to Special Interrogatory 4B.)   In her deposition, she stated that the savings comprised $70,000 in cash as of

the beginning of 2013.   (Claimant's Deposition at T.76.)   But Claimant has no support for this contention.

When asked to produce documentation, Claimant acknowledged that her business, Banks Management, has none of the ordinary records showing income and expenses that a business would be expected to maintain.   (Response to Request for Production; Claimant's Deposition at T.28-29, 116.)   To the contrary, the only records Claimant was able to produce regarding her income from 2005 through 2012 were invoices from 2007 totaling $6,203 and rental agreements for 2010 and 2012 that would have yielded $8,050 in income if all rents were actually paid, and if Claimant were entitled to retain all such income for herself.   (Response to General Interrogatories 7 and 8.)   Assuming, conservatively, that Claimant did obtain all of this money and retain it for herself, it would constitute but a fraction of the $70,000 Claimant alleged saved between 2005 and 2012.

In addition, when asked in Special Interrogatory 9 to provide details regarding each transaction that gave rise to any part of the defendant currency, including the form of payment, the dates of the transactions, and the location where the currency was kept after it was obtained, Claimant merely referred back to the aforementioned documents from 2007, 2010 and 2012. (Response to Special Interrogatory 9.)   This non-response gives rise to an adverse inference that Claimant simply has no documentation whatsoever for most of the $70,000.   *See United States v. Funds in the Amount of $239,400*, ___ F. Supp.3d ___, 2014 WL 5023453, *5-6 (N.D. Ill. Oct. 7, 2014) (the "non-responsive nature" of the claimant's responses to the Government's special interrogatories gives rise to "an adverse inference with respect to the validity of the claimant's claim to standing").

Nor does the testimony of Claimant's husband substantiate her claim to having had

$70,000 in her possession as of the beginning of 2013.   At most, Jerry Lee Banks was able to

agree with his wife that they had saved a large sum of money from her business.   But he offered

no documentation, and could only say, "I'm not really sure;" "Something like that," "I couldn't tell

you," and "I don't know" when asked for details as to how much money they had and when they

obtained it.   (JLB Deposition at T.55-56.)

**Tax Returns for 2005 – 2012**

Tax returns are frequently used by courts in civil forfeiture cases to determine whether a

claimant had sufficient legitimate income to support her possession of the defendant currency.

*See United States v. $74,206.00 in U.S. Currency,* 320 F.3d 658, 662 (6th Cir. 2003) (relying on

claim's tax returns to show that he lacked sufficient legitimate income to explain his possession of

the seized currency); *United States v. $30,670,* 403 F.3d 448, 465 (7th Cir. 2005) (same).   Here,

Claimant's assertion that she saved $70,000 from her income between 2005 and 2012 is

completely inconsistent with the income she declared on her federal tax returns.

The tax returns that Claimant produced in response to the Government's Request for

Production are attached at Exhibits 10A-10I.[4]   In tabular form, the returns show the following

income for 2005 – 2012:

| | |
|---|---|
| 2005 | $6,669 |
| 2006 | $15,428 |
| 2007 | $12,207 |
| 2008 | $11,663 |
| 2009 | $3,988 |
| 2010 | $8,999 |
| 2011 | $19,045 |
| 2012 | $14,550 |
| Total | **$92,549** |

---

[4] To decrease volume, only the first two pages of the Form 1040s are attached for each year.

In short, before considering her living expenses, Claimant had at most $92,549 in total income during this eight-year period from which she could have saved $70,000.   At her deposition, Claimant agreed with this calculation but maintained that she nevertheless was able to save the $70,000 because, in her words, "I didn't have no living expenses." (Claimant's Deposition at T.78)   Claimant was forced to admit, however, that she had incurred over $30,000 in expenses in buying and maintaining her home on Connecticut Street in 2011 and 2012 (T.19-21, 78), and had car payments of $300 per month in those same years, and utility, telephone and travel expenses as well.   (T.78-81).[5]   She initially denied that she had incurred child care expenses, but admitted that she did in fact incur such expenses when it was pointed out that she took a child care deduction on her tax returns.   (T.79-80)

Stated plainly, the numbers simply do not add up.   As the court held in *United States v. $107,840 in U.S. Currency,* 784 F. Supp.2d 1109 (S.D. Iowa 2011), "the Court would have to assume that Claimant lived essentially expense free over the past [eight] years in order to conclude that these sources were sufficient to account for the defendant currency." *$107,840,* 784 F. Supp.2d at 1126.   "When . . . general living expenses are accounted for, it is not plausible to conclude that Claimant was able to acquire the defendant currency solely from the sources of income [she] has presented to the Court." *Id.*

**Car loan, food stamps, and credit report**

Claimant's actions throughout the years 2011 and 2012 also belie her assertion that she had $70,000 in savings under the floor boards in her residence during that time.

---

[5] As discussed later, Claimant alleged that she never traveled out of state (T.81), but that assertion turns out to have been false.

On June 3, 2011, Claimant purchased at 2002 Ford Explorer from Lukes Family Motors in Highland, IN for $9,375.00. She paid $1,200 down and financed the balance through Credit Acceptance Corp. at 18.49 percent interest, thus incurring a total finance charge of $3,559.40 over the life of the $8,000 loan. (Credit Acceptance Records, Exhibit 16; Claimant's Deposition at T.89-92.) At her deposition, Claimant acknowledged that Credit Acceptance Corp. is a lender that caters to persons "that have bad credit, low credit or no credit at all." (T.89)

To put it bluntly, a person who really has $70,000 in cash under her floor boards would have no reason to finance the purchase of a $9,000 car by taking out a loan at 18.49 percent interest from a lender who caters to borrowers with no assets.

The reason Claimant went to Credit Acceptance, of course, was because she had no assets and no credit. At her deposition, Claimant acknowledged that in 2012 and 2013, she defaulted or failed to pay 15 separate bills, including the car loan, five medical bills, and various bills from merchants and assessments from the State of Illinois. (T.86-88.) Indeed, the default on the car loan resulted in the repossession of the 2002 Ford Explorer in 2013. The following exchange appears at T.88 of Claimant's deposition:

> Q. All together during that period of time we have just discussed, 2012/2013, you defaulted or failed to pay 15 separate bills while having $70,000 in a plastic bag in your crawl space; is that right?
>
> A. That is correct.

In light of that history, her assertion that she was hoarding the defendant currency under the floor of her house is not credible. A person with $70,000 in cash at her disposal would be unlikely to allow her credit rating to be destroyed by defaulting on 15 separate bills and loan payments, one of which resulted in the repossession of her automobile.

36

Finally, Claimant's assertion that she had $70,000 in lawfully acquired funds at her disposal at the beginning of 2013, and that she acquired the balance of the defendant currency in the months that followed, is belied by her applications for food stamps in 2011, 2012, and 2013. Records provided by the Lake County (Indiana) Division of Family Resources show that Samantha Bell began receiving public assistance in the form of food stamps on August 1, 2011 and was still receiving food stamps when the defendant currency was seized on September 12, 2013. (Declaration of Gustavo Perez and related records, Exhibit 17.)   Moreover, on July 20, 2011, August 9, 2012 and July 20, 2013, Claimant submitted applications for food stamps that contained the following question at Line 7: "Are the total resources owned by you or any member of your household (such as checking, savings, *cash*, or other accounts or assets) $2,000 or more?"   *Id.* (emphasis added).   On each such application, Claimant checked "NO" and proceeded to sign the form "under penalty of perjury."   *Id.*

Claimant should be taken at her word: Three times she said under oath that she did not have $2,000 in cash in her possession.   Indeed, the last of those statements was made less than 60 days before the defendant currency was seized in Baltimore.   Assuming Claimant was telling the truth then, she cannot be telling the truth now when she claims that she had the bulk of the defendant currency in her possession under the floor boards in her home in 2011, 2012 and 2013.   *Cf. United States v. $2,164,341 in U.S. Currency,* 2013 WL 2458757, *11 (D. Ariz. June 6, 2013) (claimant's assertion that the seized cash came from the sale of a building and was lawfully in his possession was undermined by showing that he subsequently declared bankruptcy and did not mention the money); *United States v. U.S. Currency Totaling $101,207.00,* 2007 WL 4106262 (S.D. Ga. 2007) (lack of legitimate income as reflected in tax returns and bankruptcy filings establish that claimant was not in lawful possession of the defendant currency as he later claimed).

### Funds earned in 2013

Claimant fares no better with her attempt to support her claim that she earned the balance of the defendant currency from legitimate business transactions in 2013. Her first problem is that she did not declare the bulk of the alleged 2013 income on her 2013 tax return. Assuming Claimant had $70,000 at the beginning of 2013, she would have had to acquire at least $52,640 in 2013 to account for the balance of the seized currency, even if she had no living expenses. In her response to General Interrogatories 5 and 7, Claimant said that she actually earned $65,500 in 2013, but her 2013 tax return shows only $6,800 in business income, and $7,030 in unemployment compensation. (Exhibit 10I.)

When questioned about this discrepancy, Claimant replied in her August 5, 2014 letter that her tax preparer at H&R Block "advised her not to include as income parts of the money seized by the federal Government – as it was already in the possession of the federal Government – and that she could amend her return within three years . . . depending out the outcome of this forfeiture case." *Id.* at p.4. In her September 5 supplemental response, Claimant identified the H&R Block employee who gave this advice as Victoria Bush. (Letter Dated September 5, 2014, Exhibit 13). *See also* Claimant's Deposition at T.107 ("when I went to fill out my tax return, I told them that Baltimore police stole my money").

Claimant's representation regarding the tax advice she received from H&R Block is at odds, however, with the sworn Declaration of Victoria Bush. (Declaration of Victoria Bush, Exhibit 18.) In her Declaration, Ms. Bush acknowledges that she prepared Claimant's 2013 tax return, and states that the income reported on the tax return (including $7,500 in gross sales from her business, reduced by $700 in business expenses) was the only income that Claimant disclosed. She continues, "Ms. Bell-Banks did not disclose to me that $122,640 had been seized from her

during 2013.   Accordingly, I did not give Ms. Bell-Banks any advice as to whether seized

currency could or should be omitted from her tax return or used to reduce her taxable income."

Ms. Bush then concludes, "I would not, under any circumstances, advise a client that any income

could or should be omitted from a tax return on the ground that such income, or an equivalent

amount, had been seized by law enforcement."   *Id.*

Moreover, the list of 2013 transactions that Claimant provided in support of her answer to

the Special Interrogatories included at least four in which she allegedly received more than

$10,000 in cash: $51,500 from Mary Boga on 6/1/13; $26,800 from Steven Walker on 7/1/13;

$50,000 from Cecilia Gonzalez on 7/13/13; and another $25,000 from Cecilia Gonzalez on

8/13/13.   (Response to Special Interrogatory 4A.)

In her deposition, Claimant acknowledged that she knew that any person engaged in a trade

or business must file a report with the IRS on any transaction involving more than $10,000 in U.S.

Currency.[6]   (T.114).   She claimed to have always complied with all requirements imposed by the

IRS (T.28), and if she had done so, the filing would constitute strong evidence that the transaction

did in fact occur.   Conversely, the failure to file the required report by a person aware of the

requirement is strong evidence that the alleged currency transaction *did not* occur.   Indeed

Claimant admitted that she did not file the form for at least one of the transactions (T.114), and

there is no record of any report being filed with the IRS by anyone else regarding any of the other

transactions that Claimant says took place in 2013.   (Second Davis Declaration, Exhibit 19, at

para k.)

---

[6] The reference is to IRS Form 8300, which must be filed in connection with any cash transaction exceeding
$10,000 per 31 U.S.C. § 5331.

### The sale of 2688 Harrison Street

Claimant's greatest difficulty, however, concerns the alleged sale of the property at 2688 Harrison Street in Gary, Indiana to Cecilia Gonzalez, which Claimant says was the source of $25,000 of the defendant currency.  (Response to General Interrogatory 7.)

According to Claimant, her husband bought the property for $18,000 and made a tidy profit on his investment when Claimant sold the property on his behalf to Cecilia Gonzalez in 2013. (Claimant's Deposition at T.124-25.)  Claimant supported this contention with documents purporting to be a Bill of Sale and an Agreement to Sell Real Estate, both bearing the signature of Cecilia Gonzalez, and with copies of two receipts for $50,000 and $25,000 in cash that she allegedly received from Gonzalez on July 13, 2013 and August 13, 2013, respectively.  The problem is that no such sale ever occurred, the documents Claimant provided are false, and the signatures of Cecilia Gonzalez are forgeries.

First, neither Claimant nor her husband ever owned the property on Harrison Street and thus were never in a position to sell it.  The land records from Gary, Indiana show that the property was conveyed by quitclaim deed on July 2, 2012 to a corporation known as It's Gary's Time, LLC, the President and Founder of which is Roger Hayward.  (Declaration of Dennis Nation, Exhibit 20.)  The corporation failed to pay the taxes on the property and it was sold in a tax sale to one Rasheda Green on or about April 4, 2013.  *Id.*  Thus, at the time of the alleged sale of the property by Samantha Banks to Cecilia Gonzalez on September 9, 2013, Rasheda Green was the owner of the property.  *Id.*  At no time did Claimant, her husband or Ms. Gonzalez have an ownership interest in the property.  *Id.*

Claimant named herself as the "Seller" of the property in the Bill of Sale and the Agreement to Sell Real Estate, and then claimed at her deposition that the owner was actually her

40

husband.  (Claimant's Deposition at T.123.)    But Jerry Lee Banks admitted in his deposition

that neither he nor his wife owned the property, and that he did not even know the identity of the

person who bought it.    The best he could do was to suggest that the buyers "might have been some

Mexicans."  (JLB Deposition at T.62.)

Second, Claimant has produced none of the paperwork that would normally be associated

with sale of real property: she has no HUD-1 form from the closing, no copy of the quitclaim deed

that she says she gave Ms. Gonzalez, and no documents relating to any inspection or title

insurance.

Finally, Cecilia Gonzalez has provided a sworn Declaration stating that the sale did not

occur and that she did not sign the documents purporting to bear her signature.    The Declaration

and several attachments are found at Exhibit 21.

In her Declaration, Gonzalez states that she entered into a rent-to-buy Purchase Agreement

to acquire the Harrison Street property on July 13, 2013 *for the sum of $8,500.*  (Declaration of

Cecilia Gonzalez at para. b.) (emphasis added).    The terms of the Agreement included a down

payment of $700 and a monthly payment of $300 until July 13, 2013.    *Id.*    A copy of this

Purchase Agreement is attached as Exhibit A to her Declaration.

Gonzalez goes on to say that she paid the $700 down payment in two installments on July

11 and 13 and that she received receipts signed by a person she understood to be "S. Barnes."

(Declaration of Cecilia Gonzalez at para. d, and Exhibits B and C to the Declaration.)    Other than

those payments and her monthly rent of $300, Gonzalez did not give any other money to anyone in

connection with the Harrison Street property.  (Declaration of Cecilia Gonzalez at para. e.)

On October 2, 2014, Gonzalez met with Senior Inspector Dennis Nation of the U.S.

Marshals Service who showed her the Bill of Sale and the receipts for $50,000 and $25,000 that

Claimant provided in response to the Government's special interrogatories.  (Declaration of Cecilia Gonzalez at para. g and h.)   According to Gonzalez, all of these documents "appear to be forgeries."  *Id.*  "Until I was shown these documents," Gonzalez continued, "I had never seen either before."  *Id.*  Moreover, she said, "the signature on the Bill of Sale that purports to be my signature is not mine.   I did not sign this document." (Declaration of Cecilia Gonzalez at para. k.)

To determine if Ms. Gonzalez was telling the truth, Mr. Nation showed her a set of genuine signatures taken from Gonzalez's motor vehicle records and juxtaposed those with the signature from Claimant's Bill of Sale.  (Declaration of Cecilia Gonzalez at para. l.)   Gonzalez indicated which of the signatures were genuinely hers and which were forgeries.  "The one taken from the Bill of Sale," she concluded, "is a forgery."  *Id.*

It is now painfully apparent what happened here: To substantiate her claim that she had the defendant currency in her possession before her husband flew to Baltimore on September 11, 2013, Claimant needed documents to show that she had in fact derived income from legitimate real estate transactions.   Taking advantage of an existing Purchase Agreement between Cecilia Gonzalez, a tenant at 2688 Harrison Street, and the owner of that property, whereby Gonzalez agreed to buy the property for $8,500 and to make a $700 down payment, Claimant created an entirely new set of false documents intended to make it appear that Gonzalez agreed to buy the property *from her* for $100,000 and that she made a $75,000 down payment.   Unfortunately for Claimant, she did not count on the U.S. Marshal being able to locate Ms. Gonzalez, and she did not realize that her clumsy effort to forge Ms. Gonzalez's signature on the false documents would be easily detected when the signature on the Bill of Sale was compared to Gonzalez's true signature.  This reprehensible act alone should be enough to disqualify Claimant from establishing standing to contest the forfeiture of the defendant currency.  *See United States v. Approximately $658,830 in*

*U.S. Currency*, 2012 WL 3233642, *8 (E.D. Cal. Aug. 6, 2012) (bare assertion of ownership is insufficient to withstand motion for summary judgment for lack of standing where claimant's corroborating evidence proved to be false); adopted by the district court, 2012 WL 4461018 (E.D. Cal. Sept. 25, 2012), aff'd 563 Fed. Appx. 579 (9th Cir. 2014).

**Claimant's inconsistent statements**

As many courts have recognized, the claimant's inability to tell a consistent story regarding her ownership or possession of the defendant currency, is probative evidence that weighs heavily in determining the outcome of a civil forfeiture action. *See United States v. Funds in the Amount of $30,670*, 403 F.3d 448, 467 (7th Cir. 2005) ("All of these inconsistencies are relevant in weighing whether the Government has established its burden justifying forfeiture"); *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216-17 (9th Cir. 2001) ("[Claimant's] inconsistent statements about the money and his reasons for being in Phoenix tended to support an inference that the money was drug-related").

As the Eleventh Circuit recognized in *$242,484.00*, the change in the claimant's story is significant because "people who tell the truth usually do not have difficulty keeping their story straight." Conversely, people who are fabricating their story may "forget their initial statement or try to make something up" when they forget what they said the first time or realize that their initial statement is too obviously false. *United States v. $242,484.00*, 389 F.3d 1149, 1164 (11th Cir. 2004).

Accordingly, in *United States v. $14,066 in U.S. Funds*, 2010 WL 4823375 (M.D. Ga. Nov. 22, 2010), for example, the court granted summary judgment for the Government in part because the claimant made inconsistent statements in his claim and at his deposition regarding the source of the defendant currency. *See also United States v. $107,840 in U.S. Currency*, 784 F.

43

Supp.2d at 1128 (granting summary judgment based in part on inconsistencies in claimant's explanation of his travel between Maryland and California); *United States v. $38,000.00 in U.S. Currency,* 2013 WL 2368377, *5 (D. Neb. May 29, 2013) (entering judgment for the Government at trial after noting that claimant's explanation for travel with bundles of "rubber-banded cash" was "riddled with inconsistencies"); *United States v. $4,790.00 in U.S. Currency,* 2006 WL 359955, *5 (C.D. Ill. Feb. 15, 2006) (entering judgment for the Government at trial based in part on inconsistent statements regarding the source and ownership of the currency).

The record in this case is riddled with such inconsistencies.   As already mentioned, Claimant asserted that the Harrison Street property belonged to her husband and that he made a profit from its sale; but Jerry Lee Banks testified that he did not own the property and knew little about its sale.   Other examples abound.

Claimant has given two entirely different explanations for the packaging of the defendant currency in vacuum-sealed plastic bags.   In response to Special Interrogatory 11, Claimant said, "Jerry Lee Banks packaged the defendant currency," and that it was packaged in vacuum-sealed plastic "so that the defendant currency would not be detected during travel."   Claimant the repeated this assertion in response to General Interrogatory 3 when she said, "The currency was packaged to avoid detection from anyone who was able to steal the currency or to otherwise negatively affect Claimant's title to and/or concomitant rights in the currency and/or Jerry Lee Banks' lawful possession of and/or use of the currency."   In her deposition, however, Claimant said for the first time that she kept the money in a crawl space under her house for a period of eight years and that she kept it in a plastic bag because the crawl space floods and she was concerned that the money would get wet.   (Claimant's Deposition at T. 55-56, 84-85.)   Moreover, Claimant said that she was the person who put the money in the plastic bag and in the crawl space and that

44

Jerry Lee Banks' only role was to count the money and put it back in the plastic bag before he left for Baltimore.  (T.55.)

Claimant also changed her story about her intended use for the defendant currency.  In the affidavit she submitted in support of her motion to dismiss the Government's complaint (ECF 13-1), Claimant said, "I was planning on using some of the currency to help [my son] pay for his college expenses."  In her response to the interrogatories and at her deposition, however, Claimant has maintained that the money was to be used solely to purchase real estate in Baltimore. Indeed, the following exchange occurred in her deposition at T.50-51:

> **Q.** So this was the money that you were planning to invest for this purpose; is that right?
>
> **A.** Yeah. That purpose.   That was my livelihood right there.
>
> **Q.** That was not money you needed for some other purpose?
>
> **A.** Oh, no.   Ain't no other purpose.

Claimant and her husband also could not agree on what happened when Jerry Lee Banks attempted to contact "Roger Hayward" in Baltimore.  Claimant has maintained throughout this litigation that, according to her husband, when Banks tried to call "Hayward," the call went to voice mail.  (Response to General Interrogatory 1; Claimant's Deposition at T.57-58, 60.)  In contrast, Banks testified that the phone "kept ringing" and there was "no answering machine." JLB Deposition at T.29-30, 41.

This is not a trivial point.  If the call went to voice mail, as Claimant testified, there would be a record of the call in the toll records from Banks' cell phone account, but if the phone "kept ringing" as Banks testified, there would be no such record.   Indeed, there is no record of any call from Jerry Lee Banks' phone to a Roger Hayward.  (Second Davis Declaration at para. q.)

Finally, Claimant and her husband could not agree on what happened when Banks called his wife to tell her that he could not make contact with "Roger Hayward." According to Claimant, when Banks called her on September 12, she told him "to bring my money back home." (Claimant's Deposition at T.65.) And when asked if Banks told her he was going to San Francisco, Claimant answered, "No. He told me he was coming home." (*Id.* at T.66.) Banks, however, testified that he had planned all along to go to San Francisco after leaving Baltimore to attend a prize fight, that his wife knew this, and that when he called her she told him to "just go ahead on." (JLB Deposition at T.42-45.)

Again the point is material: Claimant's version supports her contention that the only reason Jerry Lee Banks was in Baltimore was to purchase real estate, and that logically, once the deal fell through, he should come home. Banks version, on the other hand, supports the view that Banks intended to go to San Francisco all along and that the stop-over in Baltimore lasted no longer than it took to arrange the details of a drug transaction and to purchase a one-way ticket to San Francisco less than three hours after he arrived.

### False statements: Food stamps, car loan, travel

Other aspects of Claimant's testimony and her responses to the interrogatories are not merely inconsistent but are plainly false. For example, Claimant stated on more than one occasion in response to the Government's discovery requests that she never applied for food stamps until after her money was seized on September 12, 2013. (Letter Dated August 5, 2014, response to Question 4; Letter Dated September 5, 2014.) In her deposition, she repeatedly claimed that she could not recall or could not remember applying for food stamps in 2011, 2012, or 2013, and insisted that if she did apply, her applications were denied. (Claimant's Deposition at T.94-96.) In fact, Claimant applied for food stamps each year from 2011 through 2013 and has

been receiving food stamp benefits continuously since July 2011.   (Declaration of Gustavo Perez, Exhibit 17.)

Making three applications for food stamps, and receiving over $13,000 in benefits, is not something that the recipient could honestly fail to recall.   Rather, Claimant intentionally tried to mislead the Government by lying about her applications for public assistance because she knew that those applications would be inconsistent with her claim to have saved the defendant currency under her house over a period of nine years.

Likewise, Claimant attempted to mislead the Government regarding her default on her car loan.   In her affidavit in support of her motion to dismiss, Claimant alleged that "as a direct result of the seizure of my life savings in this case . . . my automobile was repossessed due to my inability to make the monthly payments on my car loan.   (ECF 13-1).   She made the same claim in her response to General Interrogatory 4 when she said, "Claimant's life savings was seized in September 2013 – three months before her automobile was repossessed – which left her without funds to meet her financial obligations with respect to the automobile, thereby causing the repossession to occur."   In her deposition, Claimant said the same thing in the following exchange which appears at T.92:

**Q.** So you did not default on the loan or miss any payments before September of last year?

**A.** That's right.

**Q.** So the first time you missed a payment was when?

**A.** In September.

The records obtained from Credit Acceptance Corp., however, tell a different story. According to the Transaction Report dated October 6, 2014 (Exhibit 16), Claimant made more or less regular payments on her car loan until June 11, 2013 *and never made another payment after*

47

*that time.*   Thus, Claimant was in default on the loan *for three months* before the seizure in Baltimore, and deliberately and repeatedly lied about the date of her default in a failed attempt to maintain the fiction that she had tens of thousands of dollars in cash at her disposal until the seizure occurred.

Finally, Claimant has been less than candid regarding her and her husband's travel history. In her deposition, as part of her effort to explain how she was able to save such a huge sum of money on modest income, Claimant asserted that she had not gone on vacation and had never traveled out-of-state.   (Claimant's Deposition at T.81).   But the records obtained from American Airlines reveal that on April 4, 2013, Claimant and her husband flew together on United Flight 1210 from Chicago to New York-LaGuardia at 8:05 a.m., stayed in New York a total of eight hours, and returned to Chicago on American Flight 361 that same day, at a cost of $357.20 each. (Declaration of Colette Odell, Exhibit 22.)

In addition, when Claimant was asked at her deposition how often her husband had flown to San Francisco, she replied, "I have no idea. I really don't know. . . . He don't go there often.   He probably went there about . . . two times. That's about it. . . . Over about . . . two, three years' time . . . ."   And when asked if he had flown to San Francisco at all in 2013, she replied, "I don't know. I don't even know.   I'm not sure.   I don't think he did.   I don't know."   (Claimant's Deposition at T.70-71.)

In fact, as discussed below, the records obtained from the airlines reveal that Jerry Lee Banks had traveled to San Francisco at least *six times* in the nine months preceding the seizure on September 12, 2013, including one trip that ended only *four days* before the seizure in Baltimore

48

(Exhibit 23),[7] and Claimant's phone records indicate that she spoke with her husband *50 times* during that trip. (Second Davis Declaration at para. p.)

Taken together with Claimant's completely fabricated story regarding the Harrison Street property which she supported it with forged signatures on false documents, these examples of deceit show that Claimant's assertion that she had a valid ownership interest in the defendant currency before it was seized is unsupported by any credible evidence.

**The Roger Hayward story**

Claimant's most serious fabrication, of course, is the "Roger Hayward" story. Her explanation for her husband's trip to Baltimore is completely uncorroborated, fanciful and untrue.

First, Claimant has offered no evidence whatsoever that "Roger Hayward" even exists: she cannot find his phone number or email address, she has no copy of his Craigslist posting, and she has no documents relating to her discussion with him other than the list of properties that Claimant admits is in her own handwriting. (Letter dated August 5, 2014, response to Quest. 2; Claimant's Deposition at T.44.)   Nor can her husband corroborate any of her testimony, as he admits he never saw "Hayward's" Craigslist posting and never spoke with "Hayward." (JLB Deposition at T.17-19.)

Moreover, Craigslist's response to the Government's subpoena indicated that the company had no record of a posting by a "Roger Hayward" in 2013 (Exhibit 24), and DEA Agent Kevin Davis was unable to find any record of a "Roger Hayward" in the real estate business in Baltimore (Second Davis Declaration at para. 1).   Finally, Claimant's telephone records reveal no phone calls to or from her principal phone number, 872-230-4856, involving *any* number with a

---

[7] The Government subpoenaed records from American, Delta, Southwest and United Airlines.   The Government cannot say whether Jerry Lee Banks did or did not also travel on other airlines.

Maryland area code in the two weeks preceding the September 12, 2013 seizure.  (Second Davis Declaration at para. n.)[8]

Nor do any of the phone calls made from Jerry Lee Banks' cell phone on the evening of September 11 or the early morning hours of September 12 come back to a "Roger Hayward." Rather, the only calls on Mr. Banks phone, beginning from the time his plane landed in Baltimore until noon on the following day when the money was seized involve his wife's phone number, numbers with area codes in California, New York, Georgia and Nevada, and three numbers in Maryland: the Aloft Hotel where he stayed and two escort services.  (Second Davis Declaration at para. q.)

Finally, Claimant admitted in her deposition that she never mentioned "Roger Hayward" in her conversations with Baltimore law enforcement agents in the days following the seizure (Claimant's Deposition at T.73-74), and she gave a non-responsive answer to Special Interrogatory 16 in which the Government asked her to respond to TFO Davis's recitation of that conversation, stating that "she was without sufficient information to respond to the declaration of Kevin Davis because she does not know Kevin Davis." (Response to Special Interrogatory 16.)

Second, in addition to having no evidence that "Roger Hayward" exists, Claimant's story regarding the proposed real estate transaction with "Hayward" is patently absurd.

It begins with the amazing coincidence that the Baltimore realtor whom Claimant never met and cannot find has the same name as the Gary, Indiana property owner who owned the house

---

8 In her counsel's letter of September 5, 2013, Claimant stated that she spoke with "Hayward" on a Boost Mobile prepaid phone with the number 773-765-8534.  (Exhibit 13.)  TFO Davis was unable to find any records for that phone number, but did find that records showing that Claimant made or received approximately 511 calls on number 872-230-4856 during the two weeks preceding the seizure (8/29 through 9/12), indicating that that was her principal phone number at that time.  (Second Davis Declaration at para. o.)

at 2688 Harrison Street that Claimant purported to sell to Cecilia Gonzalez --- a fact that Claimant tried not to reveal until confronted at her deposition with the revelation that the Harrison Street property was titled in the name It's Gary's Time, LLC, the founder and president of which was Roger Hayward.   (Claimant's Deposition at T.129-32; Declaration of Dennis Nation at para. d.) Almost certainly, Claimant, in her awkward attempt to fabricate the name of a fictional Baltimore realtor to create a reason for her husband's trip to Baltimore, picked the name of a real person with whom she was well-acquainted from her property management business, never guessing that the Government would uncover the coincidence in the course of its investigation.

In addition, Claimant would have the court believe that she would give her life savings – carefully hidden under her house for nine years – to a realtor she had never met, in a city she had never visited, to invest in property she had never seen, without retaining any money for her household expenses and without the benefit of title insurance or a proper inspection of the property, only to rely on the "crook on the corner" or " the wine head down the block" to look after the property after the investment was made.   That such as tale has no corroboration is hardly a surprise.

Nor is it a surprise that most of the story is demonstrably false.

Claimant and her husband both testified that Jerry Lee Banks flew to BWI, checked into the Aloft Hotel, called "Roger Hayward" several times before going to bed, called him again in the morning, and *then* made a reservation to fly to San Francisco when he determined that "Hayward's" phone had been disconnected.   But that is not what happened: The hotel, telephone and airline records show that Banks did not check into his hotel room until 12:08 a.m., that he spent the next half hour on the phone with his wife followed by two hours on the phone with unknown persons in Georgia, New York, California and Nevada, and then bought the one-way ticket to fly

to San Francisco on the Delta Airlines website at 2:35 a.m., less than two and a half hours after he arrived.  (Declaration of Woody Montgomery; Declaration of Pamela Fears; Second Davis Declaration at para. q.)   Moreover, he conceded at his deposition that he made no effort to find the elusive "Roger Hayward" before changing his plans.  (JLB Deposition at T.43-44.)   After flying all the way to Baltimore with his wife's life savings to make a real estate investment, one would think Banks would have made some effort – to include looking for "Hayward's" name in the phone book, or going downtown to see the properties he intended to buy – to find the person his wife had spent several months cultivating as a business connection.   But instead, Banks made at most a perfunctory effort *at one o'clock in the morning* to call "Hayward" before changing his plans to return to San Francisco, where he had been just four days before.

### The profile of a drug courier

The fact is, Jerry Lee Banks' trip to Baltimore bears none of the indicia of a real estate transaction and all of the indicia of a drug courier who picked up a bundle of currency in Baltimore and was on his way to San Francisco to consummate a drug deal when the money was found in his checked luggage.

First, Banks has a criminal record.   At the outset of the deposition, Banks stated that he did not know how many times he has been arrested, but stated that "it was – maybe more than five or 10 times. I don't know.   I'm not sure."   When asked, "And how many times it was drug-related?" he replied, "Once or twice, I believe."   T.13-14.

Second, the concealment of a large quantity of currency in vacuum-sealed bags (so packaged to prevent its detection by a drug dog) in the luggage of a person traveling on a one-way ticket, purchased immediately before travel for full fare, from the East Coast to California or the Southwest, is a classic scenario followed by couriers for drug dealers whose suppliers are in the

52

Southwest and whose customers are in the cities in the East.   (Second Davis Declaration at para. d

through i.)   Indeed, the case law on the probative value of the quantity of currency and the manner

in which it is packaged is voluminous.

For example, in *United States v. $242,484.00,* 389 F.3d 1149 (11th Cir. 2004), the Eleventh

Circuit said the following: "A common sense reality of everyday life is that legitimate businesses

do not transport large quantities of cash rubber-banded together into bundles and stuffed into

packages . . . because there are better, safer means of transporting cash if one is not trying to hide it

from authorities."   389 F.3d at 1160-61.   *See United States v. $124,700 in U.S. Currency,* 458

F.3d 822, 826 (8th Cir. 2006) ("Possession of a large sum of cash is strong evidence of a connection

to drug activity;" thus, courts "have adopted the common-sense view that bundling and

concealment of large amounts of currency, combined with other suspicious circumstances,

supports a connection between money and drug trafficking"); *United States v. $252,300.00 in U.S.*

*Currency,* 484 F.3d 1271, 1275 (10th Cir. 2007) (agreeing that large quantity of currency bundled

in stacks held by rubber bands is "strong evidence" of a drug connection); *United States v.*

*$67,220.00 in U.S. Currency,* 957 F.2d 280, 285 (6th Cir. 1992) (same).

Accordingly, district courts have relied on the quantity of currency and the manner in

which it was bundled as one of the factors supporting the entry of summary judgment for the

Government in civil forfeiture cases.   *See United States v. $864,400.00 in U.S. Currency,* 2009

WL 2171249 (M.D.N.C. July 20, 2009) (granting summary judgment as to quantity of currency

wrapped in newspaper and found concealed in vehicle's door during traffic stop), aff'd *sub nom.*

*United States v. Tan,* 405 Fed. Appx. 717 (4th Cir. 2010).[9]

---

9 At this point in a motion for summary judgment, the Government would normally note that a drug dog
alerted to the defendant currency.   A drug dog did alert to the currency in this case, but because the

Jerry Lee Banks' travel to Baltimore and on to San Francisco fits the drug courier profile to a tee.   He had been to San Francisco six times in the past nine months, including five trips within days of each other between December 23, 2012 and January 27, 2013, and a sixth trip completed just four days before the instant seizure.   (Summary Chart of Airline Records, Exhibit 23.)   He always traveled on a one-way ticket for full fare (including, in this instance, the flight on Southwest Airlines to BWI on the evening of September 11), and generally purchased the ticket on the day of travel.   (JLB Deposition at T.48.)   Indeed, on September 12, 2013, he spent less than two and a half hours in Baltimore before purchasing his ticket to San Francisco, and spent the majority of that time on the telephone to unknown persons in Georgia, New York, California and Nevada.

Finally, Banks' testimony that he thought that it was safer to conceal $122,640 in currency in his checked luggage rather than carrying it on his person or in his hand luggage is absurd. More likely, he knew that hand luggage would be screened at the TSA checkpoint but may have believed that checked luggage would not.   Indeed, the checked luggage may have simply been a prop brought along to disguise the money and for no other purpose.   Otherwise it is hard to understand why Banks declined the return of his suitcase and clothing after the money was seized.

### Applying the law

As stated earlier, Claimant has the burden of proving a sufficient ownership or possessory interest in the defendant currency to establish Article III standing.   Her sworn statements to that effect are not enough: she must have corroboration, especially when the Government has produced evidence that she did not have the financial resources necessary to account for her possession of

---

reliability of the dog in this case has been controverted, and because the evidence negating Claimant's standing is otherwise so overwhelming, the Government chooses not to rely on the dog sniff in support of this motion.

such a large sum of money.   *United States v. $138,381.00,* 240 F. Supp.2d 220 (E.D.N.Y. 2003);

*United States v. $447,815.00 in U.S. Currency,* 2011 WL 4083640 (M.D.N.C. July 26, 2011)

(Report and Recommendation), adopted by the district court, 2011 WL 4083640, *3-4, aff'd *sub*

*nom. United States v. Carroll,* 470 Fed. Appx. 192 (4th Cir. 2012); *United States v. $225,894 in*

*U.S. Currency,* 852 F. Supp.2d 578, 581 (D.N.J. 2012).

    The Government has produced ample evidence that Claimant lacked such resources.   Her

tax returns viewed in combination with the living expenses to which she admitted, as well as her

application for a car loan at 18.49 percent interest, her defaults on 15 bills and consumer loans, and

the sworn statements on her applications for food stamps that she did not have $2,000 in her

possession, all suggest that Claimant lacked the ability to have saved $122,640 from her legitimate

income over nine years and did not in fact have such resources at her disposal.   Against that

evidence, Claimant has produced little more than her own sworn statement that the defendant

currency was in her lawful possession before her husband traveled to Baltimore.   Indeed, aside

from receipts for a few modest amounts in 2007 and 2012, and for somewhat larger cash

transactions in 2013 that were not reported on her tax return and are not supported by the required

IRS forms regarding large cash transactions, Claimant has produced nothing to support her claim

aside from a fraudulent Bill of Sale bearing the forged signature of an innocent third party.

    As the courts in *$138,381.00, $447,815.00, $225,894,* and the other cases cited in footnote

2 have held, when a claimant finds herself relying on nothing more than her own testimony to

establish her ownership of the defendant currency, no reasonable court could conclude that the

claimant has met her burden of proof with regard to Article III standing.

    But Claimant's standing difficulties go far beyond the lack of corroboration for her claim.

She has relied on false evidence and contradictory statements that undermine her credibility and

foreclose any possibility she might be able to satisfy her burden of proof.   She lied when she said she had never applied for food stamps and that she did not default on her car loan until after the seizure of the defendant currency; she claimed ignorance of her husband's travel history and denied her own; she asserts that he traveled to Baltimore to meet with a realtor whose existence she cannot establish but who happens to have the same name as a realtor with whom she was well-acquainted in Indiana; and she created false documents regarding the sale of the Harrison Street property.   Moreover, she contradicted herself and her husband with respect to who owned the Harrison Street property, why the defendant currency was packaged in vacuum-sealed bags, who placed it there, what she intended to use the defendant currency for, and what occurred when Jerry Lee Banks arrived in Baltimore.

As the Eleventh Circuit said in *$242,484.00*, changes in the claimant's story are significant because "people who tell the truth usually do not have difficulty keeping their story straight." Conversely, people who are fabricating their story may "forget their initial statement or try to make something up" when they forget what they said the first time or realize that their initial statement is too obviously false.   389 F.3d at 1164.   The record in this case is a classic example of that point.

Stated simply, a claimant who relies on false and contradictory testimony cannot establish standing because she has nothing other than her own unsupported assertions to establish her ownership or possession of the defendant currency.   *United States v. $31,000 in U.S. Currency,* 2012 WL 5343350 (E.D. Mich. Oct. 29, 2012); *United States v. Approximately $658,830.00 in U.S. Currency,* 2012 WL 3233642 (E.D. Cal. Aug. 6, 2012).

Finally, Claimant's explanation for her husband's travel to Baltimore is both uncorroborated and incredible.   There is no evidence that "Roger Hayward" exists, there is no

56

evidence in the phone records that Claimant ever called any such person, and the supposed "plan" to invest her life savings in property unseen without even so much as a title inspection is absurd. Moreover, Jerry Lee Banks' story about attempting to call "Hayward" between his arrival on the evening of September 11 and the time he got up for breakfast the next morning is contradicted by documents showing that at most he had a window of two and half hours from midnight to 2:35 a.m. to make such calls – an odd time to attempt to arrange a bona fide real estate transaction.

Those few hours, however, were not an odd time to arrange a drug deal.   Indeed, Banks' trip to Baltimore, viewed in light of all of the circumstantial evidence, including his arrest record, past travel history, the quantity of currency that was seized and the manner of its packaging, and the other factors that fit the drug courier profile, all suggest that the defendant currency was intended to be used in a drug trafficking offense.

The point is not that the court should find, at this stage in the proceeding, that the Government has established the forfeitability of the defendant property under Section 881(a)(6) because it was used or intended to be used to commit a drug offense.   The instant motion relates solely to Claimant's standing, and we are not seeking to conflate the standing issue with the ultimate question of forfeitability on the merits.   Rather, the point is that the stronger the evidence that the defendant property was being transported to San Francisco as part of a drug deal that was arranged in the early morning hours of September 12, 2013, the less likely it is that Claimant had ever had the money in her lawful possession in the crawl space under her home, and thus the less likely it is that a court could find that she has met her burden of proof as to standing. *United States v. Funds in the Amount of $239,400,* ___ F. Supp.3d ___, 2014 WL 5023453 (N.D. Ill. Oct. 7, 2014); *United States v. $119,030.00 in U.S. Currency,* 955 F. Supp.2d 569 (W.D. Va. July 2, 2013).

57

In short, Claimant has relied on perjured testimony and false evidence to establish her standing to contest the forfeiture of property that in all likelihood was intended to be used to consummate a drug transaction and was never in her lawful possession. The court should not countenance such behavior by finding that Claimant has established or has any chance of establishing a lawful interest in the defendant property.

**CONCLUSION**

Because no reasonable finder of fact could conclude, in light of this evidence, that Claimant has met her burden of proving that she has standing to contest this forfeiture action, the court should enter summary judgment for the Government.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____

Stefan D. Cassella
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800