# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. JKB-13-3778 |
| $122,640 in U.S. Currency, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS

Claimant Samantha Banks, by and through counsel, C. Justin Brown, hereby replies to the Government's Response to her Motion to Dismiss. Claimant seeks dismissal of this action because the Government produced to undersigned counsel in discovery a falsely created document that was material to the case.[1] While the Government referred internally to this document as "the bogus certificate," the Government presented it to counsel as "a reproduction of the original." Despite being fully aware of how this document was created, and despite receiving repeated requests by the Claimant for more information about the document, the Government never disclosed the truth to counsel.

---

[1] The Government has called Banks' claims, at various times, "sanctimonious," (ECF No. 29 at 8), a "manufactured horror," (*id*.) "scurrilous," (*id*. at 11), "spurious," (ECF No. 18 at 2), and a "scorched Earth" tactic," (*id*. at 3). The Court has warned counsel that its claims "should not be made lightly, i.e., without substantial underlying evidence." (ECF No. 30 at 4). Counsel assures the Court that Banks' claims have not been raised lightly; they are important on a number of different levels; they have been carefully vetted; and counsel has gone to great lengths to investigate the matter thoroughly and remain grounded in the facts.

Contrary to what the Government argues in its Response, this was not a "reproduction of the original." The document was made out of whole cloth, from a home computer, with a date that was most likely incorrect. We do not know if an original ever existed. While the Government may now attempt to frame the meaning of "reproduction" to match its needs, it is inescapable that, despite numerous warnings, the Government failed to disclose material facts about this document, and as a result misled opposing counsel.

## I. Facts

This is a forfeiture case that originated with the seizure at BWI airport of $122,640 in U.S. currency. The Government alleges that the currency is related to drug trafficking even though no drugs were found with the money, no criminal charges were pursued, and neither the Claimant nor her husband, Jerry Banks, who possessed the currency, had a single drug conviction.

Because the Government must ultimately show a connection between the money and narcotics activity, a critical piece of evidence, from the outset, was the fact that a Maryland Transportation Authority Police (MTAP) narcotics canine, Falco, alerted to the currency at the airport. The instant Motion is centered on the most important document related to that alert – the certificate proving that the canine team was properly trained and credentialed.

It is undisputed that the document provided to Claimant in discovery was not a copy of an actual certificate that MTAP had in its possession. Rather, the facts show that the document was created for litigation – approximately one year after the fact – when either (1) the original had been lost, or (2) no original existed in the first place.

It is now known that the document was created by two individuals: Cpl. Joseph Lambert, Falco's handler at the time of the alert, and Sr. Officer Joseph McCarty, who trained the team. McCarty, who was on sick leave, created the text of the document on his home computer, signed it, and faxed it to Lambert. Lambert apparently affixed a seal and a background border design to make the certificate look official. Because neither McCarty nor Lambert knew an exact date on which a certification had been conducted, they settled on an estimate, August 16, 2013. (ECF No. 13, Ex. 10 (McCarty Affidavit)).

The document was created in response to Claimant's Request for Production of Documents, which was directed to Assistant United States Attorney Stefan Cassella. On March 24, 2014, Cassella, in turn, passed the request to his paralegal, Jennifer Stubbs. (Cassella Declaration[2] at ¶ 8). Stubbs then contacted Lambert to fulfill the request.

On April 7, 2014, Lambert emailed the newly created document to Stubbs, providing no explanation of its genesis. (Stubbs Declaration at ¶ 4; Gov't Ex. Stubbs 3). It would appear that, at this point in time, the Government was unaware that anything was wrong with the document.

Other law enforcement officers at MTAP, however, soon caught wind of how the document was created. In particular, Sr. Officer Michael McNerney, who was then the head trainer of the canine unit, learned about what McCarty and Lambert had done. He believed the document to be "fraudulent," and he timely alerted his supervisors to this problem. (ECF No. 13, Ex. 9 (McNerney Depo.) at p. 26). According to McNerney, his concerns travelled all the way up the chain of command at MTAP, and a meeting was held to figure out what to do. McNerney was not present at that meeting. (*Id.* at 31–32).

---

[2] The declarations of AUSA Cassella, AUSA Evan Shea and paralegal Stubbs are attached as exhibits to the Government's Response, ECF Doc. # 29.

Four days after the manufactured document had been emailed to the United States Attorney's Office (USAO), and after discussing the matter with McNerney, MTAP Sgt. Joseph Hoyer called Stubbs and discussed the certificate, telling her, at the very least, that the certificate "was not the original." (Stubbs Declaration at ¶ 7). It is unknown what, if anything else, Hoyer told Stubbs about the document – *i.e.* that an original certification had been lost, or that the date was not authentic.

Upon learning this information, Stubbs first took the issue to AUSA Evan Shea, who then advised Cassella that this should be brought to the attention of Claimant's counsel. (Cassella Declaration at ¶ 15; *c.f.* Shea Declaration (not mentioning such an interaction with Stubbs)). Cassella then instructed Stubbs to "prepare a letter… relaying what she had been told about the Certificate." (Cassella Declaration at ¶ 15).

The letter that Stubbs eventually sent to Claimant, dated April 15, 2014, was signed by Cassella. It was a cover letter for the Government's first production in response to Claimant's initial Request for Production of Documents, and it was attached to 34 pages of various documents. The letter contained the following sentence: "Please note the Narcotic Certification (bates number 0033) is a reproduction of the original certificate." No further information was provided about the certification. (ECF No. 13, Ex. 2 (3/15/14 letter)).

The certificate itself was printed as a color copy. It was the only document counsel is aware of – including other narcotics certificates – that was produced in color throughout the course of discovery. Missing from the disclosure was any supporting documentation related to the certificate.

About three weeks later, on May 7, 2014, Stubbs was attempting to locate the person who the Government would name as its expert witness, Sr. Officer McNerney. When she could not get in touch with McNerney, she ended up calling Ted Cox, a retired MTAP K-9 trainer who was then living in South Dakota. In that phone conversation, Stubbs learned, essentially, the full story of how the document was created, including, in pertinent part, the following: (1) MTAP officers could not find the original certificate, or supporting documents, so McCarty had created a new certificate for purposes of the ongoing litigation; and (2) the K-9, Falco, had not been properly trained. Stubbs presented this information verbally to Shea, then to Cassella in an email. (Stubbs Declaration at ¶ 14; Shea Declaration at ¶ 7).

The May 8, 2014, email provided Cassella with a relatively complete picture of how the document came to be. Stubbs explained: "because MTAP had lost the certificate and score card that goes along with it, they basically panicked and created this new certificate which likely does not have the correct certification date on it." She also wrote: "I also found out that K-9 Falco was likely not receiving the minimum monthly training required by law and that he likely has not been trained with uncirculated currency." Finally, at the conclusion of the email, she referred to the document that had been turned over to the Claimant as "the bogus certificate." (Gov't Ex. Stubbs 6).

Meanwhile, on the very same day that Stubbs sent this email to Cassella, Claimant's counsel emailed the Government a letter expressing concern about the Government's failure to sufficiently disclose documents related to the K-9 issue. Specifically, the letter stated "[a]s you will see below, we are most concerned that you have not turned over any of the training records pertaining to Cpl. Lambert and his K-9,

Falco, other than a one-page certificate." (ECF No. 13, Ex. 4 (5/8/14 Letter) (emphasis in original)).

The letter also requested: "any information you are aware of related to a lack of competency, integrity or reliability on the part of Cpl. Lambert . . . " (*Id*.). Claimant made similar requests again in a May 30, 2014, letter. (ECF No. 13, Ex. 6 (5/30/14 Letter)). As noted above, Lambert was the MTAP officer who played the leading role in the creation of the backdated certification.

In the wake of all of this – the phone conversation with Cox, the email to Cassella and Claimant's repeated requests for more information – the Government did not supplement its disclosure related to the K-9 evidence in any way.

On June 13, the Government learned yet more information about the process by which the certification had been created. Shea and Stubbs met with Sgt. Joseph Hoyer and Sr. Officer Michael McNerney, who by then had been named as the Government's K-9 expert. According to Stubbs, Hoyer stated he "did not like that the certificate had been recreated." (Stubbs Declaration at ¶ 11). According to Shea, McNerney said approximately the same thing, that the document turned over to Claimant "should not have been recreated." (Shea Declaration at ¶ 17).

McNerney would later give a different account of this interaction. He stated under oath that he told Shea, "I felt it was a fraudulent document," and that Shea responded by saying, "it was a duplicate document… the training had occurred." (ECF No. 13, Ex. 9 at p. 30).

On June 16, 2014, now fully aware of the facts related to the narcotics certificate – as related by three different MTAP sources: McNerney, Hoyer and Cox – the

Government responded to Claimant's letters requesting more information about the qualifications of Falco and Lambert. The letter was signed in Cassella's name, with the initials "ETS." But again, the Government did not disclose all the facts – and on at least one issue affirmatively presented what appears to be inaccurate information. First, while the letter stated that "[a]fter a reasonable search of the files in the possession of MTAP's training personnel, the certification score sheets and photographs for the August 16, 2013 Certification cannot be located," the letter never mentioned the fact that the real certificate (if it existed) had been lost. (ECF No. 13, Ex. 8).

Second, the letter, partially styled as a first-person account by Lambert, stated that "[o]n August 16 2013, K9 Falco and I completed a certification conducted by Officer John McCarty III." This statement was misleading, however, because at that point in time the Government knew that August 16 was, according to Stubbs' email, "likely" not the correct date. (Gov't Ex. Stubbs 6).

What is more, in the paragraph immediately following this statement, the letter stated, "This office is unaware of any information relating to any lack of competency, integrity or reliability on the part of Cpl. Lambert." (ECF No. 13, Ex. 8). This last statement was made despite numerous communications, from multiple sources, about inadequate training of the K-9 team and, in all likelihood, compelling information that Lambert had played the leading role in the recreation of the narcotics certification, which his own trainer referred to as "fraudulent."

On July 8, 2014, the Government called McNerney into its offices to prepare him for his expert deposition, which was scheduled for the next day.[3] McNerney met with Cassella and Shea. According to Shea, McNerney again expressed concern about the certificate. (Shea Declaration at ¶ 26). Cassella, however, states that he does not recall McNerney "saying anything about any problem with the training certificate." (Cassella Declaration at ¶ 26). Both Shea and Cassella recall, however, that McNerney expressed misgivings about the reliability of Falco. (Shea Declaration at ¶ 24 ("McNerney stated that he believed that the K-9 was *not* properly trained and was *not* reliable.")). Cassella and Shea conferred and then decided to withdraw McNerney as their expert witness.

Later that day, Shea told Claimant's counsel that McNerney was no longer the Government's expert. When counsel asked Shea why this decision had been reached, Shea declined to answer, and asked counsel to "guess" or "read between the lines." (Shea Declaration at ¶ 29). Shea provided no direct information related to the certificate, the reliability of the K-9 team, and why McNerney had been dismissed as an expert.

The following day, July 9, 2014, McNerney was deposed by Claimant's counsel. McNerney, a law enforcement officer, testified that he considered the certification document to be "fraudulent" and that he had told this to Shea. (ECF No. 13, Ex. 9 at p. 30). During the deposition, the Government attorneys made repeated speaking objections

---

[3] The Government in its Response emphasized that undersigned counsel would not consent to an extension of the discovery deadline, and that somehow forced an early deposition of McNerney. (ECF No. 29 at 6; Cassella Declaration at ¶ 23). The Government's characterization, however, does not paint the full picture. Rather, with respect to McNerney's deposition, counsel wrote in a June 23 email to Cassella, "I am certainly willing to work with you on the deposition dates – that is why I sent you so many to choose from. If you need something farther out, I understand that too and I will work with you. But, in the interest of my client, I cannot accept an indefinite extension."

that appeared intended to encourage the witness to call the document a "duplicate" or an "original document that was lost." (ECF No. 13, Ex. 9 at 32, 27).

During a break in the deposition, which was witnessed by court reporter Donna Gladwin, both Government attorneys stated the following:

- They were fully aware of McNerney's account – as testified to in the deposition – of how the document was created.

- They saw nothing wrong with how the document had been created, they did not investigate the matter any further, and they were comfortable presenting the document for litigation.

- They believed that the April 15, 2014, letter fully disclosed the true nature of the document to opposing counsel.

(Ex. 1, Gladwin Affidavit; Shea Declaration at ¶ 36 ("I reviewed the letter for the first time at that point as well, and, reacting on instinct, defended it as adequately disclosing the nature of the document.")).

Following McNerney's deposition, undersigned counsel contacted McCarty, who explained how the document had been created. He made it on his home computer at the direction of Cpl. Lambert, the K-9 handler. He stated that when he made it he did not realize it would be used in litigation and presented as a "reproduction of the original;" that he was not sure if it had the correct date; and that, without supporting documentation, it had "no value." (ECF No. 13, Ex. 10). According to McCarty, he faxed the newly created document to Lambert, who then turned it into an official-looking certificate. McCarty also stated that he was on pain killers at the time and he thought that he had no choice but to follow the order of his superior officer, Cpl. Lambert. (*Id.*).

Claimant filed her Motion to Dismiss on July 18, 2014; the Government responded on October 6, 2014. (ECF Nos. 13, 29).

## II. Analysis

While the parties may agree on some of the known facts above, they do not agree on what the facts mean. The three primary issues in dispute are: (1) whether describing the document as a "reproduction of the original" was a fair and accurate disclosure; (2) whether the Government intentionally misled Claimant (assuming the disclosure was not accurate); and (3) whether dismissal of the action is an appropriate remedy.

### a. Fair and accurate?

The Government's initial disclosure of the narcotics certificate – in which it described the document as a "reproduction of the original" – was neither fair nor accurate. First, it gave the false impression that the certification was a *facsimile* of a real certificate that was in the possession of the Government or MTAP. Second, the disclosure of the certification omitted the most important facts about it: that it had been created for litigation; that it had been backdated with a date that was probably incorrect; and that the actual certification, if it existed, had been lost. It is undeniable that somebody reading the Government's April 15 letter – even the most astute of readers – would not have been able to discern the truth about the document from the way it was described.[4]

Also problematic was the manner in which the document was disclosed to opposing counsel. The statement that it was a "reproduction of the original" was made in the middle of a routine discovery cover letter – not in a separate correspondence. This,

---

[4] A more accurate term for the certification would have been "fake," which, according to the Mirriam Webster online dictionary means: "not true or real; meant to look real or genuine but not real or genuine."

combined with the language used by the Government, had the effect of hiding or camouflaging the information.

The document itself, meanwhile, was produced as a color copy. Counsel is unaware of why this was the only document the USAO produced in color, but, generally speaking, color creates the impression of authenticity.

In its Opposition, the Government emphasizes that the document was "accurate" and that the K-9 team of Falco and Lambert were actually certified. Gov. Opp. at 8. However, it is unclear how the Government reaches this conclusion. At the very least, as disclosed in Stubbs' email to Cassella, it is "likely" that the team was not certified on August 16, 2013. Thus, it would seem, the document was anything but accurate.

There is also circumstantial evidence that the canine team was never actually certified prior to the alert.[5] First, the training records leading up to the supposed certification date indicate that the team had not trained nearly enough hours to be ready for a legitimate certification. The records show that Falco and Lambert, a new canine team, had only trained a total of about 20 hours prior to the supposed certification. Based on other training records provided by the Government, and industry standards, this is not nearly enough training for a new team to be certified.

There is also circumstantial evidence that the actual documents associated with the narcotics certification never existed. Based on other MTAP certifications provided by the Government, all of the documents that are part of a certification package are computer-generated. The certificate itself, the score sheets, and the supporting

---

[5] Claimant initially assumed that the canine team was actually certified but the paperwork had been lost. This is reflected in the Motion to Dismiss. As more facts have emerged, however, there is insufficient evidence to reach this conclusion.

photographs are all digital documents. Digital documents leave footprints. To date, undersigned counsel is unaware of the discovery of any digital footprint proving that the K-9 team was certified.

 Other Government disclosures related to the document were also inaccurate. As of Stubbs' conversation with Ted Cox on May 7, 2014, if not earlier, the Government knew that Lambert had been involved in manufacturing a backdated certificate with a date that was likely incorrect. It knew that K-9 Falco had not received "the minimum training required by law…" Stubbs Affidavit, Ex. 2 (email to Cassella). The Government's own designated expert, McNerney, had referred to the creation of the document as "fraudulent." Yet, when asked in an interrogatory whether there were any issues with Lambert, the Government responded: "This office is unaware of any information relating to any lack of competency, integrity or reliability on the part of Cpl. Lambert." Doc. 13, Ex. 8.

 These examples demonstrate that the Government's characterization of the document, and surrounding facts, was misleading.

### b. The Government's Intent

 The Government maintains that the Motion should be denied because Cassella, Stubbs and Shea acted without "intent to deceive opposing counsel." Opp. at 11. Intent, however, can be inferred from the Government's actions.

 First, the Government actors, whether Cassella, Shea or Stubbs, *chose* the words and context in which they produced the document in discovery.  They could have accurately described what happened, but they chose to describe it as a "reproduction of

the original." They chose to make this statement in what otherwise was a routine discovery cover letter. They chose to produce the document in color.

Internally, they referred to the document as the "bogus certificate." Their expert witness had referred to the document as "fraudulent." Yet, for whatever reason, they collectively chose not to pass this information on to Claimant's counsel.

The timing and context of the disclosure – or lack of disclosure – indicates intent. At the very same time that the Government attorneys were learning about the true nature of the document, the Claimant was pressing for more information about the K-9 certification. While Stubbs was calling the document "bogus" to Cassella, Claimant was persistently expressing concern that the Government had not "turned over any of the training records pertaining to Cpl. Lambert and his K-9, Falco, other than a one-page certificate." Doc. 13, Ex. 4 (5/8/14 Letter).

The AUSAs had multiple opportunities to correct their description of the document, but each time they chose not to do so. In the Government's June 16, 2014, letter, the author addressed the certification and stated that the supporting documentation (as opposed to the certification itself) could not be located. It also included a narrative stating that the team *had* been certified on August 16 (even though they knew this was likely not the case). This letter would have been a perfect opportunity to clear the air and tell Claimant's counsel what really happened. But they chose not to.

There were other opportunities for Cassella and Shea to tell the truth. While meeting with McNerney to prepare for his deposition, the Government attorneys learned yet more problems with Falco, Lambert and the certification process. McNerney reiterated that that he was not comfortable with how the certificate had been produced

and, through use of the word "fraudulent," he implied that something illegal had taken place. Instead of sharing this information with opposing counsel, however, Shea chose to tell counsel to "guess" or "read between the lines."

At the deposition itself, the Government could have encouraged McNerney to be forthcoming about the document and how it was created. As representatives of a federal law enforcement agency, they could have shared some concern about allegedly fraudulent activity. Instead, the Government attorneys, in apparent violation of the Federal Rule of Civil Procedure 30(c)(2), lodged speaking objections that seemed to put words into the witness' mouth that would have the effect of minimizing the seriousness of what Lambert and McCarty had done. (ECF No. Doc. 13, Ex. 9). *See* Fed. R. Civ. P. 30(c)(2) ("An objection [made during a deposition] must be stated concisely in a nonargumentative and nonsuggestive manner.").

Collectively, these were choices that Cassella, Shea and Stubbs made. Given multiple opportunities to reveal the truth, they consistently stuck to the misleading statement that the document was a "reproduction of the original."

Intent can also be inferred from the Government's insistence that it did nothing wrong. First, when the true genesis of the certification document was revealed by McNerney in his deposition, both Cassella and Shea unambiguously stated that 1) they knew the story of how the document was created; 2) they saw nothing wrong with it, and 3) that the manner in which it was disclosed to Claimant was appropriate. (Ex 1 (Gladwin Affidavit)). This insistence continues to this day. Cassella states in his affidavit: "the Certificate being produced in discovery was not the original document but rather was a reproduction. The letter accurately stated that fact." (Cassella Declaration at 16).

In sum, this is not a case in which the Government unintentionally conveyed incorrect information – and is now accepting responsibility for it. Rather, this shows that the Government believes it is proper to conduct discovery in this manner, and it will continue to do so in the future. Here, the two sides have a fundamental difference of opinion about what is right and what is wrong.

Claimant's counsel firmly believes that the information about the creation of the narcotics certification should have been disclosed fully, in a manner that neither concealed the truth nor omitted material facts. Counsel believes that the actual manner of disclosure – describing the document as a "reproduction of the original" – fell well short of that. The Government's word choice, rather, appears to be clever legal terminology that was designed to obscure the truth, while at the same time protect the prosecutors in the event that Claimant discovered the truth.

Meanwhile, the Government, or at least Cassella,[6] takes the position that it did nothing wrong; that is it acceptable to describe the document as a "reproduction of the original;" that it was acceptable to represent that it was unaware of any problems with Lambert's character or competency; that it was acceptable to not disclose that the certification likely did not happen on the 16th; that it was acceptable to not disclose that an original certificate – if it existed – had been lost, and that the replacement had been backdated and prepared for litigation without supporting documentation.

Because the Government takes the position that it made no mistakes, it cannot now raise lack of intent as a defense. The attorneys did what they meant to do.

---

[6] There is an indication that Shea thinks the disclosure was inadequate. In his affidavit, he states, about the April 15 letter, "I reviewed the letter for the first time at that point as well, and, *reacting on instinct*, defended it as adequately disclosing the nature of the document." (Shea Declaration at ¶ 36) (emphasis added).

### c. Remedy

There is no dispute that the Court can impose whatever remedy it deems appropriate. (ECF No. 13 at 17–19 (setting forth legal basis)). It is Claimant's position that the only appropriate remedy is dismissal.

The factors outlined in *United States v. Shaffer*, 11 F.3d 450, 462–63 (4th Cir. 1993), weigh in the direction of dismissal. This is an egregious wrong because it was committed by the Government in the context of a civil forfeiture case. The Government has expressed no remorse, and it has given no indication that it would do anything differently if presented with the same scenario in the future.

There are important public policy concerns at play here. First, as this court is well aware, there is a vast imbalance of power in civil forfeiture cases. Many potential claimants are unable to pursue claims because they are unable to afford counsel. The litigation process is confusing and cumbersome. The Government, meanwhile, is highly motivated to take the money first, and ask questions later. Forfeiture money has become a lifeblood of law enforcement. *See* Michael Sallah, et al., *Stop and Seize*, THE WASHINGTON POST (Sept. 6, 2014), http://www.washingtonpost.com/sf/investigative/2014/09/06/stop-and-seize/#. Within this dynamic, it is critical that the Government plays by the rules. And, when the Government fails to do so, the harm is magnified.

In the instant case, the Government's misleading conduct concerned the central piece of evidence in the case. The certification was important because the Government needed it to help show a connection between the money and narcotics. There was (and remains) no other evidence that could provide that link. And, only by establishing that evidence can the Government seize the money.

This case also raises a public policy concern related to the Government and its interaction with MTAP. The conduct of the State agency through the course of this litigation has been highly concerning. Not only were the dogs and handlers improperly trained, but, in the words of the supervisor of the canine unit, their conduct was fraudulent. Rather than express concern about that – and try to correct it – the Government chose to try to minimize it, and even encourage others to do the same. It is telling that, at one point, McNerney tried to tell the federal prosecutor about what he believed to be fraudulent conduct, and the prosecutor responded by correcting him and saying it was merely a "duplicate" document. (ECF No. 13, Ex. 9 (McNerney Depo.) at p. 26).

Fortunately, MTAP learned a lesson on its own. Since this case was reported in the media, MTAP has restructured its entire canine unit, and brought in outside personnel to train and certify its teams. They are conducting an internal investigation of what happened with the creation of the narcotics certification. A public good has come of this – and it is a far more important public good than the amount of money at stake in this controversy. This Court can affirm this notion by dismissing the suit.

Lastly, Claimant can think of no appropriate remedy other than dismissal. It is already apparent that the Government – without an expert witness and without a reliable canine team – cannot in good faith put on evidence of the dog alert at trial. So, if the Court were to exclude this type of evidence as a remedy, in effect, it would be doing nothing. Dismissal is the fair resolution of this case.

***d. A hearing is necessary.***

Claimant respectfully asks this Court to grant a hearing so that the facts of this case can be more fully explored. Most relevantly, the Government has provided affidavits of the key individuals in this episode, and has used those affidavits to argue their version of the facts – while at the same time refusing to make those individuals available to Claimant for depositions.[7] It is only fair that these witnesses be subject to cross-examination before the Court makes the factual findings necessary to resolve this Motion.

## III. Conclusion

For the reasons described above, Claimant respectfully asks this Court to grant this Motion, or to impose any other remedy the Court deems appropriate, on the grounds that the Government violated its duty of candor. Claimant seeks attorney's fees, costs and any other appropriate remedy.

Respectfully submitted,

_____/s/_____

C. Justin Brown
THE LAW OFFICE OF C. JUSTIN BROWN
231 E. Baltimore St., Suite 1102
Baltimore, MD 21202
Tel: 410-244-5444

---

[7] Claimant requested to depose Cassella, Shea and Stubbs. On August 29, 2014, the Government responded that it would not agree for them to be deposed.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of November, 2014, a copy of the

foregoing Motion was sent to each of the parties via CM/ECF.


_____/s/_____
C. Justin Brown