FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

2015 JAN 27 A 11: 23

CLERK'S OFFICE
AT BALTIMORE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** BY_____ * __DEPUTY | | |

|  |  |  |
|---|---|---|
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO.  JKB-13-3778** |
| **$122,640.00 IN U.S. CURRENCY,** | * | |
| **Defendant** | * | |
| * * * * * * * * * * * | | |

## MEMORANDUM

Pending before the Court is the Government's motion for summary judgment on the issue of Claimant Samantha Banks's standing to challenge the forfeiture of the Defendant currency. (ECF Nos. 34, 38.)  The Court has considered it, Claimant's response (ECF No. 43), and the reply (ECF No. 48). No hearing is necessary. Local Rule 105.6 (D. Md. 2014). The motion will be granted.

### I. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the "mere

existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).   Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

Two Supreme Court opinions have discussed a court's responsibility to evaluate the plausibility of a nonmovant's claim in the context of a motion for summary judgment. "If the factual context renders [a] claim implausible . . . [the nonmovant] must come forward with more persuasive evidence to support [the] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.").

## II. Facts

It is undisputed that $122,640 in U.S. currency was seized on September 12, 2013, at Baltimore-Washington International Thurgood Marshall Airport (BWI) in Maryland from an

unlocked bag that Claimant's husband, Jerry Lee Banks, had checked for a flight from BWI to San Francisco, California, with a connection in Atlanta. It is further undisputed that the currency was discovered by a Transportation Security Administration (TSA) screener based upon an anomaly in the image of the bag as it was passing through the baggage scanner. Also, it is undisputed that the currency was either packaged inside vacuum-sealed plastic bags or in multiple bundles secured with rubber bands and concealed within the clothing inside the suitcase. Additional evidence will be discussed in the Court's analysis.

### III. Standing

Although the Government and Claimant argue as to the inferences that should be drawn from the evidence before the Court, Claimant has failed to establish a *genuine* dispute of material fact on the question of whether she has standing to contest the forfeiture. A plaintiff's standing to sue in federal court is "an integral component of the case or controversy requirement" of Article III of the United States Constitution. *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). A forfeiture claimant must have Article III standing to challenge a forfeiture. Such standing arises from either an ownership interest, a possessory interest, or a security interest in the specific property that is the subject of the forfeiture action. *See United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 57 (1st Cir. 2013); *United States v. Real Property Located at 4527-4535 Michigan Ave., Detroit, Mich.*, 489 F. App'x 855, 857 (6th Cir. 2012) (unpublished); *United States v. Miscellaneous Jewelry*, 667 F. Supp. 232, 235-36 (D. Md. 1987), *aff'd sub nom. United States v. Walker*, 889 F.2d 1317 (4th Cir. 1989).

"Standing is a question of law for the court to decide; it is not a question of fact for the jury." *United States v. $543,190.00 in U.S. Currency*, 535 F. Supp. 2d 1238, 1248 (M.D. Ala. 2008). Further, a forfeiture claimant has the burden to establish standing by a preponderance of

the evidence. *United States v. $119,030.00 in U.S. Currency*, 955 F. Supp. 2d 569, 576 (W.D.

Va. 2012). One asserting an ownership interest in the seized property must support that claim

with evidence beyond a bare assertion of ownership. *United States v. $133,420.00 in U.S.

Currency*, 672 F.3d 629, 639 (9th Cir. 2012); *United States v. $148,840.00 in U.S. Currency*, 521

F.3d 1268, 1275 (10th Cir. 2008); *United States v. $38,570.00 in U.S. Currency*, 950 F.2d 1108,

1112 (5th Cir. 1992); *$119,030*, 955 F. Supp. 2d at 576. "'Ownership may be established by

proof of actual possession, control, title, and financial stake.'" *$119,030*, 955 F. Supp. 2d at 576

(citation omitted).

### *IV. Analysis*

The Government has provided land records, airline records, tax returns, telephone

records, hotel records, and other evidence that "blatantly contradicts" the claim of ownership

asserted by Claimant to the seized currency. *See Scott*, 550 U.S. at 380. As a result, the Court

cannot rationally conclude that she has standing in this case.

Claimant[1] relies upon her deposition testimony and that of her husband as well as her

responses to the Government's discovery requests in an effort to establish her ownership of the

$122,640 in currency. She stated she has a business in Indiana that rehabilitates ("rehabs")

distressed properties for sale or rental and manages them for the property owners; her husband,

Jerry Lee Banks, is a contractor who works with her in her business. (Mot. Summ. J., Ex. 14A,

S. Banks Dep. 21:12-13; 24:10-13; 26:8—27:15, Sept. 18, 2014, ECF No. 34-15; Mot. Summ. J.,

Ex. 7, Cl.'s Ans. Special Interrog. 10, ECF No. 34-8.) She asserted that she does not use banks

---

[1] Claimant has used the name of "Samantha Banks" in these proceedings. At her deposition, she recited for the record her name as "Samantha Lee Bell-Banks." (S. Banks Dep. 4:7.) She said Bell was her maiden name, which she continued to use for some time after she and Jerry Lee Banks were married; but a couple of years before her deposition, she hyphenated it, allowing her to continue to use the name "Bell" in her business of property management. (*Id.* 7:25—8:12.)

and operates only on a cash basis. (Cl.'s Ans. Special Interrog. 10, 12.) She also said that she does not have many business records because she shreds them for security purposes. (S. Banks Dep. 116:10—117:3.) However, included within her discovery responses are copies of handwritten documents that she says are invoices and receipts for the cash transactions from which she derived her income. (Cl.'s Ans. Special Interrog. Ex. A – F; Mot. Summ. J., Ex. 9, Cl.'s Prod. of Docs, ECF No. 34-10.) Claimant said that the seized money was money that she had saved from her income received from rehab projects, tenant rentals, and sales of real estate over nine years preceding the seizure. (Cl.'s Ans. Special Interrog. 4B.)

She filed federal income tax returns for the years 2005 through 2013. Those showed the following amounts of income reported by Claimant:

| | |
|---|---|
| 2005: | $ 7,176 |
| 2006: | $15,310 |
| 2007: | $13,135 |
| 2008: | $12,550 |
| 2009: | $ 4,291 |
| 2010: | $10,329 |
| 2011: | $19,045 |
| 2012: | $14,550[2] |
| 2013: | $13,830[3] |

(Mot. Summ. J., Ex. 10A-10I, Tax Returns, ECF No. 34-11.) The Court observes that she did not include any business income on her tax returns for 2011 and 2012; in 2011, her only reported income was from "wages, salaries, tips, etc.," and in 2012, her only reported income, besides her unemployment compensation, was also from "wages, salaries, tips, etc." (Id. Ex. 10H, 10I.) Claimant testified that she declares all income from her business on her tax returns. (S. Banks Dep. 27:25—28:11.)

---

[2] This amount includes $4,070 in unemployment compensation.
[3] This amount includes $7,030 in unemployment compensation.

In 2011, 2012, and 2013, Claimant filed applications for public assistance in the form of food stamps from the State of Indiana. (Mot. Summ. J., Ex. 17, Perez Decl. ¶ c, ECF No. 34-20.) On each of the applications, all of which were approved, Claimant responded "NO" to the question: "Are the total resources owned by you or any member of your household (such as checking, savings, cash, or other accounts or assets) $2,000 or more?" (*Id.*) When asked about these applications during her deposition, Claimant could not recall getting food stamps in these three years. (S. Banks Dep. 94:13-21.) Records show that Claimant has received this public assistance since August 1, 2011, and as of October 10, 2014, was still receiving it. (Perez Decl. ¶ b.) When specifically asked about her answer to the above-quoted question, Claimant testified, "On this paper right here when I signed these documents at the time, the money was not at my house. It was at my mother's house. So I did not have the $2,000 at my house or in no [*sic*] checking account or in no [*sic*] savings account." (S. Banks Dep. 104:21-25.)

Claimant testified that as of January 1, 2013, she had saved about $70,000 over the previous nine years out of total income of $92,500 and that she had earned the rest of the seized currency from various transactions occurring in 2013.[4]   (*Id.* 76:12—77:18; 78:2-7.)   She explained that she was able to save $70,000 out of the $92,500 she reportedly earned during that time "because when I was living in the properties where I took care of or I had my own house, I didn't have no [*sic*] living expenses. It was all in my contract. So all my living expenses was [*sic*] paid. The only thing I had to do was save my money." (*Id.* 78:13-19.) However, she acknowledged that she had used about $30,000 of the $92,500 to purchase and improve a house and that she had car payments, childcare expenses, travel expenses, and utility expenses during that time. (*Id.* 78:20—81:3.) When asked if she had saved $70,000 out of the $92,500 *after*

---

[4] This span of time perhaps should be eight years, beginning with January 1, 2005. The Court has not been supplied with proof of Claimant's income prior to 2005.

subtracting the $30,000 and her other expenses, she responded affirmatively. (*Id.* 78:25—81:23.)[5] Claimant has not provided to the Court any evidence of contracts that included payment of all of her living expenses.

In 2013, she stated she received significant amounts of income. This income consisted of $100,000 in cash from Cecilia Gonzalez who, Claimant averred, bought a home from Claimant at 2688 Harrison Street, Gary, Indiana, plus an additional $103,300 in cash from various payors for rehab projects. (Cl.'s Ans. Special Interrog. 4A.) Claimant confirmed that she knew she was required to file a report with the Internal Revenue Service ("IRS") for any cash transaction in excess of $10,000 that was received by her business. (S. Banks Dep. 114:7-11.) She also stated that she had not filed such a form. (*Id.* 114:12-13.) Out of these amounts she said she received in 2013, she reported net business income of $6,800; the copy of her 2013 tax return before the Court does not include the supporting schedule that shows her gross business income before expenses (Mot. Summ. J. Ex. 10I), but in her deposition, she testified that, because Claimant's husband is a contractor, her expenses were lower: "The only thing I have to buy is materials" (S. Banks Dep. 81:21-24). She also testified that her husband was the owner of the Harrison Street property and that she had authority to sell it. (*Id.* 122:3—123:24.) A bit later in the deposition, Claimant testified that the title of the property was in the name of It's Gary's Time, LLC, which was her company. (*Id.* 129:14—130:19.) The "bill of sale" produced by Claimant in discovery shows Samantha Bell-Banks as the owner of that property. (Cl.'s Ans. Special Interrog. Ex. E.) However, Jerry Banks testified that neither he nor his wife owned the Harrison Street property. (Mot. Summ. J., Ex. 15A, J. Banks Dep. 60:9-22, Sept. 18, 2014, ECF No. 34-17.)

---

[5] Obviously, Claimant could not save $70,000 out of $62,500 ($92,500 minus $30,000) or less, after deducting her other acknowledged expenses. The Court also reasonably infers that she likely had other expenses during that time before 2013, such as for groceries (other than the documented public assistance she received in 2011 and 2012), personal care, and health care, for which no accounting has been made.

Cecilia Gonzalez stated in a declaration that she resides with another individual, Christopher Puente, at 2688 Harrison Street, Gary, Indiana, that they occupied the property from the summer of 2013 until April 2014 when they moved briefly to Florida, and that they moved back to the property on October 1, 2014. (Mot. Summ. J., Ex. 21, Gonzalez Decl. ¶ a, ECF 34-31.)  Gonzalez also stated that on July 13, 2013, she entered into a purchase agreement to purchase the property for $8,500 in a rent-to-own arrangement with a down payment of $700 and a monthly rental of $300 for two years until July 13, 2015, at which point she would become the owner of the property.  (*Id.* ¶ b; Purchase Agrmt., Gonzalez Decl. Ex. A, ECF No. 34-32.)  The person with whom Gonzalez negotiated the purchase agreement identified herself as "S. Barnes," who indicated she was acting on behalf of the owner, Morton Mikkelson of Pennsylvania. (Gonzalez Decl. ¶ c.)  Gonzalez paid Ms. Barnes $400 on July 11, 2013, and $300 on July 13, 2013, totaling $700, which represented the down payment.  (*Id.* ¶ d; Receipts, Gonzalez Decl. Ex. B & C, ECF Nos. 34-33, 34-34.)  She gave no other money to Ms. Barnes or anyone else in connection with the property.  (*Id.* ¶ e.)  Gonzalez declared that the documents produced by Claimant to the Government in discovery as support for Claimant's sale of the property for $100,000 to Gonzalez—a bill of sale and two receipts—appeared to her to be forgeries; she did not sign the bill of sale, she did not buy the property from Claimant or anyone else for $100,000, and she did not pay Claimant $50,000 in currency to Claimant on July 13, 2013, or $25,000 on August 13, 2013.  (*Id.* ¶¶ h, k.)  The Court observes that the signatures Claimant seeks to attribute to Gonzalez, *e.g.*, on the "bill of sale" and the "agreement to sell real estate" purportedly signed by Gonzalez (Cl.'s Ans. Special Interrog., Ex. E), are noticeably different from the signatures Gonzalez has verified are hers (Gonzalez Decl. Ex. F).

The land records pertaining to the property that Claimant said she sold to Cecilia Gonzalez were searched by Dennis Nation, Senior Inspector of the U.S. Marshals Service in the Northern District of Indiana. (Mot. Summ. J., Ex. 20, Nation Decl. ¶¶ a – b, ECF No. 34-26.) The property of 2688 Harrison Street, Gary, Indiana, was conveyed by quitclaim deed from Morten Mikkelsen to a corporation, It's Gary's Time, Inc., on July 2, 2012. (*Id.* ¶ c.) The president and founder of It's Gary's Time, Inc., is Roger Hayward. (*Id.* Nation Decl. Ex. C, Certif. Sec'y of State, ECF No. 34-29.) It's Gary's Time, Inc., failed to pay the property taxes on the property, and it was sold in a tax sale to Rasheda Green on April 4, 2013. (Nation Decl. ¶ e.) The land records show that at no time did Claimant, her husband, or Cecilia Gonzalez have an ownership interest in the property. [6] (*Id.* ¶ f.)

Claimant stated that the difference, roughly $52,000, between the amount seized, $122,640, and the amount she testified she had saved prior to 2013, $70,000, was earned in 2013 from rental houses and real estate investments. (S. Banks Dep. 106:5-18.) When questioned about the disparity between the amount she claimed was earned by her and seized in 2013 and the amount of income she reported to the IRS in 2013, Claimant testified that the tax preparer at H & R Block told her she had three years "to file that money on [her] taxes." (*Id.* 107:3— 108:5.) The person who prepared Claimant's 2013 tax return, Victoria Bush, declared that the income reported on that return was the only income disclosed by Claimant to Bush, that it was her standard practice to ask a client if she had any other income, and that when she prepared the return Bush had no knowledge of any seizures and, therefore, did not give Claimant any advice regarding the seized money. (Mot. Summ. J., Ex. 18, Bush Decl. ¶¶ b – e, ECF No. 34-21.)

---

[6] Given these conveyances of title, it is unclear whether the recitation in Gonzalez's purchase agreement of Morten Mikkelsen as the seller on July 13, 2013, is accurate. However, it is not necessary for the Court to resolve that question. What is clear is that neither Claimant nor her husband nor It's Gary's Time, LLC (the company Claimant testified was hers) was the owner of 2688 Harrison Street when Claimant says she sold the property to Gonzalez in July 2013.

Further, she stated that if Claimant or anyone else had advised Bush of seized money, Bush would have notified her supervisor, and she had no occasion to so notify her supervisor. (*Id.* ¶ f.) Finally, Bush stated she "would not, under any circumstances, advise a client that any income could or should be omitted from a tax return on the ground that such income, or any equivalent amount, had been seized by law enforcement." (*Id.* ¶ g.)

In June 2011, and at a time when she said she had approximately $70,000 at her disposal, Claimant applied for a car loan with Credit Acceptance Corporation. (Mot. Summ. J., Ex. 16, Application & Contract, ECF No. 34-19; S. Banks Dep. 91:13-18.) The total sales price was $13,798.65, including a down payment of $1,200 and finance charges computed at 18.49% annually, and her monthly payment was $279.97 for 45 months. (Mot. Summ. J., Ex. 16, Contract.) The company's records show that the last payment Claimant made on the loan was June 11, 2013, and the car was repossessed in November 2013. (*Id.* Transaction Rept.) At her deposition, Claimant said she made all of her monthly payments until September 2013, and it was only then that she missed making the monthly payment. (S. Banks Dep. 92:5-19.) She blamed her default as to the car loan on the seizure of the currency. (Mot. Summ. J., Ex. 8, Cl.'s Ans. Gen. Interrog. 4, ECF No. 34-9.) Also during 2012 and into 2013, and during the time when she said she possessed $70,000 in cash, Claimant defaulted on or failed to pay fifteen separate bills. (S. Banks Dep. 88:13-18.)

Claimant testified that she had a nervous breakdown in September 2013, that she got "fed up" with Gary, Indiana, and that she wanted to buy property somewhere that would provide her a profit and at the same time be able to live there. (S. Banks Dep. 29:7-19.) She said she found a posting on Craigslist in June 2013 by a Mr. Roger Hayword who said he was a realtor and he

was selling some properties in Baltimore for an owner who was tired of them.[7] (*Id.* 30:15—32:3; 36:8—37:1.) From June to September 2013, she had five or six telephone conversations with Mr. Hayword, but she never met him and did not know him before she called him. (*Id.* 32:3-8; 33:14-18.) After all of these conversations and after she looked at the properties on the realtor.com web site, Claimant felt comfortable about the properties in Baltimore. (*Id.* 35:15—36:7.) She said that Mr. Hayword was advertising about eight properties, but she was only interested in six of them. (*Id.* 45:21-25.)

She said she arranged with Mr. Hayword for her husband to fly from Chicago to Baltimore on September 11 and to call Mr. Hayword the next day, and then Mr. Hayword was supposed to pick up her husband from his hotel and take him around Baltimore to show him the properties. (*Id.* 37:13-22; 38:4-9, 18-21; 40:22—41:5.) Claimant told Mr. Hayword that if everything went well, she and her husband would make "a nice down payment for the properties and we can get started." (*Id.* 41:21-25.) She said, "As long as we know the paperwork is going to come back right, we start working on the properties right away." (*Id.* 42:4-6.) Her husband would then "hire a couple of guys from Baltimore to start doing the painting, cleaning and stuff like that around the properties." (*Id.* 45:16-18.) Claimant said that she usually "hire[s] the person that I think that's going to steal my pipes and furnishings and stuff out of there and . . . make them a house sitter or something like that." (*Id.* 50:7-14.) Claimant also said Mr. Hayword was supposed to make sure all of the titles to the properties were "clean," and she said that her husband was prepared to invest the entire $122,000 based on Mr. Hayword's promise that he was going to do the title searches. (*Id.* 52:23—53:15.) Claimant testified that the only

---

[7] The name is spelled "Hayward" in the deposition transcript. In Claimant's answers to general interrogatories, she spelled the name as "Hayword." (Cl.'s Ans. Gen. Interrog. 1B *et seq.*) The Court will use the latter spelling in this opinion to refer to the realtor in Baltimore with whom Claimant was talking about buying distressed properties.

intended purpose for the currency was to invest in the properties in Baltimore; the money was not to be used for any other purpose. (*Id.* 50:3—51:6.) Jerry Banks, on the other hand, said that he and his wife had other purposes for the $122,000 besides buying property, mentioning another "travel venture." (J. Banks Dep. 39:6—40:3.)

When asked for Mr. Hayword's telephone number, Claimant said she did not remember it, but she had it programmed into the cell phone she was using at that time, (773) 765-8534, and she called him from that number. (S. Banks Dep. 34:20—35:9.) At her deposition, she said she no longer had that cell phone. (*Id.* 35:13-14.) Claimant said she had all the contacts with Mr. Hayword; her husband never talked to him. (*Id.* 37:9-12.) But she gave her husband Mr. Hayword's phone number before his trip; she also said Jerry Banks was planning to stay in Baltimore a couple of days. (*Id.* 43:9-11; 44:25—45:5.) It was Claimant's idea for her husband to stay in a hotel near BWI airport rather than in Baltimore because "you want to . . . stay somewhere nice where they have security, they have safes and everything," and it would not have made more sense to stay in a secure hotel with safes in Baltimore where the properties were located. (*Id.* 46:18—47:10.) She stated that her arrangement with Mr. Hayword for Jerry Banks to make the trip to Baltimore was made about a week before it occurred. (*Id.* 41:6-17; 43:3-8.)

In her interrogatory responses, Claimant said she kept the currency in a safe in her home (Cl.'s Ans. Special Interrog. 9), and that Jerry Banks packaged the currency in the vacuum sealed plastic and put clothing around it in the suitcase "so that the defendant currency would not be detected during travel" (*id.* 11). She claims she "called the airport prior to Jerry Lee Banks' travel to inquire whether it was legal to transport the defendant currency in the form of currency. An agent of the airport told Claimant to conceal the defendant currency in her luggage." (*Id.*).

In her opposition to the motion for summary judgment, she clarifies that the airport she called for information on transportation of currency was BWI. (Cl.'s Opp'n 10.)

In her deposition, Claimant testified that in 2013, she kept the money in plastic vacuum-sealed bags, sitting up on bricks, in the crawl space under her son's bedroom floor because the crawl space usually floods. (S. Banks Dep. 55:24—56:2; 84:10—85:5.) She also said she was the one who put the money in the bag and that her husband merely counted the money and put it back in the bag before he left for Baltimore. (*Id.* 54:12-55:19.) She testified that the cash she gave her husband to take to Baltimore consisted of "over $122,000 in a bag, and for his— supposed to have been spending expenses in the carry-on[;] he had about close to $7,000 in that bag." (*Id.* 49:6-11.)

After Jerry Banks arrived in Baltimore late in the day on September 11, he went to the hotel and called Claimant to say good night; she told him, "[M]ake sure you call this man and get this ball rolling, because you know . . . I have to be out of this house at a certain time, and I need to relocate. I need to get my son set up in school." (*Id.* 39:2-11; 56:3-24.) Claimant said that her husband told her he called Mr. Hayword after arriving at the hotel but reached his voicemail; then, the next morning, Jerry Banks tried to call Mr. Hayword again and learned his phone number was disconnected. (Cl.'s Ans. Gen. Interrog. 1; S. Banks Dep. 60:2-9.) Claimant did not suggest to her husband that he make any effort to find Mr. Hayword; instead, she told him they were not going to waste any more time on this and to bring her money back home. (*Id.* 64:15— 65:7.) She said she went back on Craigslist to find Mr. Hayword's information, but the post had been deleted. (*Id.* 65:15-20.) Jerry Banks told Claimant he was coming home, but instead he bought a ticket to San Francisco to go to a party. (*Id.* 66:13-21.) He did not tell her he was going to San Francisco. (*Id.* 66:10-12.) She said she did not know if her husband had been to

San Francisco in 2013 and also stated he had been there only two times in the previous two or three years. (*Id.* 70:15-25.)

Jerry Banks testified that he bought his one-way, airplane ticket from Chicago to Baltimore, at full fare, either the day of the trip on September 11, 2013, or the previous night even though the trip was planned for a while. (J. Banks Dep. 21:21—23:2.) The plan was for Mr. Hayword to show him all of the properties, for Jerry Banks to see what needed to be done to the properties, for them to negotiate price, for Jerry Banks to make the down payment, for them to get the paperwork started, and for Jerry Banks to get "someone started on the property" and to get someone from the neighborhood to watch the property. (*Id.* 24:4-15; 35:25—36:5.) He expected to accomplish all of those things in a day or two. (*Id.* 24:16-18.) He indicated that he typically hires, to watch the property, "the crook on the corner, you know what I mean, the wine head down the block." (*Id.* 36:9-15.)

Jerry Banks testified that he made his hotel reservation, for one night only, before he left Gary, and he went directly from the airport to the hotel. (*Id.* 29:20-25; 35:15-25.) He stated it was his idea for him to stay in a hotel near BWI airport because it was the closest place for him to travel from the airport. (*Id.* 34:3-15.) He was supposed to call Mr. Hayword the night of September 11, 2013, when he got to his hotel in Baltimore, but when he called after he had checked into his room, Mr. Hayword's phone "just rang." (*Id.* 28:25—29:4; 30:4-6; 41:1-11.) He said that it was late when he got in. (*Id.* 29:5-8.) He stated he called Mr. Hayword several more times that night but could not reach him and he never reached Mr. Hayword's voicemail. (31:3-4, 21—32:10.) He could not remember at his deposition in September 2014 the number of his phone on which he called Mr. Hayword a year earlier. (*Id.* 21:10-20.)

Jerry Banks said that after he unsuccessfully called Mr. Hayword several times following his arrival in his hotel room, he tried to reach him the next morning after he awakened. (*Id.* 41:12-18.) He said he woke up around 6:00 a.m. (*Id.* 41:21-25.) When he called that time, he got a message indicating the phone number was disconnected, and then he called Claimant and told her he could not contact Mr. Hayword. (42:1-13.) She told him to go ahead on to San Francisco; she knew all along he was going to San Francisco from Baltimore. (*Id.* 42:20— 43:13.) He did not make any effort to find a phone number for Mr. Hayword, to check to see if there was a real estate business associated with Mr. Hayword, or to go the properties to see if they had signs providing contact information. (*Id.* 43:14—44:8.) He said that, altogether, seven or eight hours had elapsed from the first time he tried to call Mr. Hayword to the time the next morning when he gave up and bought his airplane ticket to San Francisco. (*Id.* 44:17-25.) He purchased his ticket online using his laptop. (*Id.* 52:4-8.) He was planning to stay in San Francisco only a day, and then he was going to buy a ticket to fly back to Chicago; he planned to buy that ticket at full price on the day of travel. (*Id.* 46:3—47:6.) He said in 2013 he had traveled to San Francisco three or four times on one-way tickets purchased at full price on the day of travel, unless he could get a deal for frequent flier miles; he "probably went straight from Chicago," but he was not sure about that or whether he had traveled to San Francisco from Atlanta. (*Id.* 47:25—48:18.)

Company records from Craigslist were searched by William C. Powell, Director of LE Relations[8] at Craigslist, in response to a subpoena. (Mot. Summ. J., Ex. 24, Certif. Pursuant to Fed. R. Evid. 803(6) and 902(11), ECF No. 34-40.) Craigslist was directed to search for "[a]ny record you have of the posting made by a Baltimore realtor named Roger Hayword, in or around

---

[8] The Court has not been informed what the "LE" in "LE Relations" designates.

September 2013, of certain Baltimore real estate parcels posted for sale." (*Id.*) Mr. Powell certified that no such records were found. (*Id.*)

Kevin Davis, a Task Force Officer with the Drug Enforcement Administration (DEA), checked all public sources and found "no indication that a person by the name of Roger Hayward was engaged in the buying or selling of real estate in the City of Baltimore or any other place in the State of Maryland." (Mot. Summ. J., Ex. 19, 2d Davis Decl. ¶ *l*, ECF No. 34-22.)

Records from the Aloft Hotel near BWI airport showed that a Gary Banks with a home address of 2688 Harrison Street, Gary, Indiana, made a reservation for two people on September 11, 2013, to arrive on September 11 and to stay one night. (Mot. Summ. J., Ex. 2, Aloft BWI Invoice, ECF No. 34-3.) They also showed that Banks checked in at 12:08 a.m. on September 12, 2013. (Mot. Summ. J., Ex. 3, Montgomery Decl. ¶ d, ECF No. 34-4.)

Officer Davis declared that he had issued administrative subpoenas for the records of the telephones that Claimant and her husband said they were using at the time of his trip to Baltimore. (2d Davis Decl. ¶ m.) The telephone number that Samantha Bell-Banks was using as her principal means of communication during that time was (872) 230-4856. (*Id.* ¶ n.) Using that number, she made or received approximately 511 phone calls between August 29 and September 12, 2013. (*Id.*) None of those calls was made to any phone number with a Maryland area code until after the currency was seized on the morning of September 12, 2013. (*Id.*) Officer Davis also attempted to subpoena records for the number, (773) 765-8534, that Claimant said she had used to communicate with Mr. Hayword, but could not locate any provider that had a record of that number. (*Id.* ¶ o.) In the two weeks before the seizure, approximately 158 of Claimant's 511 calls were to or from (708) 717-3077, her husband's number, including

approximately 50 calls occurring between September 6 and September 8, when airline records showed her husband was in San Francisco. (*Id.* ¶ p.)

Officer Davis also declared that Jerry Banks's telephone records showed he made or received approximately 65 calls from the time shortly before his departure from Chicago on September 11 to the time he was questioned about the currency found in his luggage at BWI on September 12. (*Id.* ¶ q.) Out of the 65 calls, three were made to Claimant within 30 minutes after he checked into the hotel at 12:08 a.m. on September 12. (*Id.*) After that, two calls were made to Maryland numbers that appear to be assigned to escort services; other calls were made to persons in Georgia, Nevada, New York, and California. (*Id.*) The hotel number was the only other Maryland number called. (*Id.*) He also spoke with Claimant at least eight times between 7:00 a.m. and 10:37 a.m. on September 12; the latter time is approximately when he checked his luggage and boarded his Delta Airlines flight for San Francisco. (*Id.* ¶ r.)

Airline records show that Jerry Lee Banks purchased a one-way ticket for travel on Delta from BWI to San Francisco, with a connection in Atlanta, on September 12, 2013. (Mot. Summ. J., Ex. 5, Fears Decl. ¶ b, ECF No. 34-6.) The ticket was purchased online on September 12 through the Delta.com website for $495.80; the time of purchase was 2:35 a.m., Baltimore time. (*Id.* ¶ d.) The billing address for the credit card supplied by him was 2688 Harrison Street, Gary, Indiana. (*Id.* ¶ f.)

Records from Southwest, Delta, and American Airlines showed several trips, including six trips to San Francisco, by Jerry Banks in the nine months preceding the currency seizure. (Mot. Summ. J., Ex. 1, Southwest Record, ECF No. 34-2; Ex. 5, 6, Delta Record, ECF Nos. 34-6, 34-7; Ex. 22, American Record, ECF No. 34-38; Ex. 23, Summary Chart, ECF No. 34-39.)

The tickets for these flights were largely purchased the day of or the day before travel occurred. (Summary Chart.)

Officer Davis declared that he had eleven years of state and federal experience as a law enforcement officer working on numerous cases involving drug trafficking, the interdiction of drugs, and U.S. currency derived from or intended to be used to commit illegal drug transactions. (2d Davis Decl. ¶ c.)  He also has received over 80 hours of training in these areas.  (*Id.*)  He has made or participated in over 60 U.S. currency seizures.  (*Id.*)  Based on his training and experience, he knows that drug traffickers typically employ couriers to transport large amounts of currency to avoid the banking system.  (*Id.* ¶ d.)  The currency is usually bundled with rubber bands and/or placed in bags or concealed within clothing.  (*Id.* ¶ e.)  Frequently, drug traffickers and couriers will place the currency in vacuum-sealed plastic bags to disguise the odor of controlled substances emanating from the currency.  (*Id.* ¶ f.)

Also based on his training and experience, Officer Davis knows that the drugs being sold in Midwestern and East Coast cities are usually obtained in California or other Southwestern states, *e.g.*, Nevada and Arizona; the money used to buy the drugs must be transported by courier or otherwise from East Coast or Midwestern cities to California or the Southwest.  (*Id.* ¶ g.)  Couriers with large amounts of currency concealed in their luggage or on their persons are commonly intercepted as they attempt departure from BWI to California or Western cities.  (*Id.*)  Typically, drug couriers traveling by air purchase one-way tickets on the day of travel for high cost because drug deals are usually arranged without much advance notice and because the courier does not know how long he might have to remain on the West Coast in order to consummate the drug deal.  (*Id.* ¶ h.)  The manner in which the currency in the instant case was packaged and concealed and Jerry Banks's purchase of a one-way ticket from Baltimore to

California are indicative of the way in which a drug courier would carry money in order to carry out an illegal drug transaction. (*Id.* ¶ i.)

After reviewing the record as a whole, this Court cannot find that the preponderance of the evidence supports Claimant's assertion of ownership of the seized currency. Only by setting rationality aside and ignoring the vast amount of evidence against her could the Court find she owned $122,640 in cash on September 12, 2013. Her version of events is utterly discredited by the evidence.

Factors that other courts have considered when evaluating forfeiture standing in similar circumstances have included the following:  (1) lack of financial means to accumulate the amount of money seized, *United States v. $138,381.00 in U.S. Currency*, 240 F. Supp. 2d 220, 232 (E.D.N.Y. 2003); (2) suspicious circumstances of travel, *$119,030.00*, 955 F. Supp. 2d at 581; (3) packaging of the money, *United States v. $239,400.00 in U.S Currency*, 2014 WL 5023453, at *5 (N.D. Ill. Oct. 7, 2014); and (4) credibility of a claimant's explanation, *id.* Each of those factors is adverse to Claimant in this case.

Claimant simply did not have sufficient legitimate income from which she could have saved $122,640, even over the period of nine years before the seizure, as she contends.  Her claim that she had no living expenses for some indefinite period of time is uncorroborated by probative evidence. "If the factual context renders [a] claim implausible . . . [the nonmovant] must come forward with more persuasive evidence to support [the] claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587.  Because her assertion of no living expenses is implausible, it was incumbent upon Claimant to come forth with more persuasive evidence, and she has not done so.  In addition, her contention that she received $100,000 from the sale of 2688 Harrison Street in Gary, Indiana, is completely undercut by the land records, which show neither

she nor her husband has ever owned the property. Her story that It's Gary's Time, LLC, was her company that owned the property is also contradicted by records from the Indiana Secretary of State showing It's Gary's Time, Inc., was founded by a Roger Hayward. No documentation has been provided to the Court that an LLC with the same name ever existed. In the same vein, her tax returns, her applications for public assistance, her car loan records, and her credit record are consistent with someone having income near or below the poverty level, *see* U.S. Department of Health & Human Services Poverty Guidelines, http://aspe.hhs.gov/poverty/figures-fed-reg.cfm (last accessed 1/13/2015), and they are inconsistent with someone possessing $122,640 in cash. The Court concludes Claimant lacked legitimate financial means to amass that quantity of money prior to its seizure.

Beyond that, the circumstances of Jerry Banks's travel from Chicago to Baltimore and of his planned, but aborted, trip from Baltimore to San Francisco are suspiciously indicative of his being a courier of money to be used in drug trafficking. By itself, the quantity of currency seized is suggestive of unlawful activity. *See United States v. $14,800.00 in U.S. Currency*, Civ. No. ELH-11-3165, 2012 WL 4521371, at *5 (D. Md. Sept. 28, 2012) (contrasting much smaller amount of money at issue in that case with "the hoards at issue" in other cases). The last-minute nature of his purchases of airplane tickets for one-way flights at full fare is also consistent with the evidence establishing such practices as typical of drug money couriers. Additionally, the manner in which the money was packaged was consistent with the manner in which currency is frequently transported by drug money couriers, according to the evidence before the Court.

Finally, Claimant's explanation of the events—how she acquired $122,640, how she found a posting on Craigslist from a Baltimore realtor with a name coincidentally nearly identical to someone she knows in Indiana, how she arranged with Mr. Hayword a week ahead of

time for Jerry Banks to fly to Baltimore and pay cash for distressed properties based on Mr. Hayword's promise to provide clean title when she had never met Mr. Hayword before and much less done business with him before, how she called BWI airport rather than the Chicago airport (where supposedly Jerry Banks first brought the currency on the plane with him) to ask how to carry currency so it would not be detected in travel, how Jerry Banks called Mr. Hayword several times (unsuccessfully) after he checked into his hotel room after midnight, how Jerry Banks tried again to reach Mr. Hayword after 6:00 in the morning on September 12, 2013, and, finally, upon learning Mr. Hayword's telephone was disconnected, how, only then, did he book his flight to San Francisco to go to a party—presents the Court with a wildly implausible story. Furthermore, it is blatantly contradicted by the mountain of evidence before the Court. *See Scott*, 550 U.S. at 380. Claimant has failed to bring forth more persuasive evidence and to carry her burden of proof on the issue of standing. *See Matsushita*, 475 U.S. at 587.

## V. Conclusion

Claimant has failed to establish a genuine dispute of material fact as to her claim of ownership of $122,640 in U.S. currency on September 12, 2013. The Government's motion for summary judgment will be granted by separate order.[9]

DATED this __26__ day of January, 2015.

BY THE COURT:

James K. Bredar
United States District Judge

---

[9] Because of the Court's disposition of the threshold issue of Claimant's standing, the Court does not address Claimant's motion to dismiss (ECF No. 13) or the allegations made therein. That motion will be found moot.